Paul V. Shalhoub (Admitted *Pro Hac Vice*)
Rachel C. Strickland (Admitted *Pro Hac Vice*)
Jordana Linder (Admitted *Pro Hac Vice*)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

    - and -

Dion W. Hayes (VSB No. 34304)
John H. Maddock III (VSB No. 41044)
McGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
(804) 775-1000

Attorneys for the Debtors and
Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

-------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| LandAmerica Financial Group, Inc., <u>et al.</u>, | : | Case No. 08-35994 (KRH) |
| | : | |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------------x

**SECOND APPLICATION OF WILLKIE FARR & GALLAGHER LLP
AS COUNSEL FOR DEBTORS FOR INTERIM ALLOWANCE OF
COMPENSATION FOR SERVICES RENDERED AND
REIMBURSEMENT OF EXPENSES INCURRED
<u>FROM MARCH 1, 2009 THROUGH MAY 31, 2009</u>**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

      Willkie Farr & Gallagher LLP ("**WF&G**"), attorneys for the above-captioned

debtors and debtors in possession, in support of its second application (the "**Application**") for

interim allowance of compensation for professional services rendered and reimbursement of

expenses incurred from March 1, 2009 through May 31, 2009 (the "**Second Application Period**"), respectfully represents:

**PRELIMINARY STATEMENT**

1. By this Application and pursuant to sections 330 and 331 of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), WF&G requests that this Court authorize interim allowance of compensation for professional services rendered and reimbursement of expenses incurred during the Second Application Period in the amount of $3,604,126.64 (the "**Application Amount**"). The Application Amount includes: (a) reimbursement of $136,347.64 in actual and necessary expenses WF&G incurred in connection with its rendition of professional services during the Second Application Period;[1] and (b) compensation of $3,467,779.00 in fees for services rendered during the Second Application Period. The Application Amount includes $520,166.85 which represents 15% of WF&G's fees that have been "held back" (the "**Holdback**") in accordance with the Interim Compensation Order (as defined herein) pending interim approval of this Application by the Court. At this time, WF&G is requesting payment of the Holdback relating to the Second Application Period.

**JURISDICTION AND VENUE**

2. This Court has jurisdiction to consider this Application pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for

---

[1] WF&G's standard practice is to treat certain expenses as having been incurred when such obligations are recorded and reflected as payable in WF&G's accounting system. Accordingly, WF&G reserves its right to seek at a later date compensation for expenses incurred during the Second Application Period that may not have been posted as of yet and thus are not included herein.

the relief requested herein are sections 330 and 331 of the Bankruptcy Code, and Bankruptcy Rule 2016.

## BACKGROUND

3.        On November 26, 2008 (the "**Initial Petition Date**"), LandAmerica Financial Group, Inc. ("**LFG**") and LandAmerica 1031 Exchange Services, Inc. ("**LES**") filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code.  On March 6, 2009, March 27, 2009 and March 31, 2009, various other LFG affiliates (LandAmerica Assessment Corporation ("**LAC**"), LandAmerica Title Company ("**LandAm Title**"), and Southland Title Corporation, Southland Title of Orange County, and Southland Title of San Diego ("**Southland Entities**," and collectively with LAC, LandAm Title, LFG and LES, the "**Debtors**") each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Pursuant to orders of this Court dated November 28, 2008, March 11, 2009, April 8, 2009 and April 9, 2009, the chapter 11 cases of the Debtors are being jointly administered under case number 08-35994.  The Debtors continue to manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Debtors' chapter 11 cases.

4.        On December 3, 2008, the United States Trustee for the Eastern District of Virginia (the "**U.S. Trustee**") appointed an Official Committee of Unsecured Creditors in the case of (a) LFG (the "**LFG Creditors' Committee**"); and (b) LES (the "**LES Creditors' Committee**", and, together with the LFG Creditors' Committee, the "**Creditors' Committees**").

## WF&G'S FEES AND EXPENSES

5.        WF&G's services in these cases have been substantial, necessary, and beneficial to the Debtors, their estates, creditors and other parties-in-interest.  Throughout the Second Application Period, the variety and complexity of the issues involved in these cases and

the need to address certain matters on an expedited basis has required WF&G, in the discharge of its professional responsibilities, to devote substantial time by professionals from several legal disciplines on a daily basis.

6.     Specifically, WF&G's requests reflect the requisite time, skill, and effort WF&G expended towards, inter alia (a) assisting the Debtors in the wind-down of their businesses; (b) working with LFG to evaluate, market, and sell, as applicable, the remaining businesses of its subsidiaries; (c) litigating disputes relating to the ownership of exchange funds, (d) implementing a protocol to resolve both inter-estate and LES related disputes, (e) disposing of over fifty of the Debtors' leasehold interests in order to mitigate losses and maximize values, (f) reviewing and filing omnibus objections to claims filed against the Debtors; and (g) moving the Debtors through the chapter 11 process without undue delay.

7.     In accordance with section II.B. of the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330, issued January 30, 1996 (the "**UST Guidelines**"), WF&G makes the following disclosures:

> (a)     The Debtors have been given an opportunity to review this Application and have approved the amount requested herein.
>
> (b)     The Debtors have not yet filed a chapter 11 plan or plans (the "**Plan**") or disclosure statement (the "**Disclosure Statement**") in these cases.  Presently, LFG's and LES's exclusive periods to file and solicit acceptances of their Plan or Plans under section 1121 of the Bankruptcy Code are scheduled to expire on July 24, 2009, and September 2, 2009, respectively.  LAC's exclusive periods to file and solicit acceptances of its Plan under section 1121 of the Bankruptcy Code are scheduled to expire on November 3, 2009 and December 31, 2009, respectively.  LandAm Title's exclusive periods to file and solicit acceptances of its Plan under section 1121 of the Bankruptcy Code are scheduled to expire on July 27, 2009 and September 23, 2009, respectively.  The Southland Entities' exclusive periods to file and solicit acceptances of their

Plan or Plans are scheduled to expire on July 29, 2009 and September 27, 2009, respectively.[2]

(c)     To the best of WF&G's knowledge, all quarterly fees have been paid to the U.S. Trustee, and required monthly operating reports covering the period from the Initial Petition Date through May 31, 2009 have been filed.

(d)     WF&G is advised that as of May 31, 2009, the Debtors had the following cash on hand: LFG had approximately $80,711,59.00; LES had approximately $131,673,727.00; LAC had approximately $1,513,253.00; LandAm Title had approximately $906,555.00; and the Southland Entities had approximately $5,468,661.00.

(e)     WF&G is advised that the Debtors are paying all undisputed administrative expenses in the ordinary course of business.

8.      By order dated May 16, 2009, this Court approved on an interim basis the allowance of $4,062,498.00, representing 100% of the fees for professional services rendered by WF&G from November 26, 2008 through February 28, 2009 (the "**First Application Period**"), and $129,170.77, representing 100% of the actual and necessary expenses incurred in connection with the rendering of such professional services.

## MONTHLY FEE STATEMENTS

9.      WF&G was retained as counsel to the Debtors, effective as of the Initial Petition Date, pursuant to an order of this Court dated December 22, 2008. On December 21, 2008, the Court entered the Order Under Sections 105(a) and 331 of Bankruptcy Code Establishing Procedures for Interim Compensation (the "**Interim Compensation Order**"). The Interim Compensation Order provides, among other things, that retained professionals of the Debtors are required to serve monthly itemized billing statements ("**Fee Statements**") to the

---

[2]     By motion dated July 10, 2009 [Docket No. 1707], LFG, LES, LandAm Title and the Southland Entities requested an extension of time to file a Disclosure Statement and Plan through and including September 15, 2009, and an extension of time to solicit acceptances of such Plan through and including November 15, 2009. A hearing on this motion is currently scheduled for July 21, 2009.

