IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRIGNIA
RICHMOND DIVISION

| | | |
|---|---|---|
| IN RE: | LANDAMERICA FINANCIAL GROUP, INC., et al., | Case No. 08-35994-KRH<br>Chapter 11<br>Jointly Administered |
| | Debtors. | |

**MEMORANDUM OPINION**

These Chapter 11 cases are proceeding under a confirmed Joint Chapter 11 plan of liquidation. Before the Court are the LFG Trustee's[1] Twenty-Fifth Omnibus Objection to the Allowance of Certain Claims Filed in the Incorrect Class [Docket. No. 3191], the LFG Trustee's Twenty-Sixth Omnibus Objection to the Allowance of Certain Claims Filed in the Incorrect Class [Docket No. 3193], and the LFG Trustee's Thirty-Seventh Omnibus Objection to the Allowance of Certain Claims Filed in the Incorrect Class [Docket No. 3468] (collectively, the "Objections"). The LFG Trustee objects to priority treatment for substantial portions of certain severance claims (the "Severance Claims") of former employees of the Debtors whose employment was terminated within the 180 days before the petition date (the "Claimants"). The Claimants assert that their severance claims are entitled to priority status under § 507(a)(4) of Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"). The LFG Trustee seeks to reduce the priority portion of the Severance Claims and to reclassify the excess as general unsecured claims by applying a formula that prorates the severance pay over the entire period of a Claimant's employment and allows only the amount that would be apportioned to the 180 days before the petition date to be given priority treatment. The Court concludes that this

---

[1] Pursuant to the Joint Chapter 11 Plan of LandAmerica Financial Group, Inc. and its Affiliated Debtors, dated November 16, 2009, two liquating trustees have been appointed: a LandAmerica 1031 Exchange Services, Inc. Trustee ("LES Trustee") to administer the LES estate, and a LandAmerica Financial Group, Inc. Trustee ("LFG Trustee") to administer the LFG estate.

method of calculation is inconsistent with § 507(a)(4) of the Bankruptcy Code. Therefore, the LFG Trustee's objection will be overruled and the Severance Claims will remain priority claims up to the amount capped by § 507(a)(4) of the Bankruptcy Code.

## Jurisdiction

The Court has subject-matter jurisdiction of this contested matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O). Venue is appropriate in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Factual and Procedural Background

On November 26, 2008 (the "Petition Date"), LandAmerica Financial Group, Inc. ("LFG"), filed a petition for relief under Chapter 11 of the United States Bankruptcy Code in this Court, along with its wholly owned subsidiary, LandAmerica 1031 Exchange Services, Inc. ("LES"). On March 6, 2009, March 27, 2009, March 31, 2009, July 17, 2009, October 12, 2009 and November 4, 2009 various LFG affiliates (LandAmerica Assessment Corporation ("LAC"), LandAmerica Title Company ("LandAm Title"), Southland Title Corporation, Southland Title of Orange County, Southland Title of San Diego (the "Southland Entities"), LandAmerica Credit Services, Inc. ("LandAm Credit"), Capital Title Group, Inc. ("CTG"), and LandAmerica OneStop, Inc.("OneStop") (collectively, "LFG Affiliates")) also commenced voluntary Chapter 11 cases in this Court. Pursuant to orders of this Court dated November 28, 2008, March 11, 2009, April 8, 2009, April 9, 2009, July 22, 2009, October 26, 2009 and November 13, 2009, the Chapter 11 cases of LFG, LES, and the LFG Affiliates (collectively, the "Debtors") are being jointly administered under case number 08-35994.

By order dated February 27, 2009 (the "Bar Date Order"), and pursuant to Rule 3003(c)(3) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), this Court established April 6, 2009 at 4:00 p.m. (prevailing Eastern Time) as the deadline by which all persons and entities had to file proofs of claim against the estates of LFG and LES (the "General Bar Date"). In accordance with the Bar Date Order, written notice of the General Bar Date was mailed to all known claimants of LFG and LES. Subsequent bar dates were set for the LFG Affiliates.[2]

On November 23, 2009, the Court entered an order confirming the Joint Chapter 11 Plan of LandAmerica Financial Group, Inc. and its Affiliated Debtors, dated November 16, 2009 (the "Plan") as to all Debtors other than OneStop. The effective date with respect to the Plan was December 7, 2009. Pursuant to Section 10.1 of the Plan, only the Post-Effective Date Entities and the Trustees, including the LFG Trustee, are entitled to object to claims or interests after the effective date. To date, over 3,400 proofs of claim have been filed in the Debtors' cases. The LFG Trustee and LES Trustee are currently in the process of reviewing and reconciling these claims.