U.S. Trustee, the Debtors, counsel to the Debtors, and counsel to the Creditors' Committees. Upon passage of a twenty day objection period, if no objections have been received, the Debtors are authorized to pay to the professionals 85% of the fees and 100% of the expenses requested.

10.     In compliance with the Interim Compensation Order, WF&G has submitted three Fee Statements relating to the Second Application Period. Payment on account of these Fee Statements has been requested as follows:

> (a)  Pursuant to the Fee Statement for the period March 1, 2009 through March 31, 2009 (the "**March Fee Statement**"), WF&G has requested payment of $947,931.03 representing 85% of the total fees requested for services rendered (i.e., $1,115,213.00), and $50,961.84 representing 100% of the expenses incurred during the period.

> (b)  Pursuant to the Fee Statement for the period April 1, 2009 through April 30, 2009 (the "**April Fee Statement**"), WF&G has requested payment of $1,003,060.78 representing 85% of the total fees requested for services rendered (i.e., $1,180,071.50), and $47,285.73 representing 100% of the expenses incurred during the period.

> (c)  Pursuant to the fee statement for the period May 1, 2009 through May 31, 2009 (the "**May Fee Statement**"), WF&G has requested payment of $996,620.33 representing 85% of the total fees requested for services rendered (i.e., $1,172,494.50), and $38,100.07, representing 100% of the expenses incurred during the period.

11.     No objections to the March Fee Statement or the April Fee Statement were submitted and no objections to the May Fee Statement have been submitted as of the filing of this Application. In accordance with the Interim Compensation Order, WF&G has received payment of $947,931.03 relating to the March Fee Statement and $1,003,060.78 relating to the April Fee Statement. The objection deadline for the May Fee Statement is July 20, 2009; therefore, as of the date of this Application, WF&G has not received payment for the May Fee Statement.

## THIS FEE APPLICATION

12. Prior to the Initial Petition Date, WF&G received retainers aggregating $700,000. These retainers were applied to fees for services rendered and reimbursement for expenses incurred prior to the Initial Petition Date.[3] As of the Initial Petition Date, WF&G had no agreement or understanding between WF&G and any other entity for the sharing of compensation to be received for services rendered in or in connection with these cases.

13. WF&G maintains written records of the time expended by attorneys and paraprofessionals in the rendition of professional services to the Debtors. Such time records are made contemporaneously with the rendition of services by the person rendering such services. A copy of the daily time records for the Second Application Period, broken down by matter and listing the name of the attorney or paraprofessional, the date on which the services were performed, and the amount of time spent in performing the services, is annexed hereto as Exhibit A. Additionally, annexed hereto as part of Exhibit A is a list of all of the matters for which services were rendered and the aggregate amount of hours and fees expended for each of those matters.

14. For the convenience of the Court and parties-in-interest, annexed hereto as Exhibit B is a list of the attorneys and paraprofessionals who have worked on these cases during the Second Application Period, the aggregate time expended by each individual during the Second Application Period, his or her hourly billing rate during the Second Application Period, and the amount of WF&G's fees attributable to each individual.

---

[3] The Affidavit of Paul V. Shalhoub filed in support of WF&G's retention application inadvertently listed the retainer balance outstanding as of the Initial Petition Date in the amount of $461,244.00. The actual outstanding retainer balance as of the Initial Petition Date was $506,735.00.

15. WF&G also maintains records of all actual and necessary out-of-pocket expenses incurred in connection with the rendition of professional services. A schedule setting forth the categories of expenses and amounts for which reimbursement is requested is annexed hereto as Exhibit C.

16. Pursuant to the Interim Compensation Order and UST Guidelines, WF&G recorded its services rendered and disbursements incurred on different matters reasonably expected by the Debtors to continue over a period of at least three months and to constitute a substantial portion of the fees sought during an application period.

## SUMMARY OF SERVICES RENDERED

17. Recitation of each and every item of professional services that WF&G performed would unduly burden the Court. Hence, the following summary highlights the major areas to which WF&G devoted substantial time and attention during the Second Application Period. The full breadth of WF&G's services is reflected in WF&G's time records.[4]

### A. General Chapter 11 and Case Administration of LFG's Case

18. WF&G has contributed significantly to the efficient administration of LFG's bankruptcy case. Where possible, WF&G has attempted to resolve disputes consensually, without seeking judicial intervention. WF&G has actively sought to maintain an efficient working relationship with Court personnel, the U.S. Trustee, counsel to the Creditors' Committees and other parties-in-interest, and to guide the Debtors to the culmination of their chapter 11 cases.

---

[4] Copies of the daily time records are being provided to the Court and the Office of the U.S. Trustee. Parties in interest required to be served with WF&G's Fee Statements pursuant to the Interim Compensation Order have previously been furnished with such daily time records. Copies of the time records will be made available to other parties in interest upon reasonable request.

19.     LFG is a holding company that operates through its various subsidiaries (collectively, with LFG, the "**Company**").  Through the bankruptcy process, LFG intends to maximize value for its creditors and its estate through sales of the Company's remaining businesses and/or the prompt and orderly wind-down and liquidation of such businesses.  To that effect, on March 6, 2009, March 27, 2009, and March 31, 2009 various LFG affiliates (LAC, LandAm Title, and the Southland Entities) commenced voluntary chapter 11 cases in this Court. In connection with such additional bankruptcy filings, WF&G attorneys prepared and filed (a) voluntary petitions on behalf of the Debtor entities, and (b) other first day pleadings.

20.     The size and complexity of the Company's business operations as well as the numerous legal and business issues arising in LFG's case, necessitate a significant amount of communication among LFG's management and other professionals employed by LFG.  As a means of coordinating and assessing the progress made in LFG's case, and to address the extensive legal issues faced by LFG, conference calls were routinely held throughout the Second Application Period among LFG's personnel, WF&G, the Debtors' co-counsel McGuireWoods LLP ("**MGW**"), LFG's financial advisors, Zolfo Cooper ("**Zolfo**"), and other professionals retained by the Debtors.  The purpose of these calls and meetings was to discuss both short-term and long-term strategies of the case, identify and address various issues affecting LFG, and provide necessary updates of information designed to assist all parties in providing their professional services efficiently.  Accordingly, such calls and meetings served the important function of, among other things, assigning tasks to specific parties to avoid the duplication of efforts among the professionals and management.

21.     In addition, LFG and WF&G have worked closely with the LFG Creditors' Committee and its professionals to keep all parties fully informed of the legal,

operational, financial and other issues affecting the estate including, but not limited to (a) the wind-down of the Debtors' businesses, (b) the evaluation, marketing, and sale, as applicable, of the remaining businesses of LFG's subsidiaries, (c) the negotiation of a settlement with the Pension Benefit Guaranty Corporation (the "**PBGC**"), (d) the implementation of a protocol to resolve both inter-estate and LES related disputes, (e) the evaluation of litigation and potential claims against the LFG estate, and (e) analyzing tax matters affecting the Debtors. Throughout the Second Application Period, WF&G assisted LFG in preparing timely and informative responses to inquiries from the LFG Creditors' Committee. Additionally, WF&G attorneys assisted Zolfo and LFG in the preparation of a detailed presentation on key issues and concerns raised by the LFG Creditors' Committee and participated in a meeting with the full LFG Creditors' Committee and SunTrust Bank[5] on March 11, 2009.

B.      **The Fidelity Transaction**

22.      During the First Application Period, WF&G attorneys devoted significant time negotiating and working to ensure that the sale to Fidelity (as defined below) was approved by the Court and timely consummated. Prior to the Initial Petition Date, approximately 85 to 90% of the Company's revenues were derived from LFG's primary title insurance underwriting subsidiaries – Commonwealth Land Title Insurance Company, Lawyers Title Insurance Corporation ("**Lawyers Title**"), and United Capital Title Insurance Company, and their respective subsidiaries (collectively, the "**Underwriters**") to Fidelity National Financial, Inc. ("**FNF**"), Fidelity National Title Insurance Company ("**FNTIC**") and Chicago Title Insurance Company ("**CTIC**" and collectively with FNF and FNTIC, "**Fidelity**").