Prior to the Petition Date, LFG provided for the payment of severance pay to employees who were participants under its Severance Benefits Plan. Pursuant to LFG's April 13, 2004 Severance Benefits Plan (the "2004 Severance Plan"), employees who were with the company for more than six months but less than one year whose employment was terminated by LFG

---

[2] On April 22, 2009, this Court entered an order establishing May 18, 2009 as the deadline by which all non-governmental persons and entities must file proofs of claim against the estate of LAC. On June 23, 2009, this Court entered an order establishing July 20, 2009 as the deadline by which all non-governmental persons and entities must file proofs of claim against the estates of LandAm Title and the Southland Entities. On September 2, 2009, this Court entered an order establishing September 30, 2009 as the deadline by which all nongovernmental persons and entities must file proofs of claim against the estate of LandAm Credit. On November 13, 2009 this Court entered an order establishing December 14, 2009 as the deadline by which all non-governmental persons and entities must file proofs of claim against the estates of CTG and OneStop. Written notices of the applicable bar dates were mailed to all known creditors of LAC, LandAm Title, the Southland Entities, LandAm Credit, CTG and OneStop.

3

without cause were entitled to one week's pay. Terminated employees who were with the company for one year or more but less than two years were entitled to two weeks' pay. Terminated employees with the company between two and four years were entitled to three weeks' pay, those with the company between four and six years were entitled to four weeks' pay, those with the company between six and eight years were entitled to five weeks' pay, those with the company between eight and ten years were entitled to six weeks' pay, and those with the company for ten years or more were entitled to pay for one week per year not to exceed twenty weeks' pay.

In June 2008, when LFG began to experience financial difficulties, the LFG Board amended the Severance Plan, effective August 1, 2008 (the "2008 Severance Plan"). The 2008 Severance Plan established a one-year eligibility waiting period for coverage to commence. It also reduced the number of weeks' pay to which terminated employees were entitled. Under the 2008 Severance Plan, terminated employees who had worked for the company for one to three years were entitled to one week's pay, those who worked between three and five years were entitled to two weeks' pay, those who worked between five and seven years were entitled to three weeks' pay, those who worked between ten and twelve years were entitled to five weeks' pay, those who worked between twelve and fifteen years were entitled to six weeks' pay, those who worked between fifteen and twenty years would get seven weeks' pay, and those who worked for twenty years or more would get ten weeks' pay.

The Claimants were terminated in August 2008, October 2008, and November 2008. None of the Claimants received any severance benefits under either the 2004 Severance Plan or the 2008 Severance Plan. The Claimants each filed a proof of claim for the severance benefit provided under the 2008 Severance Plan and asserted that the Severance Claim was entitled to

4

priority in its entirety up to the capped amount of $10,950 pursuant to § 507(a)(4) of the Bankruptcy Code.

On February 16, 2010 and April 16, 2010, the LFG Trustee filed the Objections, seeking to partially reclassify the Severance Claims from priority claims under § 507(a)(4) of the Bankruptcy Code to general unsecured claims. Several *pro se* claimants filed responses to the Objections, asking that the full amount of the Severance Claims be given priority treatment.[3] On May 19, 2010, hearing was held on the LFG Trustee's Objections (the "Hearing). At the Hearing, the LFG Trustee presented evidence and made argument in support of its Objections. The Court sustained the Objections as they related to issues other than the calculation of the priority portion of the Severance Claims. The Court took the Objections under advisement as they pertained to the reclassification issue. On June 4, 2010, the LFG Trustee filed a supplemental memorandum in support of the Objections [Docket No. 3624].