---

[5]      SunTrust Bank serves as the Administrative Agent under LFG's prepetition credit facility.

23.     During the Second Application Period, WF&G professionals continued to resolve numerous complex issues relating to the sale of the Underwriters to Fidelity, including handling numerous transition issues relating to the Fidelity sale.  As part of the Fidelity transaction, the Court approved a transition services agreement that requires LFG and Fidelity to provide substantial transition-related services to one another.  WF&G professionals have worked with LFG employees to separate LFG and its subsidiaries' operations from the Underwriters pursuant to the Transition Services Agreement, whereby LFG operated material elements of the Underwriters businesses (e.g., accounting, information technologies, human resources, etc.) pending their transition to Fidelity.  WF&G has assisted LFG and Zolfo in their ongoing efforts towards resolution of issues with respect to reimbursement of services provided pursuant to the transition services agreement between the parties.

C.     **Asset Sales**

24.     Since the sale of the Underwriters, WF&G has been working with Zolfo and LFG to evaluate the Company's remaining businesses to determine the manner in which to best maximize value, including through one or more sales of such remaining businesses and/or the prompt and orderly wind-down and liquidation of such businesses.  As of the Initial Petition Date, LFG wholly-owned approximately 28 direct subsidiaries and approximately 219 active and inactive indirect subsidiaries (certain of which are joint ventures), and it owned an interest in approximately 14 non-title joint ventures.  During the Second Application Period, LFG, together with Zolfo and the assistance of WF&G attorneys, marketed, negotiated and pursued over ten different transactions.  WF&G attorneys devoted significant time to drafting and negotiating asset purchase agreements and stock purchase agreements for such transactions.  Several of these

transactions have not yet been finalized, and negotiations between LFG and its professionals, and the potential strategic buyers continued throughout the Second Application Period.

25.     In connection with the proposed sale of LFG's stock in Loancare Servicing Center, Inc. and LC Insurance Agency, Inc. (the "**LoanCare**"), WFG attorneys assisted LFG in negotiating a stock purchase agreement, bidding procedures and drafting and filing a motion with this Court on March 20, 2009, seeking approval of the bidding procedures and terms of the sale (the "**LoanCare Sale**").  At the hearing held on April 16, 2009, the bidding procedures for the LoanCare Sale were approved by this Court.  WF&G professionals assisted LFG and Zolfo in reviewing additional bids received from other potential purchasers and prepared for and oversaw the auction held on March 12, 2009 in connection with the LoanCare Sale.

26.     Further, in connection with the proposed sale of LFG's stock in LandAmerica Home Warranty Company, LandAmerica Property Inspection Services, Inc., Buyers Real Estate Services, Inc., and Residential Property Maintenance, Inc. (the "**Home Warranty**"), WF&G attorneys undertook significant efforts in negotiating and drafting a stock purchase agreement and bidding procedures.  In order to consummate the sale of LFG's stock in Home Warranty (the "**Home Warranty Sale**"), WF&G attorneys prepared and filed on April 8, 2009 a motion requesting approval of the bidding procedures and terms of the proposed stock purchase agreement.  At the hearing held on April 16, 2009, the bidding procedures for the Home Warranty Sale were approved by this Court.  WF&G professionals assisted LFG and Zolfo in reviewing additional bids received from other potential purchasers and prepared for and oversaw the auction held on May 11, 2009 and May 12, 2009 in connection with the Home Warranty Sale.

27.     In addition, WF&G played a critical role in brokering a settlement with the PBGC regarding various claims asserted by the PBGC in connection with the Company's cash balance plan (the "**PBGC Settlement**"), which claims had threatened the successful completion of the above sales.  As a result of negotiations by and among WF&G professionals, the LFG Committee, and the PBGC, the PBGC Settlement enabled the sales of LoanCare and Home Warranty to go forward, resulting in significant value for LFG's estate, and eliminated uncertainty for prospective sales of LFG's interest in its subsidiaries.  WF&G professionals also represented LFG at the hearing to approve the PBGC Settlement, LoanCare Sale, and Home Warranty Sale on May 21, 2009.  Further, WF&G attorneys worked closely with LFG in order to meet the required conditions and timely close both the LoanCare and Home Warranty sales.

28.     On June 19, 2009, LFG filed a motion seeking approval of a sale of LFG's shares in RealEC Technologies, Inc. to LPS Asset Management Solutions, Inc. pursuant to a stock purchase agreement negotiated in part by WF&G attorneys.  A hearing with respect to the proposed sale is scheduled for July 21, 2009..

D.     **1031 Litigation**

29.     Prior to the Petition Date, LES entered into agreements with its customers (the "**Exchange Agreements**") whereby it acquired the net proceeds of the sales of relinquished properties (the "**Exchange Funds**") in order to facilitate like kind exchanges in accordance with the requirements of the Internal Revenue Code.  LES took sole and exclusive possession, dominion, control, and use of all Exchange Funds, including interest, if any, earned on the Exchange Funds until the earlier of the consummation of a like kind exchange or such other date or event as provided in the Exchange Agreement and other related documents.  Since the Petition

Date, approximately 104 customers have filed adversary proceedings in this Court regarding the Exchange Funds, and several related actions have been filed in various state courts.

30.     Due to the great number of suits and the need for the Court to deal with these claims in an orderly and efficient manner, shortly after the Petition Date, LES sought to establish procedures to settle disputes relating to the ownership of Exchange Funds through the designation of four test cases (the "**Lead Cases**"),[6] by which the common legal and factual issues involved in the adversary proceedings would be litigated and all adversary proceedings other than the Lead Cases would be stayed.

31.     Towards the end of the First Application Period and continuing into Second Application Period, the Lead Cases entered the "Liability Phase I" stage which contemplated the resolution of the issue of the ownership of the Exchange Funds and was limited to the following legal issues: (a) tracing the Exchange Funds, (b) contractual interpretation of the Exchange Agreements, and (c) the existence of an express or resulting trust between LES and the plaintiffs in each of the Lead Cases.  Therefore, WF&G attorneys conducted fact discovery, which involved preparing for and taking twenty-one depositions of current or former LES employees, Lawyers Title employees involved in the transactions, and third parties.  In addition, WF&G attorneys spent a significant amount of time conducting research and drafting summary judgment motions and responses to the same.  Further, WF&G began initial preparation for the first Lead Case trial which was scheduled to begin on April 24, 2009.  However, Phase I of the litigation of the Lead Cases concluded with the entry, on April 15, 2009 and May 7, 2009, of two

---

[6]     A fifth Lead Case was later designated.  However, as LES consummated a court approved settlement with one of the Lead Case claimants, Health Care REIT, Inc., four Lead Cases now remain.

summary judgment opinions and orders, each in favor of LES finding that the Exchange Funds constitute property of LES's estate.

32.     Further, during the Second Application Period, WF&G assisted LES in negotiating settlements and obtaining Court approval of settlement agreements with several customers, including, RP One-DDD ("**RP One**"), IQC Properties, Inc. ("**IQC**"), and Arboleda Corporation ("**Arboleda**").  The negotiations conducted by WF&G attorneys were key to reaching such settlement agreements.