**Discussion**

Section 507(a)(4) of the Bankruptcy Code allows a fourth priority for "allowed unsecured claims, but only to the extent of $10,950 for each individual or corporation, as the case may be, earned within 180 days before the date of filing the petition or the date of the cessation of the debtor's business, which occurs first, for—(A) wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual." 11 U.S.C. § 507(a)(4). The Claimants believe they are entitled to priority treatment for the full amount of their severance pay, at least up to the $10,950 capped amount. The Trustee argues that only that portion of the severance pay that was "earned within 180 days" before the Petition Date is entitled to priority status. The Trustee maintains that the value of the severance package for each Claimant must be

---

[3] Response of Keiko Lam [Docket No. 3332]; Response of Paul Yao [Docket No. 3343]; Response of Melina C. Davis [Docket No. 3344]; Response of Frenanda L. James [Docket No. 3512].

5

prorated across all of the days of all of the years of employment to calculate the rate of severance pay earned per day. That derived daily rate must then be multiplied by the number of days worked during the 180-day period to determine the proper amount of severance pay entitled to priority.[4] The result of this calculation is that terminated employees who worked many years at the company will receive a much smaller percentage of their severance package as a priority payment than will employees who worked for only a short period of time. The question for the Court is whether this absurd result is what Congress intended. The answer to this question turns on when is severance pay "earned" by an employee under § 507(a)(4) of the Bankruptcy Code.

The Bankruptcy Code does not define the term "earned" and there is no controlling case law directly on point in this jurisdiction.[5] Most of the case law from other jurisdictions addresses the entitlement to severance pay in the context of administrative expense claims under § 503(b)(1)(A) of the Bankruptcy Code[6] for employees terminated post-petition. A number of courts have held that "[s]everance pay based on length of service is an administrative expense *only* to the extent it was earned by service during the bankruptcy case." *In re Yarn Liquidation,*

---

[4] The Trustee proposes the following formula to determine the amount of severance pay that is entitled to priority: Priority Amount = Total severance package owed multiplied by the number of days the claimant was employed within the 180 period divided by the total number of days the claimant was employed with the company.

[5] "When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993). Black's Law Dictionary defines "earn" as "1. To acquire by labor, service, or performance. 2. To do something that entitles one to a reward or result, whether it is received or not." BLACK'S LAW DICTIONARY 547 (8th ed. 2004). These definitions are not particularly instructive in the context of severance pay as to *when* that service or performance or "something" is deemed to occur. Is the performance the service and labor provided by an employee during the entire course of employment or is the performance that which occurs on the day the employee shows up for work and is told he or she is no longer needed. The Court is inclined towards the second interpretation as an employee does not become "entitled" to severance pay until the unfortunate event of termination.

[6] Section 503(b)(1)(A) provides an administrative expense for "wages, salaries, and commissions for services rendered after the commencement of the case" that are "the actual, necessary costs and expenses of preserving the estate."

6

*Inc.*, 217 B.R. 544, 546 (Bankr. E.D. Tenn. 1997); *see also In re Roth American, Inc.*, 975 F.2d 949, 957 (3rd Cir. 1992) ("This court. . . has held that [severance] claims, like vacation pay claims, only have administrative priority to the extent that they are based on services provided to the bankruptcy estate post-petition."). These cases often make a distinction between severance pay due at termination in lieu of notice versus severance pay due at termination based on length of employment.[7] For the purposes of determining entitlement to an administrative expense for post-petition severance pay, "severance pay in lieu of notice is usually considered to be earned at termination, while severance pay based on length of employment is earned over the entire term of the employee's tenure." *In re Fleming Packaging Corp.*, 2004 Bankr. LEXIS 1384, at *8 (Bankr. C.D. Ill. Aug. 31, 2004). In order to calculate the amount of severance pay entitled to administrative expenses treatment, the courts in these cases use a formula much like the one proposed by the LFG Trustee: they divide the number of days worked post-petition by the total number of days worked at the company and multiply that number by the severance package to arrive at the amount entitled to administrative expense treatment.