33.     Specifically, on May 15, 2009, this Court approved a settlement agreement (the "**RP One Settlement Agreement**") between LES, RP One, and the Creditors' Committees regarding funds held by LES pursuant to an Exchange Agreement between LES and RP One.  At the time of the Initial Petition Date, LES held approximately $158,004.36 in funds associated with the Exchange Agreement.  The RP One Settlement Agreement provided for the payment by RP One of $7,500.00 to LES in exchange for LES's release of the remainder of the funds to RP One. Pursuant to the RP One Settlement Agreement, the parties also exchanged full releases, including the release by RP One of any claims against LES, LFG, LES and LFG officers, directors, and employees, as well as the Creditors' Committees.

34.     Also, on April 10, 2009, this Court approved a settlement agreement (the "**IQC Settlement Agreement**") between LES, IQC, and the Creditors' Committees regarding funds held by LES pursuant to an Exchange Agreement between LES and IQC.  At the time of the Initial Petition Date, LES held approximately $1,001,900.00 in funds associated with the Exchange Agreement.  On February 19, 2009, IQC filed an adversary proceeding against LES seeking a declaratory judgment that the funds were IQC's property and not property of LES's bankruptcy estate on the grounds that LES held the funds in trust for IQC's benefit.  The IQC

Settlement Agreement provided for the payment by IQC of $200,380.80 to LES in exchange for LES's release of the remainder of the funds to IQC.  Pursuant to the IQC Settlement Agreement, the parties also exchanged full releases, including the release by IQC of any claims against LES, LFG, LES and LFG officers, directors, and employees, as well as the Creditors' Committees.

35.     Finally, on April 10, 2009, this Court approved a settlement agreement (the "**Arboleda Settlement Agreement**") between LES, Arboleda, and the Creditors' Committees regarding funds held by LES pursuant to an Exchange Agreement between LES and Adboleda.  At the time of the Initial Petition Date, LES held approximately $4.2 million in funds associated with the Exchange Agreement.  On January 6, 2009, Arboleda filed an adversary proceeding against LES seeking a declaratory judgment that the funds were Arboleda's property and not property of LES's bankruptcy estate on the grounds that LES held the funds in trust for IQC's benefit.  The Arboleda Settlement Agreement provided for the payment by Arboleda of $853,020.99 to LES in exchange for LES's release of the remainder of the funds to Arboleda. Pursuant to the Arboleda Settlement Agreement, the parties also exchanged full releases, including the release by Arboleda of any claims against LES, LFG, LES and LFG officers, directors, and employees, as well as the Creditors' Committees.

E.     **General Chapter 11 and Case Administration of LES's Case**

36.     During the Second Application Period, WF&G contributed significantly to the efficient administration of LES's case.  Additionally, WF&G attorneys spent a significant amount of time working with LES customers, the LES Creditors' Committee, and the U.S. Trustee to ensure that the Exchange Funds are held in stable financial institutions.

F.     **Inter-Estate Plan and Mediation**

37.     During the Second Application Period, WF&G worked with LFG and LES to establish a protocol whereby the Creditors' Committees could resolve issues relating to the

characterization and treatment of certain prepetition inter-estate transactions between LFG and LES.[7]  On April 24, 2009, LFG and LES filed a motion seeking to establish a litigation protocol to resolve certain inter-estate issues, including the treatment of Intercompany Transfers (the "**Inter-Estate Protocol Motion**") and allocation of contingent claims asserted by the Internal Revenue Service (the "**Internal Revenue Code**") and the PBGC.  The Inter-Estate Protocol Motion proposed an expedited timetable for litigating both inter-estate issues and disputes involving Exchange Funds.  As a result of further discussions between and among WF&G, the Creditors' Committees, and the U.S. Trustee, on May 8, 2009, LES and LFG submitted a revised protocol (the "**Mediation Protocol**") providing for a two-step mediation of the (a) inter-estate issues (the "**Inter-Estate Mediation**") and (b) issues relating to an LES plan of liquidation involving a global resolution of, among other things, the pending Lead Cases (as defined above) (the "**LES Mediation**").[8]  An order approving the Mediation Protocol was entered May 21, 2009.

38.     WF&G played a critical role in the creation and implementation of the Mediation Protocol.  Additionally, WF&G attorneys spent a significant amount of time researching and reviewing documentation in preparation for the depositions taken in connection with the Inter-Estate Mediation.  During the Inter-Estate Mediation, which concluded on July 3, 2009, the Creditors' Committees agreed to a proposed resolution for the treatment of all inter-

---

[7]     In the approximately two months preceding the Initial Petition Date, LFG advanced approximately $65 million to LES to enable LES to honor customer claims notwithstanding the illiquidity of its investments in auction rate securities (together with any other prepetition inter-estate transactions between LFG and LES, the "**Intercompany Transfers**").

[8]     As described in the Mediation Protocol, the Inter-Estate Mediation was designed to address the validity, priority, characterization or allowance of Intercompany Transfers and the extent to which such transfers should be avoided under chapter 5 of the Bankruptcy Code as well as the estates' allocable share of liabilities associated with the claims asserted by the IRS and PBGC.  The goal of the LES Mediation is for the parties to resolve  issues raised in the Lead Cases.

estate issues.  Further, during the LES Mediation, which concluded on July 14, 2009, the Creditors' Committees and plaintiffs in the Lead Cases agreed to a proposed resolution of many of the outstanding issues subject to the LES Mediation.

G.      **General Litigation**

39.      During the Second Application Period, WF&G continued to represent the Debtors in connection with various litigations in courts other than this Court brought against certain of the Debtors' current and former officers and employees by various plaintiffs who deposited Exchange Funds with LES prior to the Initial Petition Date.  WF&G was able to negotiate agreements to stay these cases without the Court's intervention.

H.      **Beau Street v. CTG Real Estate**

40.      During the Second Application Period, WF&G represented LFG's subsidiaries LandAmerica OneStop, Inc. ("**OneStop**") and Capital Title Group, Inc. ("**CTG**") in connection with a complaint in equity filed on February 13, 2009, by the landlords Beau Street Associates, Inc. and JBP Holdings, LLC's (together, the "**Beau Street Complaint Plaintiffs**") in Pennsylvania state court against OneStop and CTG, as well as against now-dissolved former LFG subsidiary CTG Real Estate Information Services, Inc. ("**CTG REIS**").  WF&G assisted LFG with several productions of documents in connection with requests by the Beau Street Complaint Plaintiff, assisted LFG in negotiating resolutions to various discovery disputes, and engaged in preliminary settlement discussions in connection with this matter.

I.      **Corporate Matters**

41.      During the Second Application Period, WF&G expended substantial time and effort addressing issues relating to the Debtors' insurance policies.  WF&G continued to assist the Debtors in evaluating their insurance coverage, including directors' and officers', errors and omissions, fiduciary, and employed lawyers liability insurance.  This specifically

included communications with the Debtors directors' and officers' and errors and omissions insurers regarding various potential coverage defenses raised by the insurers, settlement notifications and defense costs submissions to the insurers, and communications with the Creditors' Committees regarding insurance proceeds. WF&G continued to coordinate with the Debtors' insurance brokers and noticed such insurers of the various claims both pending and threatened in these cases.

J.    **Executory Contracts/Leases**

42.    The Debtors have spent a significant amount of time disposing of their interests in their real property leases. During the Second Application Period, WF&G assisted the Debtors and Zolfo in evaluating and setting up stream-lined procedures whereby the Debtors disposed of over fifty of their real property leashold interests in order to mitigate losses and maximize values. Further, with WF&G's assistance, the Debtors have reached settlements with several vendors and landlords and have established settlement procedures pursuant to which such settlements have been approved.

K.    **Tax**

43.    During the Second Application Period, WF&G continued to assist MGW in advising LFG with respect to various tax issues, including the preservation of net operating loss carryforwards arising from the sale of the Underwriters to Fidelity.