In the Second Circuit, on the other hand, courts treat all severance pay as "earned" on the date of termination. *See, e.g., Matter of Staus-Duparquet, Inc.*, 386 F.2d 649, 651 (2nd Cir. 1967) ("Severance pay is not earned from day to day and does not 'accrue' so that a proportionate part is payable under any circumstances. After the period of eligibility is served, the full severance pay is due whenever termination of employment occurs."). This is recognized to be the minority approach, but remains the rule in the Second Circuit. *See Supplee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, 2006 U.S. Dist. LEXIS 8029, at *5-6 (S.D.N.Y. Mar. 1, 2006); Daniel Austin, *Payment of Prepetition and Post-petition Employee*

---

[7] In the instant case, these courts would probably determine that the severance pay was based on length of service, as length of service is used to calculate the number of weeks of pay that would be paid as severance benefits.

7

*Severance Benefits: Part I*, 22-2 ABIJ 1 (2003) ("The Second Circuit has held that where severance payments arise post-petition, the full amount of the payments are entitled to administrative priority. . . .  Although this is still the rule in the Second Circuit. . . , no other circuits follow it.").

In support of the Objections, the LFG Trustee relies on *In re Russell Cave Co.*, 248 B.R. 301 (Bankr. E.D. Ky. 2000), which adopts the approach described in *In re Yarn Liquidation* for determining administrative expense treatment of severance pay under 11 U.S.C. § 503(b)(1)(A) and extends the same reasoning to priority treatment under § 507(a)(3).[8]  Unlike the method of calculation proposed by the LFG Trustee, the Court in *Russell Cave* calculated the daily accrual rate by prorating the allowed amount of the severance pay over the course of one year (365 days), rather than over the course of the entire period of an employee's employment.  *In re Russell Cave*, 248 B.R. at 304 ("In order to calculate any administrative expense allowable. . . courts have used a multiplier fraction which has the number of days of employment after the petition date as the numerator and 365 as the denominator. . . .  Pre-petition priority claims for severance pay in this case are therefore limited to 90 days prior to date of filing plus date of filing or 91/365. . . applying a multiplier similar to that used to calculate administrative expense claims.").  The *Russell Cave* court's reasoning for prorating over the course of one year is unclear and the court does not lay out the terms of the severance policy.  Perhaps the court in *Russell Cave* was faced with a severance policy that awarded an additional week of severance pay for every year of employment, and, therefore, the court needed only to look at the one year period wherein the additional one week of severance pay was issued.  The LFG Trustee does not address this discrepancy between the prorated calculation used in *In re Russell Cave* and his own

---

[8] When the Bankruptcy Code was amended in 2005, § 507(a)(3) became § 507(a)(4) and the period for calculating the priority was expanded from 90 days to 180 days.

calculation. Rather, the LFG Trustee simply states that *In re Russell Cave* stands for the proposition that to determine how much severance pay is "earned" in the 180 days, the severance pay should be prorated over a period of the employee's employment.[9]

The Eastern District of Virginia has declined to adopt either of the above described approaches in the context of administrative expense treatment of severance pay for employees terminated post-petition. *See generally In re Dornier Aviation (North America), Inc.*, 2002 Bankr. LEXIS 1653 (Bankr. E.D. Va. Dec. 18, 2002). Courts in this jurisdiction look to whether the severance benefits arise from a post-petition agreement with the debtor-in-possession or a pre-petition agreement. *Id.* at *11-*22. Rather than allow a prorated amount of severance pay to be apportioned to an employee's post-petition employment as an administrative expense as the Court did in *Russell Cave*, administrative expense treatment is only allowed for severance pay under severance contracts that are either assumed by the debtor-in-possession or re-negotiated and approved post-petition. The court in *Dornier* specifically noted that because the employee's severance contract had been rejected in that case by the debtor-in-possession, "the legal effect of which was to make the breach effective as of the filing date, [the employee's] right to severance pay is properly treated as having occurred within 90 days of filing of the petition and would therefore be entitled to third-level priority. . . to the extent [of the capped amount]." *In re Dornier Aviation*, 2002 Bankr. LEXIS 1653, *28 n.11. There is no mention in *Dornier* of prorating that amount entitled to priority. As this jurisdiction does not follow the approach laid out in *Russell Cave* for calculating the severance pay entitled to administrative expense treatment, this Court sees no reason to follow the *Russell Cave* court's

---

[9] The LFG Trustee does concede that there may be more than one method for calculating the rate at which severance pay is "earned" over time but argues that the LFG Trustee's proposed method is "the most equitable."