L.    **Creditor/Claims Issues**

44.    During the Second Application Period, WF&G continued to respond to numerous communications from creditors received in these chapter 11 cases. WF&G obtained orders of this Court (a) dated February 27, 2009, establishing April 6, 2009, as the deadline by which all non-governmental entities must file proofs of prepetition claims against the estate of

LFG and LES, (b) dated April 22, 2009, establishing May 18, 2009, as the deadline by which all non-governmental entities must file proofs of claim against LAC's estate, and (c) dated June 22, 2009, establishing July 20, 2009, as the deadline by which all non-governmental entities must file proofs of claim against the estates of LandAm Title and the Southland Entities.

45.     As of the date hereof, approximately 2,370 proofs of claim (the "**Claims**") have been filed in the Debtors' chapter 11 cases.  Further, Claims are still being filed against LandAm Title and the Southland Entities.  During the Second Application Period, WF&G attorneys spent a significant amount of time working with Zolfo and the Debtors to review, reconcile, and file omnibus objections to Claims filed against LFG and LES.

M.     **WF&G Fee Application**

46.     During the Second Application Period, WF&G continued to compile and serve Fee Statements, in compliance with the Interim Compensation Order.  In addition, during this period, WF&G prepared, filed, and served its application for interim allowance of compensation relating to the First Application Period.

N.     **LandAmerica Assessment Corporation**

47.     On a regular basis, WF&G attorneys have responded to the regular and numerous communications from LAC's creditors inquiring as to the status of the LAC chapter 11 case.  Further, during the Second Application Period, WF&G assisted LAC in compiling and filing its schedules of assets and liabilities (the "**Schedules**") and its statements of financial affairs (the "**SOFAs**") which were timely filed on April 15, 2009.

O.     **LandAmerica Title Company**

48.     On a regular basis, WF&G attorneys have responded to the regular and numerous communications from LandAm Title's creditors inquiring as to the status of LandAm

Title's chapter 11 case. Further, during the Second Application Period, WF&G assisted LandAm Title in compiling and filing its Schedules and Sofas which were timely filed on May 11, 2009.

P.      **Southland Entities**

49.      On a regular basis, WF&G attorneys have responded to the regular and numerous communications from the Southland Entities' creditors inquiring as to the status of the Southland Entities' chapter 11 cases. Further, during the Second Application Period, WF&G assisted the Southland Entities in compiling and filing their Schedules and Sofas which were timely filed on May 11, 2009.

**EVALUATING WF&G'S SERVICES**

50.      The allowance of interim compensation for services rendered and reimbursement of expenses incurred in bankruptcy cases is expressly provided for in section 331 of the Bankruptcy Code:

> [A] debtor's attorney, or any professional person . . . may apply to the court not more than once every 120 days after an order for relief in a case under this title, or more often if the court permits, for such compensation for services rendered . . . as is provided under section 330 of this title.

11 U.S.C. § 331.

51.      Concerning the level of compensation, section 330(a)(l) of the Bankruptcy Code provides, in pertinent part, that the court may award to a professional person, including the debtor's attorney

> reasonable compensation for actual, necessary services rendered by the . . . professional person, or attorney and by any paraprofessional person employed by any such person . . . .

11 U.S.C. § 330. The Congressional intent and policy expressed in section 330 of the Bankruptcy Code is to provide for adequate compensation to continue to attract qualified and competent practitioners to bankruptcy cases.

52. The "lodestar" method of fee calculation developed by the Third Circuit is the method used to determine a "reasonable" attorney fee in all the federal courts, including the bankruptcy courts. Under the "lodestar" approach, the Court should consider the number of hours of service reasonably devoted to the case multiplied by the attorney's reasonable rates. Courts frequently consider the specific "lodestar" factors enumerated in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974). The lodestar factors were adopted by the Fourth Circuit in Barber v. Kimbrells, Inc., 577 F.2d 216, 226 (4th Cir.), cert. denied, 439 U.S. 934 (1978), and in Anderson v. Morris, 658 F.2d 246, 249 (4th Cir. 1981), where the Fourth Circuit held that the district court should employ the lodestar approach, and then adjust the fee on the basis of the remaining Johnson factors in the case. The following are the Johnson factors:

(a)     the time and labor required;

(b)     the novelty and difficulty of the questions;

(c)     the skill requisite to perform the legal service properly;

(d)     the preclusion of other employment by the attorney due to acceptance of the case;

(e)     the customary fee;

(f)     whether the fee is fixed or contingent;

(g)     time limitations imposed by the client or the circumstances;

(h)     the amount involved and the results obtained;

(i)     the experience, reputation and ability of the attorneys;

(j)     the "undesirability" of the case;

(k)     the nature and length of the professional relationship with the client; and

(l)     awards in similar cases.

Johnson, 488 F.2d at 717-719; Barber, 577 F.2d at 226, n.28; Anderson, 658 F.2d at 248, n.2.

## WF&G'S REQUEST FOR INTERIM COMPENSATION

53.     WF&G submits that its request for interim allowance of compensation is reasonable.  The services rendered by WF&G, as highlighted above, required substantial time and effort, resulting in the timely resolution of various issues presented in these cases.

54.     The services rendered by WF&G during the Second Application Period were performed diligently and efficiently.  Accordingly, when possible WF&G delegated tasks to lower cost junior attorneys or, for discrete matters, to attorneys with specialized expertise in the particular task at issue.  While that approach may have required intra-office conferences or involved individual attorneys who spent only a few hours on the matter at hand, the net result was enhanced cost efficiency.

55.     In many instances, WF&G has been able to successfully resolve disputes without the need to resort to the Court.  When necessary, however, WF&G actively represented the Debtors' interests before the Court and substantially furthered the Debtors' efforts to preserve the value of the Debtors' estates for their creditors.

56.     During the Second Application Period, WF&G encountered a variety of challenging legal issues, often requiring substantial research and negotiation.  WF&G brought to bear legal expertise in many areas, including bankruptcy, litigation, corporate, and tax.  WF&G attorneys have rendered advice in all of these areas with skill and dispatch.

57.     The services rendered to the Debtors by WF&G during the Second Application Period required an aggregate expenditure of 6,461.70 recorded hours of the time of

attorneys and paraprofessionals.  Exhibit B sets forth a list of such individuals, the aggregate

amount of time expended by each, and the current hourly billing rate for each.  The blended

hourly rate for the services of attorneys who recorded time during the Second Application Period

was $575.21.[9]

58.     WF&G's hourly rates and fees charged are consistent with the market rate

for comparable services.  The hourly rates and fees charged by WF&G are the same as those

generally charged to, and paid by, WF&G's other clients.  Indeed, unlike fees paid by most

WF&G clients, due to the "holdback" of fees from prior monthly fee statements and the delays

inherent in the fee application process, the present value of the fees paid to WF&G by the

Debtors is less than fees paid monthly by other WF&G clients.

## DISBURSEMENTS

59.     WF&G incurred actual and necessary out-of-pocket expenses during the

Second Application Period, in connection with the rendition of the professional services

described above, in the amounts set forth in Exhibit C.  By this Application, WF&G respectfully

requests allowance of such reimbursement in full.