9

extension of this formula for calculating the amount of pre-petition severance pay entitled to priority treatment.

Sections 503(b)(1)(A) and 507(a)(4) of the Bankruptcy Code are quite distinct from one another. Beyond the fact that the first governs post-petition obligations and the second pertains to pre-petition obligations, § 503(b)(1)(A) of the Bankruptcy Code does not make use of the word "earned." Rather, it refers to "services rendered." Furthermore, § 503(b)(1)(A) of the Bankruptcy Code does not expressly list "severance" as a form of "wages, salaries, and commissions." Section 507(a)(4) of the Bankruptcy uses the word "earned" twice with regard to "wages, salaries, or commissions," and very specifically notes that these wages include "vacation, *severance*, and sick pay" (emphasis added). While a number of courts applying the *In re Yarn Liquidation/Russell Cave* approach have discussed severance being "earned" over the period of employment rather than on the date of termination, they were concerned with calculating the value of the services rendered post-petition pursuant to § 503(b)(1)(A) and not with defining the word "earned" for the purposes of § 507(a)(4) of the Bankruptcy Code. *Cf. In re Pittson Stevedoring Corp.*, 40 B.R. 424, 427-8 (Bankr. S.D.N.Y. 1984) (noting that "earned within" means something different than "from services rendered within" for the purposes of § 507 of the Bankruptcy Code and that "earned" in fact "allows for some variation according to agreements between employers and employees" whereas "services rendered" does not).

In determining whether claims may be paid as administrative expenses, the Fourth Circuit Court of Appeals has instructed that "since there is a general presumption in all bankruptcy cases that all of the debtor's limited resources be equally distributed among creditors, § 503 must be narrowly construed." *In re Stewart Foods, Inc.*, 64 F.3d 141, 145 (4th Cir. 1995). This narrow construction is necessary given the fact that claimed administrative expenses can involve large

sums of money such that liberal construction could render a debtor unable to reorganize or administratively insolvent, with unsecured creditors receiving nothing. Congress has taken an entirely different approach with regard to § 507(a)(4) of the Bankruptcy Code. In lieu of imposing a narrow construction to the statute, Congress created a cap of $10,950 on each individual employee's claim. "In construction of code provisions relating to wage priorities, courts have liberally construed the statutes to accord possible intent of Congress by giving broad meaning to the provisions of the Code as to relate to the facts rather than narrow restrictive meanings." *In re Seventh Avenue South, Inc.*, 10 B.R. 289, 291 (Bankr. W.D. Va. 1981) (determining that the claimant "earned" her commissions under § 507 of the Bankruptcy Code when all factors necessary for determining commissions had occurred and when the computation was finally made, rather than over the period of employment).

The Court is not persuaded by the LFG Trustee's narrow and restrictive interpretation of the word "earned." Severance pay, such as the type provided in the 2004 Severance Plan and 2008 Severance Plan, is different than many other types of employee compensation. It is neither "earned" nor "accrued" on a daily basis. An employee who worked for LFG for a year and two days would be entitled to the same severance benefit as an employee who worked for the company for a year and 250 days. If severance pay was earned and accrued on a daily basis, one would expect the second employee to have earned more severance pay than the first. Further, severance pay is not accrued as an alternative form of compensation in any meaningful fashion. If an employee chooses to quit of his or her own volition, he or she would not have "earned" and certainly would not be entitled to any severance pay. Rather, severance pay is "earned" on the day that an employee shows up to work and is terminated by the company without cause. Prorating a severance benefit over the period of one's employment is inconsistent with the

11

manner in which severance benefits are actually paid to (or in the language of the Bankruptcy Code "earned" by) employees. Proration creates the inequitable result of punishing employees who have worked for LFG for the longest period of time.[10]

The LFG Trustee argues that because the severance package is calculated based on length of employment, severance is "earned" over the entire course of employment rather than at termination. The LFG Trustee simply fails to recognize the purpose of the severance pay. "[S]everence pay is designed to compensate employees for the economic disruption and readjustment that follows termination," whereas "[l]ength of service is a measurement – a method of calculating severance pay to compensate an employee for losses attributable to dismissal." *In re Landmark Land Company*, 136 B.R. 410, 413 (S.D.S.C. 1992). The reason for creating the tiered structure for severance pay lies "with the premise that a greater number of senior employees may suffer more hardship upon termination than junior employees. A time-proven employee who has adjusted to a certain level of economic security in his job and whose skills have been honed to a certain level of proficiency in a given position perhaps is more traumatized by loss of a job. Furthermore, there is some likelihood that a more senior employee is also an older employee who may have more difficulty marketing his or her skills." *Id.* at 413.