60.     The disbursements for which WF&G seeks reimbursement include the

following:

(a)     Duplicating – Charged at $0.10 per page, based upon the
        cost of supplies.  The charge per page includes a charge for
        maintaining the duplicating facilities;

(b)     Telecommunications – Long distance calls are billed at
        actual cost.  Outgoing domestic facsimile transmittals are

---

[9]     The blended hourly rate (excluding paraprofessional time) is calculated by dividing the total amount of fees
        earned by WF&G attorneys ($3,326,979.50) by the total number of hours billed (5,783.90) by such
        attorneys.  The blended hourly rate including paraprofessional time is $536.67= or $3,467,779.00 in fees
        billed by WF&G professionals (both attorneys and paraprofessionals) divided by 6,461.70 hours billed.

billed at $0.50 per page, while there is no charge for incoming facsimiles. This rate is based upon costs incurred by WF&G for machine maintenance, phone line rental, and supplies used in operating the fax machine;

(c) <u>Computer Research Charges</u> – WF&G's practice is to bill clients for LEXIS and Westlaw research at actual cost, which does not include amortization for maintenance and equipment;

(d) <u>Overtime Expenses</u> – WF&G's practice is to allow any attorney working later than 8:00 p.m. and any legal assistant working later than 7:30 p.m. to charge a working meal to the appropriate client;

(e) <u>Local Car Service</u> – WF&G's practice is to allow attorneys, legal assistants, and secretaries to charge car service to the appropriate client after 8:00 p.m.; and

(f) <u>Delivery Services</u> – WF&G's practice is to charge postal, overnight delivery, and courier services at actual cost.

61. Though WF&G's practice is to bill clients for secretarial overtime and word processing at actual cost, WF&G, in its billing discretion, does not bill the Debtors for such charges.

**<u>NOTICE</u>**

62. Pursuant to the Interim Compensation Order, WF&G will or has served copies of the Application on the Notice Parties (as defined therein). In addition, WF&G will or has served notice of the Application and notice of the hearing on the Application on the parties entitled to receive notice under the Amended Case Management Order [Docket No. 435]. WF&G submits that no other or further notice need be given.

**NO PRIOR REQUEST**

63.     No previous motion for the relief sought herein has been made to this or to any other Court.

**CONCLUSION**

WHEREFORE, WF&G respectfully requests that this Court enter an order: (a) allowing WF&G interim allowance of compensation for services rendered in the aggregate amount of $3,467,779.00, during the Second Application Period, which includes $520,166.85 representing the 15% portion of fees for services rendered that has been "held-back"; (b) awarding WF&G reimbursement of actual, necessary expenses incurred in connection with the rendition of services during the Second Application Period, in the amount of $136,347.64;

(c)  authorizing and directing the Debtors to pay the foregoing amounts to WF&G to the extent

not already paid; and (d)  granting such other and further relief as may be just or proper.

Dated: Richmond, Virginia                          Respectfully submitted,
        July 15, 2009

                                                   /s/ Paul V. Shalhoub
                                                   WILLKIE FARR & GALLAGHER LLP
                                                   Paul V. Shalhoub, Esq.
                                                   Rachel C. Strickland, Esq.
                                                   Jordana Linder, Esq.
                                                   787 Seventh Avenue
                                                   New York, New York  10019
                                                   (212) 728-8000

                                                   -and-

                                                   /s/ John H. Maddock III
                                                   Dion W. Hayes (VSB No. 34304)
                                                   John H. Maddock III (VSB No. 41044)
                                                   McGUIREWOODS LLP
                                                   One James Center
                                                   901 East Cary Street
                                                   Richmond, Virginia 23219-4030
                                                   (804) 775-1000


                                                   Attorneys for the Debtors and Debtors in
                                                   Possession

\9671831.1

**SERVICES RENDERED BY CATEGORY**
**MARCH 1, 2009 THROUGH MAY 31, 2009**

| Service Category | Hours | Fees Earned |
|---|---|---|
| General Chapter 11 | 398.20 | 220,566.00 |
| General Litigation | 324.30 | 158,609.50 |
| General Corporate | 390.60 | 264,405.00 |
| Executory Contracts and Leases | 150.10 | 75,805.00 |
| Automatic Stay | 25.00 | 14,584.50 |
| Employee/Pension/Labor | 108.80 | 65,449.50 |
| Tax Issues | 12.10 | 9,271.00 |
| Creditor/Claim Issues | 184.30 | 90,843.00 |
| WF&G Retention | 2.90 | 1,349.50 |
| Non-WF&G Retention | 74.40 | 42,619.00 |
| WF&G Fee Applications | 96.30 | 41,087.50 |
| Non-WF&G Fee Applications | 11.30 | 5,433.50 |
| Schedules/Statements/Monthly Reports | 3.90 | 2,595.50 |
| Plan of Reorganization/Disclosure Statement | 41.20 | 24,271.00 |
| Asset Sales | 1,007.80 | 564,623.00 |
| 1031 Litigation | 2,257.10 | 1,191,985.50 |
| Fidelity Transaction | 2.00 | 1,390.00 |
| SEC Matters | 359.40 | 202,584.50 |
| LandAmerica Assessment Corp. | 96.10 | 55,620.50 |
| LES General Chapter 11 | 39.90 | 22,291.50 |
| Beau Street v. CTG Real Estate | 627.50 | 262,481.00 |
| LandAmerica Title Company | 32.60 | 20,119.00 |
| Southland Entities | 39.60 | 19,847.00 |
| Inter-Estate Plan and Mediation | 169.30 | 105,576.00 |
| Regulatory Compliance | 7.00 | 4,371.50 |
| **TOTAL** | **6,461.70** | **$3,467,779.00** |

<u>EXHIBIT B</u>

## SERVICES RENDERED BY PROFESSIONALS
## MARCH 1, 2009 THROUGH MAY 31, 2009

| Name | Department | Law School Graduation Date | Position | Hours | Hourly Rate | Fees Earned |
|------|-----------|---------------------------|----------|-------|-------------|-------------|
| **PARTNERS** | | | | | | |
| Mitchell J. Auslander | Litigation | 1980 | Partner (1/1/89) | 13.00 | 995 | 12,935.00 |
| Gregory S. Bruch | Litigation | 1985 | Partner (5/12/08) | 33.20 | 995 | 33,034.00 |
| Mark A. Cognetti | Corporate | 1998 | Partner (1/1/07) | 68.60 | 695 | 47,677.00 |
| Kelly Hnatt | Litigation | 1989 | Partner (1/1/98) | 2.90 | 855 | 2,479.50 |
| Lawrence O. Kamin | Litigation | 1976 | Partner (1/1/85) | 259.9 | 950 | 246,905.00 |
| Michael J. Kelly | Bankruptcy | 1988 | Partner (1/1/97) | 0.10 | 855 | 85.50 |
| Martin B. Klotz | Litigation | 1991 | Partner (1/1/97) | 3.70 | 855 | 3,163.50 |
| Alan Lipkin | Bankruptcy | 1978 | Partner (1/1/89) | 0.10 | 950 | 95.00 |
| Terence K. McLaughlin | Litigation | 1996 | Partner (1/1/05) | 117.80 | 695 | 81,871.00 |
| Bernard A. Nigro, Jr. | Litigation | 1986 | Partner (1/1/06) | 1.20 | 950 | 1,140.00 |
| Christopher Peters | Tax | 1997 | Partner (1/1/07) | 4.80 | 695 | 3,336.00 |
| David E. Rubinsky | Employee Benefits | 1996 | Partner (1/1/07) | 3.40 | 695 | 2,363.00 |
| Paul V. Shalhoub | Bankruptcy | 1991 | Partner (1/1/00) | 145.30 | 855 | 124,231.50 |
| Rachel C. Strickland | Bankruptcy | 1998 | Partner (1/1/07) | 331.10 | 695 | 230,114.50 |
| | **TOTAL PARTNERS:** | | | **986.5** | | **$789,430.50** |
| **COUNSEL** | | | | | | |
| Peter Allman | Employee Benefits | 1980 | Special Counsel | 0.50 | 690 | 345.00 |
| Ian Hochman | Litigation | 1997 | Special Counsel | 6.50 | 690 | 4,485.00 |
| Kim A. Walker | Intellectual Property | 1991 | Special Counsel | 1.10 | 690 | 759.00 |
| | **TOTAL SPECIAL COUNSEL:** | | | **8.1** | | **$5,589.00** |
| **ASSOCIATES** | | | | | | |
| Elizabeth Bower | Litigation | 2001 | Associate | 455.70 | 680 | 309,876.00 |
| Katie Calabrese | Employee Benefits | 2006 | Associate | 1.60 | 510 | 816.00 |