On a conceptual basis, the length of service method for calculating severance pay is not unlike other forms for computing the amount of an employee's compensation, such as base salary or the number of vacation hours earned each pay period. Such components routinely

---

[10] Compare the proposed treatment of the Severance Claims of Monque Laufau and Steven Fahrenkrog, to which the LFG Trustee objected in the Twenty-Fifth Omnibus Objection. Ms. Laufau worked for the company for a little over one year. Under the 2008 Severance Plan, she would be entitled to severance pay in the amount of $1,666.67, $679.66 of which the LFG Trustee proposes to treat as a § 507(a)(4) priority under the LFG trustee's proposed formula. Mr. Fahrenkrog worked for the company for over four years. He had a slightly higher salary than Ms. Laufau and was fired on the exact same day as Ms. Laufau. Mr. Fahrenkrog would be entitled to a severance pay in the amount of $3,511.03, but only $341.11 of that amount would be entitled to a § 507(a)(4) priority under the LFG trustee's proposed formula.

increase as a consequence of an employee's length of service at a company. In calculating the amount entitled to a priority under § 507(a)(4) of the Bankruptcy Code, one would not look at whether an employee "earned" wage increases throughout the course of his or her history of employment with the company. Similarly, the existence of a tiered plan such as the one laid out in the 2008 Severance Plan simply should not matter in the context § 507(a)(4) of the Bankruptcy Code. It does not matter what factors go into an employee's severance package, only what that severance package is during that 180-day period. The Court is not concerned that the reason a person may have a higher base salary is that he or she may have "earned" it throughout his or her length of service. If one takes the LFG Trustee's definition of "earned" to the logical extreme, then courts in calculating what compensation was "earned" in the 180 days would have to somehow discount base salary if it was increased over the length of employment since the increase would be deemed "earned" over the entire course of employment, and perhaps even "earned" as a result of prior employment at other companies.

The amendment of the severance benefits plan by the LFG board in 2008 to reduce the number of weeks of severance pay to which employees of the company would be entitled upon termination underscores the fact that the severance benefit had not been "earned" over the previous years of employment. As the company retained the right to unilaterally reduce the amount of the benefit at any time, it is inescapable that the nature of the benefit necessarily was not "earned" until the date of termination.[11]

## Conclusion

---

[11] For example, on July 31, 2008, an individual who had worked for nine years with the company would have been entitled to six weeks of severance pay under the 2004 Severance Plan if that individual was terminated on that date. On August 1, 2008, that same individual would only have been entitled to four weeks of severance pay under the 2008 Severance Plan if that individual was terminated on that date. If employees "earned" severance pay over their entire employment with LFG, LFG would not have been able to freely take away two weeks of "earned" severance pay.

13

For the reasons described above, the Court concludes that LFG Trustee's method for calculating the portion of the Severance Claims entitled to priority treatment is inconsistent with § 507(a)(4) of the Bankruptcy Code. Severance pay is "earned" on the date of termination.[12] The LFG Trustee's objection will be overruled and the Severance Claims will remain priority claims for each Claimant up to the amount capped by § 507(a)(4) of the Bankruptcy Code, less any amounts for which any such Claimant may already have been given § 507(a)(4) priority treatment. Any remaining claim amounts above the $10,950 cap for each Claimant shall be reclassified as a general unsecured claim.

A separate order shall be issued.

ENTERED: _____

       /s/ Kevin R. Huennekens
UNITED STATES BANKRUPTCY JUDGE

---

[12] If an employee terminated post petition is covered under a pre-petition severance benefit contract that has not been assumed post-petition, then the severance claim will be deemed to have accrued immediately prior to the Petition Date. *See In re Dornier Aviation (North America), Inc.*, 2002 Bankr. LEXIS 1653 (Bankr. E.D. Va. Dec. 18, 2002).