| Name | Department | Law School Graduation Date | Position | Hours | Hourly Rate | Fees Earned |
|---|---|---|---|---|---|---|
| Tonisha Calbert | Corporate | 2007 | Associate | 25.70 | 465 | 11,950.50 |
| Sindy Chen | Litigation | 2003 | Associate | 3.50 | 320 | 1,120.00 |
| Jeffrey B. Clancy | Corporate | 2000 | Associate | 162.40 | 680 | 110,432.00 |
| Laurita M. Denny | Litigation | 2007 | Associate | 389.90 | 465 | 181,303.50 |
| Jamie Eisen | Bankruptcy | 2003 | Associate | 459.10 | 625 | 286,937.50 |
| Chantalle Fish | Litigation | 2008 | Associate | 87.70 | 290/380 [10] | 1,428.00 |
| Christopher R. Freeland | Corporate | 2005 | Associate | 0.70 | 530 | 371.00 |
| Matthew J. Guercio | Corporate | 2003 | Associate | 305.10 | 625 | 190,687.50 |
| Steven R. Hamlin | Litigation | 2002 | Associate | 11.40 | 320 | 3,648.00 |
| Sandra Hanna | Litigation | 2001 | Associate | 246.60 | 680 | 167,688.00 |
| Jennifer Hardy | Bankruptcy | 2007 | Associate | 13.20 | 465 | 3,648.00 |
| Amina Jafri | Litigation | 2005 | Associate | 433.00 | 530 | 229,490.00 |
| Emma James | Litigation | 2007 | Associate | 236.00 | 465 | 109,740.00 |
| Dan Kozusko | Litigation | 2003 | Associate | 15.10 | 625 | 9,437.50 |
| Jeremy A. Linden | Litigation | 2007 | Associate | 205.10 | 465 | 95,371.00 |
| Jordana Linder | Bankruptcy | 2007 | Associate | 438.10 | 465 | 203,716.50 |
| Andrew Marinello | Corporation | 2005 | Associate | 0.70 | 530 | 371.00 |
| Nancy McCabe | Insurance | 1993 | Associate | 86.00 | 685 | 58,910.00 |
| Jordan Messinger | Employee Benefits | 2004 | Associate | 9.60 | 590 | 5,664.00 |
| Kevin J. O'Neil | Litigation | 2003 | Associate | 10.70 | 320 | 3,424.50 |
| Shalini Rajoo | Bankruptcy | 2003 | Associate | 132.90 | 625 | 83,062.0 |
| Derek M. Schoenmann | Litigation | 2003 | Associate | 146.40 | 625 | 91,500.00 |
| Khiran Sidhu | Litigation | 2008 | Associate | 238.90 | 380 | 90,782.00 |
| Andrew Sorkin | Bankruptcy | 2007 | Associate | 12.70 | 465 | 5,905.50 |
| Michael P. Trahar | Litigation | 2004 | Associate | 0.30 | 590 | 177.00 |
| Ruth Van Veldhuizen | Litigation | 2008 | Associate | 65.70 | 380 | 23,931.00 |
| Stephen B. Vogel | Litigation | 2003 | Associate | 99.20 | 625 | 62,000.00 |
| Brian J. Weinberger | Real Estate | 2006 | Associate | 38.10 | 510 | 19,431.00 |
| Monica Welby | Litigation | 2005 | Associate | 3.60 | 530 | 1,908.00 |
| Jeffrey A. Williams | Litigation | 2007 | Associate | 7.30 | 465 | 3,394.50 |
| Seth Zelnick | Corporate | 2005 | Associate | 1.70 | 530 | 901.00 |
| | **TOTAL ASSOCIATES:** | | | **4,343.7** | | **$2,369,022.50** |
| **LAW CLERKS** | | | | | | |
| Howard Block | Corporate | 2008 | Law Clerk | 142.10 | 290 | 41,209.00 |
| Geri Anne Chich | Employee Benefits | 2008 | Law Clerk | 0.20 | 290 | 58.00 |
| Joshua M. Nahum | Litigation | 2008 | Law Clerk | 55.20 | 290 | 16,008.00 |
| Gregory Reid | Litigation | 2008 | Law Clerk | 248.10 | 290 | 71,949.00 |
| | **TOTAL LAW CLERKS:** | | | **445.6** | | **$129,224.00** |

---

[10]     Ms. Fish became was both a Law Clerk and Associate during this time period, causing her hourly rate to change during the Second Interim Period.

| Name | Department | Law School Graduation Date | Position | Hours | Hourly Rate | Fees Earned |
|---|---|---|---|---|---|---|
| **LEGAL ASSISTANTS** | | | | | | |
| Andy Alcindor | Litigation | | Legal Asst. | 8.60 | 105 | 903.00 |
| Mark Allen-Gifford | Litigation | | Legal Asst. | 4.40 | 175 | 770.00 |
| Janice Amador | Litigation | | Legal Asst. | 2.90 | 235 | 681.50 |
| Alison R. Ambeault | Bankruptcy | | Legal Asst. | 244.30 | 235 | 57,410.50 |
| Michael Arakelyan | Litigation | | Legal Asst. | 8.50 | 125 | 1,062.50 |
| Christian Arriola | Litigation | | Legal Asst. | 3.50 | 175 | 612.50 |
| Wayne Blackwell | Corporate | | Legal Asst. | 1.50 | 150 | 225.00 |
| Arthur Daye, Jr. | Litigation | | Legal Asst. | 3.60 | 175 | 630.00 |
| Kelly Fitzgerald | Bankruptcy | | Legal Asst. | 6.70 | 165 | 1,105.50 |
| Dan Gerstle | Litigation | | Legal Asst. | 28.60 | 165 | 4,719.00 |
| Diane Hinrichs | Litigation | | Legal Asst. | 129.50 | 260 | 33,670.00 |
| Jana A. Jones | Litigation | | Legal Asst. | 0.50 | 235 | 117.50 |
| Lauren Kessler | Litigation | | Legal Asst. | 81.00 | 175 | 14,175.00 |
| Susan Lacheman | Litigation | | Legal Asst. | 4.10 | 240 | 984.00 |
| Chris Lisciandro | Litigation | | Legal Asst. | 39.70 | 175 | 6,947.50 |
| Sal Mancuso | Litigation | | Legal Asst. | 1.80 | 240 | 432.00 |
| Andy McClure | Litigation | | Legal Asst. | 1.50 | 175 | 262.50 |
| Ana Munoz | Litigation | | Legal Asst. | 70.40 | 135 | 9,504.00 |
| Heriona Pepaj | Litigation | | Legal Asst. | 3.90 | 105 | 409.50 |
| Simon Raymundo | Litigation | | Legal Asst. | 8.30 | 125 | 1,037.50 |
| Joshua Rosenthal | Litigation | | Legal Asst. | 5.90 | 165 | 973.50 |
| Adam Scavone | Bankruptcy | | Legal Asst. | 1.70 | 175 | 297.50 |
| Ann Staron | Corporate | | Legal Asst. | 12.40 | 250 | 3,100.00 |
| Charles Tricomi | Bankruptcy | | Legal Asst. | 1.80 | 165 | 297.00 |
| Caitlin Wong | Litigation | | Legal Asst. | 2.70 | 175 | 472.50 |
| | | **TOTAL LEGAL ASSISTANTS:** | | **677.8** | | **$140,799.50** |
| | | | | | | |
| | | **GRAND TOTAL:** | | | | **$3,467,779.00** |

## EXHIBIT C

### DISBURSEMENTS FOR PERIOD
### MARCH 1, 2009 THROUGH MAY 31, 2009

| Disbursement | Amount |
|---|---:|
| Postage/Messenger/Overnight Delivery | 450.70 |
| Local Transportation | 6,816.15 |
| Long Distance Telephone | 2,530.71 |
| Local Meals | 4,407.18 |
| Other Out of Town Travel | 1,865.28 |
| Lodging | 4,368.73 |
| Airfare/Train | 8,167.00 |
| Reproduction | 20,624.16 |
| Air Freight | 1,432.68 |
| Data Acquisition | 70,326.58 |
| Court Reporter/Other Fees | 13,545.06 |
| Filing Fees/Corp Trust | 52.60 |
| Other Disbursements | 1,760.81 |
| **TOTAL:** | **$136,347.64** |

<u>**EXHIBIT D**</u>

Paul V. Shalhoub (Admitted Pro Hac Vice)
Rachel C. Strickland (Admitted Pro Hac Vice)
Jordana Linder (Admitted Pro Hac Vice)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

        - and -

Dion W. Hayes (VSB No. 34304)
John H. Maddock III (VSB No. 410444)
McGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
(804) 775-1000

Attorneys for the Debtors and
Debtors in Possession


IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

-------------------------------------------------------x
In re                                            :     Chapter 11
                                                 :
LandAmerica Financial Group, Inc., <u>et al.</u>,   :     Case No. 08-35994 (KRH)
                                                 :
                         Debtors.                :     (Jointly Administered)
**-------------------------------------------------------x**


**SUMMARY SHEET PURSUANT TO
UNITED STATES TRUSTEE GUIDELINES FOR
REVIEWING APPLICATIONS FOR COMPENSATION
AND REIMBURSEMENT OF EXPENSES FILED
<u>UNDER SECTION 330 OF THE BANKRUPTCY CODE</u>**

        1.        <u>Total Compensation and Expenses Requested</u>.  Willkie Farr & Gallagher

LLP ("**<u>WF&G</u>**"), in connection with its application (the "**<u>Application</u>**") for interim allowance of

compensation for professional services rendered and reimbursement of expenses incurred in the above-captioned cases, has requested that the Court enter an order:

(a) awarding WF&G interim allowance of compensation for services rendered in the aggregate amount of $3,467,779.00, during this interim application period, which includes $520,166.85 representing the 15% portion of fees for services rendered that has been "held-back";

(b) awarding WF&G interim allowance of reimbursement of actual, necessary expenses incurred in connection with the rendition of such professional services, in the aggregate amount of $136,347.64;

(c) authorizing and directing the Debtors to pay the foregoing amounts to WF&G to the extent not already paid; and

(d) granting such other and further relief as may be just or proper.

2. <u>Total Compensation and Expenses Previously Awarded</u>. WF&G has previously been awarded on an interim basis the allowance of $4,062,498.00, representing 100% of the fees for professional services rendered by WF&G from November 26, 2008 through February 28, 2009, and $129,170.77, representing 100% of the actual and necessary expenses incurred in connection with the rendering of such professional services.

3. <u>Name, Billing Rate, Bar Admission Date, Total Hours Billed, and Total Billings for Each Professional</u>. Please refer to <u>Exhibit B</u> to the Application for: (a) the names and applicable billing rates for each professional and paraprofessional who billed time during the period for which compensation for services rendered and reimbursement of expenses incurred is sought (the "**Second Application Period**"); (b) the date of law school graduation for each attorney; (c) the total hours and total amounts billed for each attorney and paraprofessional listed; and (d) the blended hourly rate for all attorneys and paraprofessionals who billed time during the Second Application Period.

# **EXHIBIT E**

Paul V. Shalhoub (Admitted Pro Hac Vice)
Rachel C. Strickland (Admitted Pro Hac Vice)
Jordana Linder (Admitted Pro Hac Vice)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

    - and -

Dion W. Hayes (VSB No. 34304)
John H. Maddock III (VSB No. 410444)
McGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
(804) 775-1000

Attorneys for the Debtors and
Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

-------------------------------------------------------x
In re                            :    Chapter 11
                                  :
LandAmerica Financial Group, Inc., et al.,   :    Case No. 08-35994 (KRH)
                                  :
             Debtors.      :    (Jointly Administered)
-------------------------------------------------------x

**ORDER APPROVING SECOND APPLICATION OF WILLKIE
FARR & GALLAGHER LLP AS COUNSEL FOR DEBTORS FOR
INTERIM ALLOWANCE OF COMPENSATION FOR SERVICES
RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED
FROM MARCH 1, 2009 THROUGH MAY 31, 2009**

Upon the application, dated July 15, 2009 (the "**Application**"), of Willkie Farr &

Gallagher LLP ("**WF&G**"), attorneys for LandAmerica Financial Group, Inc. and LandAmerica

1031 Services, Inc. (collectively, the "**Debtors**"), for interim allowance of compensation for

professional services rendered and reimbursement of expenses incurred from March 1, 2009

through May 31, 2009, pursuant to sections 330(a) and 331 of title 11 of the United States Code

(the "**Bankruptcy Code**") and Rule 2016 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"); and a hearing (the "**Hearing**") having been held before this Court on

August 25, 2009 to consider the Application; and it appearing that sufficient notice has been

given, and no other notice being necessary; and upon the full record of the Hearing and all prior

proceedings in these cases; and after due deliberation and sufficient cause appearing therefore, it

is hereby

ORDERED, ADJUDGED AND DECREED that:

1.      The Application is granted to the extent set forth herein.

2.      All capitalized terms used but not defined herein shall have the same

meaning ascribed to them in the Application.

3.      The fees and expenses of WF&G requested for services rendered and

expenses incurred during the Second Application Period are approved on an interim basis, in the

amounts and to the extent provided in Schedule A-1 annexed hereto.

4.      The Debtors are authorized and directed to pay as soon as practicable all

fees and expenses approved by this Order (including the 15% Holdback) that remain unpaid.

5.      This Court shall retain jurisdiction over all matters arising from or related

to the interpretation and implementation of this Order.


Dated: Richmond, Virginia
        August ___, 2009

                                    _____
                                    UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

_____

WILLKIE FARR & GALLAGHER LLP
Paul V. Shalhoub, Esq.
Rachel C. Strickland, Esq.
Jordana Linder, Esq.
787 Seventh Avenue
New York, New York  10019
(212) 728-8000

-and-

_____

Dion W. Hayes (VSB No. 34304)
John H. Maddock III (VSB No. 41044)
McGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
(804) 775-1000

Attorneys for the Debtors and Debtors in Possession

## LOCAL BANKRUPTCY RULE 9022-1 (C) CERTIFICATION

      Pursuant to Local Bankruptcy Rule 9022-1 (C), I hereby certify that the foregoing order

has been endorsed by or served upon all necessary parties.

                             _____
                             Dion W. Hayes (VSB No. 34304)
                             John H. Maddock III (VSB No. 41044)
                             McGUIREWOODS LLP
                             One James Center
                             901 East Cary Street
                             Richmond, Virginia 23219-4030
                             (804) 775-1000

CASE NAME: LandAmerica Financial Group, Inc.
CASE NUMBER:  08-35994 (KRH) (Jointly Administered)

## <u>SCHEDULE A-1</u>

### FEES AND EXPENSES APPROVED ON AN INTERIM BASIS

| <u>Applicant</u> | <u>Capacity</u> | Interim Compensation <u>Approved</u>[1] | Interim Reimbursement of Expenses <u>Approved</u> | Hold-Back <u>Approved</u> |
|---|---|---|---|---|
| Willkie Farr & Gallagher LLP | Attorneys for the Debtors | $3,467,779.00 | $136,347.64 | $520,166.85 |

---

[1]     This amount includes amounts "held-back."