Jeffrey S. Sabin (*admitted pro hac vice*)
Mark M. Elliott (*admitted pro hac vice*)
Jared R. Clark (*admitted pro hac vice*)
BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, New York 10022-4689
Telephone: (212) 705-7000
Facsimile: (212) 752-5378
-and-
Everette G. (Buddy) Allen, Jr. (VSB No. 05179)
Robert Wm. Best (VSB No. 72077)
Christopher L. Perkins (VSB No. 41783)
LeClairRyan, A Professional Corporation
Federal Reserve Bank Building, 16th Floor
701 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 545-1508
Facsimile:  (804) 545-1501
  *Attorneys for the Plaintiff Bruce H. Matson, as Trustee of the LFG Liquidation Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| LandAmerica Financial Group, Inc., *et al.*, | ) | Case No. 08-35994 (KRH) |
| | ) | |
| Debtors | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| Bruce H. Matson, Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| Janet A. Alpert, Gale K. Caruso, Theodore L. | ) | |
| Chandler, Jr., Michael Dinkins, Charles H. | ) | |
| Foster, Jr., John P. McCann, Dianne M. Neal, | ) | |
| Robert F. Norfleet, Jr., Robert T. Skunda, Julious P. | ) | |
| Smith, Jr., Thomas G. Snead, Jr., Eugene P. Trani, | ) | |
| Marshall B. Wishnack, G. William Evans, Michelle | ) | |
| H. Gluck, Pamela K. Saylors, Jeffrey C. Selby, | ) | |
| Christine R. Vlahcevic, Stephen Connor, | ) | |
| Brent Allen, and Ronald B. Ramos, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Bruce H. Matson, as Trustee of the LFG Liquidation Trust (the "LFG Trustee" or the "Plaintiff"), by his attorneys, LeClairRyan, A Professional Corporation, and Bingham McCutchen LLP, submits this complaint against each of the individual defendants (collectively, the "Defendants") named herein and for his complaint alleges as follows:

## The Nature of the Case

1.     This is an action by the LFG Trustee against directors and certain officers of LandAmerica Financial Group, Inc. ("LFG") and LandAmerica 1031 Exchange Services, Inc. ("LES") who, by breaching their fiduciary duty of care, caused LFG and LES to suffer massive financial losses.

2.     LFG was a holding company that operated through its various regulated and unregulated subsidiaries (collectively, "LandAmerica").  LandAmerica's products and services facilitated the purchase, sale, transfer and financing of residential and commercial real estate.  At its height, LandAmerica was the third largest title insurance underwriter in the United States.

3.     LES, a wholly-owned LFG subsidiary, operated as a "qualified intermediary" under section 1031 of the Internal Revenue Code (as amended, the "Tax Code").  Section 1031 of the Tax Code permits a taxpayer to defer all or a portion of the gains from the disposition of business or investment property.  To qualify for this tax treatment, the taxpayer must structure the transaction as an exchange of one property for another of "like kind."  LES entered into agreements with its customers to facilitate these 1031 "like kind" exchanges ("Exchange Agreements").

4.     Under the Exchange Agreements, and in order to qualify for 1031 tax treatment, the proceeds of the LES customer's sale of property would be transferred to LES, which was to

2

maintain possession and control over such funds until such time that the taxpayer has identified a "like kind" replacement property (the "Replacement Property").   In addition, of course, to receiving favorable tax treatment, the fundamental premise -- indeed the assumption -- of these transactions was that LES would have at the ready at the appropriate time sufficient funds to consummate the customer's purchase of the Replacement Property.

5.     Since the inception of LES in the early 1990s, LES's general practice was to commingle the proceeds of one customer's sale of property with funds received in connection with the 1031 transactions of other customers.   This practice worked as long as LES had sufficient funds available when needed to complete all 1031 transactions.   The failure to complete such a transaction would cause severe reputational damage to LES and potentially to the LandAmerica brand as a whole.

6.     In February 2008, market disruptions brought with them the ominous prospect that the day might soon come when LES would be unable to fulfill all of its exchange obligations.   And yet, for at least seven months thereafter, the directors and officers of LFG and LES remained ostrich-like, with their heads buried in the sand, as the crisis worsened through neglect and unexamined missteps.

7.     Since in or about 2002, LES had invested a substantial portion of the 1031 proceeds it received from 1031 exchangers in auction rate securities ("ARS").   An ARS is a debt instrument with a long-term nominal maturity for which the interest rate is regularly set through an auction process whereby an auctioneer begins with a high asking rate, which is lowered until some participant is willing to accept the auctioneer's rate, or a predetermined reserve rate is reached (a "Dutch Auction").   During the week of February 11, 2008, the auctions for such ARS

failed, which rendered the ARS LES owned illiquid, meaning that LES could not access the securities to meet its 1031 exchange obligations.

8.      When this ARS market "froze" in mid-February, approximately 41% percent of the LES commingled assets set aside to fulfill exchange transactions became illiquid, and therefore, inaccessible.  From February 2008 forward, the extent to which and for how long LES could continue to meet its obligations to 1031 customers became a critical issue.  Despite this, LES continued to take in new customer funds with no change in operations or in any of its disclosures to its customers.  Because of the reputational inter-dependency of LFG and LES, this situation, if not addressed promptly and effectively, was a crisis in the making for all of LandAmerica.

9.      The LES Board of Directors' response to this growing crisis was non-existent.  In fact, the LES Board held not one meeting in 2008.  Two of its three board members, who were also its President and Senior Vice President, were oblivious to the situation throughout much of 2008.

10.     For at least seven months after the ARS market seized up, the LFG Board of Directors and its officers failed to become adequately informed about the extent of the crisis and failed to consider or take any timely action to avoid or mitigate the resulting damage to LFG.  Yet the gravity of the situation for LFG was -- or should have been -- obvious.  LFG and LES depended for their survival on business relationships and a reputation for reliability.  LES's default on its 1031 obligations -- if it came after months of taking in new customer funds following the ARS Freeze -- would inflict a fatal wound on the LandAmerica brand as a whole.  Yet the directors and officers of LFG blindly allowed new customer funds to continue to be taken in, without review of readily available information or deliberation.

4

11.     If the Defendants had timely and adequately informed themselves about this crisis, it would have been plain that simply allowing LES to conduct business as usual after February 2008 posed too great a risk to LFG.

12.     When LFG's officers and directors finally awoke from their slumber, the alternatives available to address the crisis had severely diminished or were lost entirely.  LES had taken in new customer money for more than seven months after the ARS market froze, so it was far too late as a matter of public and customer relations to lay that crisis at the feet of a dysfunctional market or the institutions that sold LES the ARS.  Through inaction, the officers and directors had placed LFG in a "bet the company" situation.  And bet the company they did -- in direct violation of corporate guidelines and breaching their duty of care, certain LFG officers caused $65 million to be transferred from LFG to LES in an attempt to put out the fires at LES that had been allowed to smolder for so long.  To that same end, approximately $70 million of liquid securities were transferred from LFG's title insurance subsidiaries -- the life-blood of the LandAmerica enterprise -- to LES in exchange for approximately $88 million face value of wholly illiquid ARS.

13.     Ultimately, LES's liquidity crisis was a substantial cause of LFG's downfall -- a downfall that included a failed merger, a bankruptcy filing, the sale of LFG's primary title insurance businesses at a distressed price, scores of lawsuits and multiple government investigations.  While most other leading title insurance companies survived the real estate downturn, LFG did not.  LFG met its demise because the LFG and LES directors and officers failed to properly inform themselves and failed to consider and implement any timely action to mitigate the effects of the LES liquidity crisis.  These failures caused LFG and its stakeholders to incur hundreds of millions of dollars in damages.

**Jurisdiction and Venue**

14.    This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334 and the Standing Order of the United States District Court for the Eastern District of Virginia Richmond Division referring to the Bankruptcy Judges of this District all cases and proceedings arising under Chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code").

15.    This Court has exclusive jurisdiction over this matter under Article XV of the Joint Chapter 11 Plan of LandAmerica Financial Group, Inc. and its Affiliated Debtors (as amended, the "Plan").

16.    This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. § 157(b)(2), including but not limited to, subsections B, C, H, and O.  In the event that this or any other appropriate court finds any part of this adversary proceeding to be "non-core," Plaintiff consents to the entry of final orders and judgments by this Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

17.    Venue in this District is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with cases pending under the Bankruptcy Code.

**The Parties**

18.    The LFG Trustee was appointed as of December 7, 2009 (the "Effective Date"), as a fiduciary responsible for implementing the applicable provisions of the Plan in accordance with that certain LFG Liquidation Trust Agreement, dated December 7, 2009, among the LFG Trustee, LFG and its respective Chapter 11 estate.  Upon the Effective Date, the Plan established a liquidating trust (the "LFG Trust"), which was assigned, among other assets, claims and causes

6

of action against, among other people and/or entities, pre-petition officers and directors of LFG or LES in their capacities as such.

19.     The LFG Trustee is authorized under Article 8.3 of the Plan to, among other things, prosecute the Trust Causes of Action (as defined in the Plan) held by the LFG Trust, including but not limited to the Other Litigation (as defined in the Plan), and to object to and/or seek to subordinate any claims against LFG.  The Plan provides that, except for the purposes expressly set forth in the Plan, the LFG Trustee shall not be deemed a successor in interest of LFG for any purpose except as otherwise expressly set forth in the Plan.  The order entered on or about November 23, 2009 confirming the Plan provides that all assets transferred to the LFG Trust by LFG were transferred free and clear of all claims, liens, encumbrances, charges or other interests, except as expressly set forth in the Plan.

20.     Upon information and belief, Defendant Janet A. Alpert ("Alpert") is a resident of the State of Michigan.  At all times relevant, Alpert served as a member of the LFG Board of Directors.  Alpert also previously served as President and Vice Chairman of the LFG Board of Directors.  At all times relevant, Alpert also served as a member of LFG's Investment Funds Committee, a committee of the LFG Board of Directors (the "Investment Funds Committee").

21.     Upon information and belief, Defendant Gale K. Caruso ("Caruso") is a resident of the State of Maine.  At all times relevant, Caruso served as a member of the LFG Board of Directors.  At all times relevant, Caruso also served as a member of the Investment Funds Committee and the LFG Audit Committee, a committee of the LFG Board of Directors (the "Audit Committee").  On or about May 13, 2008, Caruso became Chairman of the Investment Funds Committee.

22.     Upon information and belief, Defendant Theodore L. Chandler, Jr. ("Chandler") is a resident of the Commonwealth of Virginia.  At all times relevant, Chandler served as President and Chief Executive Officer of LFG.  At all times relevant, Chandler also served as Chairman of the LFG Board of Directors.  At all times relevant, Chandler also served as a member of LFG's Risk Committee, a committee of LFG management (the "Risk Committee").

23.     Upon information and belief, Defendant Michael Dinkins ("Dinkins") is a resident of the Commonwealth of Virginia.  At all times relevant, Dinkins served as a member of the LFG Board of Directors.  At all times relevant, Dinkins also served as a member of the Investment Funds Committee.

24.     Upon information and belief, Defendant Charles H. Foster, Jr. ("Foster") is a resident of the Commonwealth of Virginia.  Foster formerly served as Chairman of LFG's Board of Directors and Chief Executive Officer of LFG.  At all times relevant, Foster served as a member of the LFG Board of Directors.  At all times relevant, Foster also served as a member of the Investment Funds Committee.

25.     Upon information and belief, Defendant John P. McCann ("McCann") is a resident of the Commonwealth of Virginia.  At all times relevant, McCann served as a member of the LFG Board of Directors.  At all times relevant until on or about May 13, 2008, McCann served as a member of the Investment Funds Committee and as Chairman of that Committee.  At all times relevant, he also served as a member of the Audit Committee.

26.     Upon information and belief, Defendant Dianne M. Neal ("Neal") is a resident of the State of North Carolina.  At all times relevant, Neal served as a member of the LFG Board of Directors.  At all times relevant, Neal also served as a member of the Audit Committee.

8

27.    Upon information and belief, Defendant Robert F. Norfleet, Jr. ("Norfleet") is a resident of the Commonwealth of Virginia.  At all times relevant, Norfleet served as a member of the LFG Board of Directors.  At all times relevant, Norfleet also served as a member of the Audit Committee.

28.    Upon information and belief, Defendant Robert T. Skunda ("Skunda") is a resident of the Commonwealth of Virginia.  At all times relevant, Skunda served as a member of the LFG Board of Directors.  At all times relevant, Skunda served as a member of the Audit Committee.

29.    Upon information and belief, Defendant Julious P. Smith, Jr. ("Smith") is a resident of the Commonwealth of Virginia.  At all times relevant, Smith served as a member of the LFG Board of Directors.  At all times relevant, Smith also served as a member of the Investment Funds Committee.

30.    Upon information and belief, Defendant Thomas G. Snead, Jr. ("Snead") is a resident of the Commonwealth of Virginia.  At all times relevant, Snead served as a member of the LFG Board of Directors.  At all times relevant, Snead served as Chairman of the Audit Committee.

31.    Upon information and belief, Defendant Eugene P. Trani ("Trani") is a resident of the Commonwealth of Virginia.  At all times relevant, Trani served as the "Lead Director" of the LFG Board of Directors.  The duties of LFG's Lead Director included, among other things, ensuring that the Board operated independently of management and that directors received on a timely basis the reports, background materials, and resources necessary or desirable to assist them in carrying out their responsibilities.  The Lead Director was also responsible for making recommendations about the retention of consultants reporting to the entire Board.

32.    Upon information and belief, Defendant Marshall B. Wishnack ("Wishnack") is a resident of the Commonwealth of Virginia.  At all times relevant, Wishnack served as a member of the LFG Board of Directors.

33.    Upon information and belief, Defendant G. William Evans ("Evans") is a resident of the Commonwealth of Virginia.  At all times relevant, Evans served as Executive Vice President and Chief Financial Officer of LFG.  At all times relevant, Evans was a member of the LES Board of Directors.  At all times relevant, Evans also served as a member of the Risk Committee.

34.    Upon information and belief, Defendant Michelle H. Gluck ("Gluck") is a resident of the Commonwealth of Virginia.  At all times relevant, Gluck served as Executive Vice President and Chief Legal Officer of LFG.  From in or about June 2008, Gluck also served as Chairperson of the Risk Committee and served as "Meeting Chair" of the Risk Committee prior to that time.

35.    Upon information and belief, Defendant Pamela K. Saylors ("Saylors") is a resident of the Commonwealth of Virginia.  Beginning on or about April 3, 2008 and at all times relevant thereafter, Saylors served as President of the Commercial Services division of LFG and served as President of LES.  Saylors also served as a member of the LES Board of Directors from April 3, 2008 through all further times relevant.  Upon information and belief, at all times relevant, Saylors served as a member of the Risk Committee.

36.    Upon information and belief, Defendant Jeffrey C. Selby ("Selby") is a resident of the Commonwealth of Virginia.  Selby served as President of LES and as a member of the LES Board of Directors at all times relevant until April 3, 2008.  Selby also served as President of the

Commercial Services division of LFG and upon information and belief, at all times relevant until on or about April 3, 2008, as a member of the Risk Committee.

37.     Upon information and belief, Defendant Christine R. Vlahcevic ("Vlahcevic") is a resident of the Commonwealth of Virginia.  At all times relevant, Vlahcevic served as a Senior Vice President and Corporate Controller of LFG.  At all times relevant, Vlahcevic also served as a member of the Risk Committee.

38.     Upon information and belief, Defendant Stephen Connor ("Connor") is a resident of the State of Illinois.  At all times relevant, Connor served as a Senior Vice President of LFG.  At all times relevant, Connor also served as a Senior Vice President of LES and as a member of the LES Board of Directors.  At all times relevant, Connor was responsible for managing the day-to-day operations of LES.

39.     Upon information and belief, Defendant Brent Allen ("Allen") is a resident of the Commonwealth of Virginia.  At all times relevant, Allen served as a Vice President and National Underwriting Counsel of LES.

40.     Defendant Ronald B. Ramos ("Ramos") is a resident of the Commonwealth of Virginia.  At all times relevant, Ramos served as a Senior Vice President and Treasurer of LFG.  At all times relevant, Ramos also served as a Vice President and Treasurer of LES.

## Factual Background

### LFG's Structure and Operations

41.     LFG, a corporation organized under the laws of the Commonwealth of Virginia, operated through its various regulated and unregulated subsidiaries.  LandAmerica's products and services facilitated the purchase, sale, transfer and financing of residential and commercial real estate.  LandAmerica had a broad-based customer group, which included residential and

11

commercial buyers and sellers, real estate agents and brokers, developers, attorneys, mortgage brokers and lenders, and title insurance agents.  LandAmerica operated through hundreds of offices and a network of thousands of active agents throughout the United States and also conducted business in Mexico, Canada, the Caribbean, Latin America, Europe, and Asia.

42.     LandAmerica was the third largest title insurance underwriter in the United States and issued title insurance policies primarily through two principal title underwriting subsidiaries: Commonwealth Land Title Insurance Company ("CLTIC") and Lawyers Title Insurance Corporation ("LTIC").  LFG also owned two other title insurance underwriters:  Commonwealth Land Title Insurance Company of New Jersey, and United Capital Title Insurance Company (together with CLTIC and LTIC, collectively, the "Underwriting Companies").  Together, these operations made up approximately 85% to 90% of LFG's annual revenue.

43.     In addition to underwriting title insurance, LFG subsidiaries provided, among other things, appraisals, home inspections, and warranties for residential real estate transactions and performed specialized services primarily for its national and regional mortgage lending customers, such as real estate tax processing, flood zone determinations, consumer mortgage credit reporting, default management services, and mortgage loan subservicing.

**LFG's Capital Structure**

44.     As of November 26, 2008, LFG had liabilities in excess of $650 million.  Certain of these liabilities arose under long-term debt instruments, including: (i) a revolving credit facility with $100 million in unsecured obligations outstanding (the "Credit Facility"); (ii) two series of senior unsecured notes with a principal amount of approximately $150 million; and (iii) two issues of convertible senior notes with a principal amount of approximately $225 million.

45.     LES was not an obligor with respect to any of the LFG obligations set forth above.

46.     The Credit Facility was governed by a credit agreement, dated July 28, 2006, as subsequently amended, among LFG and a syndicate of lenders (the "Credit Agreement") led by SunTrust Bank, Inc. ("SunTrust") as Administrative Agent.  As of September 30, 2008, the amount outstanding under the Credit Agreement was $100 million.

**LES**

47.     LES was a wholly-owned subsidiary of LFG organized under the laws of the State of Maryland.

48.     Traditionally, LES accounted for less than one percent of the revenue of LFG and its subsidiaries.  LES was not part of the centralized cash management system that LFG had in place for it and its subsidiaries, including the Underwriting Companies.

49.     Prior to November 26, 2008 (the "Petition Date"), LES was a qualified intermediary for like-kind exchanges consummated by taxpayers (each a "1031 Exchange") pursuant to Section 1031 of the Tax Code.

50.     A 1031 Exchange allows a taxpayer to defer the payment of tax that otherwise would be due upon the realization of a gain on the disposition of business or investment property.  In a typical transaction, an exchanger assigns his rights as seller under a purchase agreement for the disposition of business or investment property (the "Relinquished Property") to a qualified intermediary such as LES.  The purchaser of the Relinquished Property transfers the net sales proceeds directly to the qualified intermediary.

51.     The exchanger must identify the Replacement Property within 45 days of selling the Relinquished Property.  The exchanger has 180 days from the date of the sale of the

13

Relinquished Property to close on the purchase of the Replacement Property. The qualified intermediary purchases the Replacement Property and then transfers the Replacement Property to the exchanger. In the event that the Replacement Property is not identified or closed within the specified time periods, the qualified intermediary pays an amount equal to the net sales proceeds to the exchanger. This series of transactions is governed by a written exchange agreement executed by the exchanger and the qualified intermediary.

52.    During the course of its operations, LES entered into Exchange Agreements with its customers ("Exchangers") whereby LES would acquire the net proceeds of the sales of a Relinquished Property (the "Exchange Funds") in accordance with requirements of the Tax Code in order to facilitate a like-kind exchange. Pursuant to the Exchange Agreements, LES took sole and exclusive possession, dominion, control and use of all Exchange Funds, including interest, if any, earned on the Exchange Funds until the earlier of the consummation of a like-kind exchange or such other date or event as provided in the Exchange Agreements.

53.    In connection with its business as a qualified intermediary for like-kind exchanges, LES maintained a general, multipurpose checking account at SunTrust since 1992. This checking account was titled in LES's own name, bearing an account number with the last four digits "3318" (the "Operating Account"). LES used the Operating Account as its general operating account.

54.    The Operating Account received cash from various sources including in the form of (i) Exchangers' exchange funds, (ii) service fees charged to Exchangers, (iii) interest, and (iv) returns on LES's investments. LES disbursed funds from the Operating Account to pay its expenses, to pay dividends to LFG, to make investments in other investment vehicles, and to

14

purchase replacement property for Exchangers who had not insisted that their exchange funds be deposited in segregated accounts.

55.    To maximize its revenue LES used funds in the Operating Account to invest in a variety of short-term investments, including money market mutual funds, short-term bonds, certificates of deposit, floating rate notes, and ARS.   The ARS were held in brokerage investment accounts at SmithBarney and SunTrust Robinson Humphrey.

56.    ARS are structured to provide liquidity through a Dutch Auction process by allowing existing investors to either rollover their holdings, whereby such investors would continue to own their respective securities, or liquidate their holdings by selling such securities at par.

**ARS Market Freeze**

57.    In February 2008, the market for ARS froze, meaning that there was not enough demand to sell the securities that holders of ARS desired to sell (the "ARS Freeze").  That same month, the ARS Freeze was publicized nationally and in attention-grabbing terms.  For example, *The Wall Street Journal* reported on Tuesday, February 12, 2008 that the market for ARS, "another seemingly safe corner of the credit markets, was succumbing to the credit crunch."  The article further stated that ARS had been shunned by investors as auctions were left to "fail," and that during the preceding five days, ARS were unable to garner investors' interest, "leaving roughly $3 billion of such securities in a sort of limbo" in the hands of investors who "might have intended to get rid of them."  Liz Rappaport and Karen Richardson, *Student-Loan Issues Under Stress*, Wall St. J., Feb. 12, 2008, at C1.  *The Wall Street Journal* reported on the ARS Freeze again the next day.   Liz Rappaport and Randall Smith, *Credit Woes Hit Funding For Loans To Students*, Wall St. J., Feb. 13, 2008, at A1.

15

58.     As a result of the ARS Freeze, LES was unable to liquidate its ARS at any price near their par value, which caused a significant LES liquidity problem that posed serious risks to both LES and LFG (the "LES Liquidity Crisis").

59.     As of March 31, 2008, out of a total LES commingled portfolio of approximately $612 million, approximately $290.5 million was invested in illiquid ARS.   Ultimately, the illiquidity of the ARS resulted in LES's inability to meet Exchanger obligations and was the cause of LES's bankruptcy and at a minimum a significant contributing factor to the Chapter 11 filing by LFG.

**The 1031 Industry**

60.     By 2008, the 1031 industry had experienced a number of scandals, which caused considerable public concern about the reliability and solvency of 1031 companies.   The scandals should have alerted the directors and officers of LES and LFG to the fact that the 1031 industry was under increased scrutiny and that the reputational consequences of a failure to meet 1031 Exchange obligations could be dire.

61.     Thus, by March 2008, LES and LFG directors and officers were aware that Edward H. Okun ("Okun") had been indicted by a federal grand jury in the Eastern District of Virginia in Richmond for defalcations relating to his operation of The 1031 Tax Group, LLC (the "1031 Tax Group") that caused the company to fail and file for relief under Chapter 11 of the Bankruptcy Code.   Indeed, this was reported in the Richmond Times-Dispatch on March 18, 2008.   Further, as of about the time of the ARS Freeze, LES and LFG directors and officers were aware, or should have been aware, of other 1031 Exchange companies, such as San Diego Realty Exchange, Inc., Southwest Exchange, Inc. ("Southwest Exchange"), and Qualified Exchange Services, Inc. that had been caught up in scandals.

16

62.    By way of example, Connor reviewed as early as May 29, 2007 an article in *The Wall Street Journal*, the first two paragraphs of which read:

> A popular tax-deferral trick for real-estate investors is facing scrutiny as key middlemen in the strategy run into financial trouble.
>
> The problems are starting to leave investors with significant losses, and raising the possibility of increased oversight of a lightly regulated corner of the real-estate investment world.  In at least one instance, a firm that helps investors defer taxes this way is facing allegations of fraud.

Peter Lattman and Kemba Dunham, *Tax Strategy for Real Estate Hits Rocky Turf*, Wall St. J., May 26, 2007, at B1.

63.    By way of further example, Connor reviewed in June 2007 an online real estate article from www.CoStar.com entitled, *Looting the Escrow Account: A 1031 Cautionary Tale Continued*, which discussed the Okun scandal.  Additionally, on or about September 12, 2007, Ramos reviewed an article from Bloomberg entitled, *Retirement Funds Vanish as Bankruptcies Hit Tax-Deferred Scheme*, which addressed the 1031-related scandals at Southwest Exchange and the 1031 Tax Group.

64.    In fact, LES's marketing materials sought to capitalize on the above-referenced 1031-related scandals.  In the very first paragraph of a 2008 marketing paper LES stated:

> Recent events have caused many advisors to recognize the need to better assess the solvency and fidelity of the Qualified Intermediaries (QI) used to structure 'safe harbor' IRC § 1031 deferred exchanges, commonly referred to as 1031 exchanges.

**LES Conducts Business As Usual**

65.    Notwithstanding the above, after the ARS Freeze in February 2008, LES continued to accept new money from Exchangers, which money was commingled with other Exchange Funds and used to meet existing 1031 Exchange obligations.  After the ARS Freeze, and until late November 2008, not one of the following actions was taken:   (i) revising

17

disclosures in marketing material to Exchangers in light of the ARS Freeze; (ii) segregating all new Exchange Funds; (iii) revising scripts for LES employees in the field working with Exchangers; (iv) increasing oversight and control of LES personnel who interacted with customers; (v) commencing legal action against the financial institutions that sold the ARS to LES and/or otherwise monetizing the ARS; (vi) closing LES; and/or (vii) filing LES for bankruptcy.   In short, LES conducted business as usual.   At no time, let alone in or about February 2008, did the Board of Directors of LES so much as consider whether LES should make any changes in the way it did business, in view of the fact that close to half of its commingled assets were no longer accessible for purposes of meeting its 1031 Exchange obligations to Exchangers.

66.     Shortly after the ARS Freeze, as a matter of customer and public relations, the LES Liquidity Crisis could have been attributed to a dysfunctional marketplace and/or to the financial institutions that sold the ARS to LES.   In March 2008, another qualified intermediary that engaged in 1031 Exchange transactions and was suffering from the ARS Freeze, Alaska Exchange Corporation ("AEC"), acted in response to the dire market conditions by doing exactly that.   AEC sent to its customers a letter dated March 19, 2008 stating as follows:

> Dear Valued Client:
>
> We must regretfully inform you that your monies currently invested in trust with UBS Financial Services, Inc. are frozen by UBS.   Alaska Exchange Corporation is in contact with several attorneys, both locally and nationally, and is actively pursuing all avenues to achieve full liquidity of your funds.

67.     The letter went on to describe the history of AEC's investment of customer funds, through AEC's financial advisor, UBS, in ARS.   The letter described the ARS Freeze, and concluded:

> Alaska Exchange Corporation deeply regrets the current circumstances.   We are

> actively pursuing all avenues of recourse to acquire the liquidity in your investment. At this time, we do not know when these funds will be available for your use in your upcoming exchange. We will endeavor to keep you informed as events develop. Please feel free to contact me if you desire additional information.

No later than March 31, 2008, LES officers, including Stephen Connor and Brent Allen, were aware of AEC's letter to its customers regarding the ARS Freeze.

68.     On or about April 2, 2008, AEC brought suit against UBS in Alaska state court, alleging, *inter alia*, that UBS had defrauded AEC and its investors by materially misrepresenting the liquidity of, and risks associated with, ARS. The litigation was later settled for an undisclosed sum. AEC continues to operate as a qualified intermediary in 1031 Exchanges.

69.     But after LES, on the other hand, continued business as usual and had for several months taken in hundreds of millions of dollars of new Exchange Funds and used such funds to meet obligations to earlier Exchangers, such a potential strategy could no longer save the LandAmerica brand. In the weeks following the ARS Freeze, the directors and officers of LFG and LES had alternatives to keep the LES Liquidity Crisis from causing LFG irreparable harm. Yet, the officers and directors of LES and LFG did not inform themselves about those alternatives, and as LES continued operating over the ensuing months using new Exchange Funds to meet prior customer obligations, alternatives to address the LES Liquidity Crisis diminished if not evaporated.

### LES's Declining Commingled Balance

70.     Since in or about August 2007 the balance of LES's commingled customer funds experienced a dramatic and continuing decline. After a modest net inflow of commingled funds in January, the commingled balance resumed its relentless decline throughout 2008, with net outflows of tens of millions of dollars a month.

71.     Beginning in August 2007 and in every single month from the time of the ARS Freeze in February until LES and LFG filed for bankruptcy in November, there was a substantial monthly net outflow of commingled Exchange Funds.

72.     A commingled balance that stood at approximately $1.1 billion in August 2007, was just above $600 million in April 2008, was below $500 million at the end of June and July 2008, and was below $400 million before September.  From February 2008 on, the percentage of LES's commingled balance that was made up of ARS dramatically increased because the balance in the Operating Account steadily declined while approximately $290.5 million of Exchange Funds remained invested in illiquid ARS.  The net outflows meant that LES's practice of using new Exchange Funds to meet existing 1031 Exchange obligations was doomed.  And when the end came, the fallout would be catastrophic.  Nevertheless, neither the LES nor LFG Boards nor their respective officers undertook to timely inform themselves as to whether LES's practice of business as usual and simply using new Exchange Funds to pay out on existing obligations was likely to fail, as it ultimately did, what the consequences of that failure would have been for LFG, or what actions should have been taken to avoid or mitigate the impending crisis.

**The Directors and Officers of LES and LFG Fail to Take or Consider Timely Action and Fail to Adequately Inform Themselves About the LES Liquidity Crisis**

73.     The LES Board did not hold a single meeting at anytime in 2008, notwithstanding a crisis that ultimately brought scandal and ruin to both LES and LFG.

74.     On February 18, 2008, LFG's Investment Funds Committee met.  The Investment Funds Committee was charged with monitoring the investments of LFG and its subsidiaries. According to the Committee's charter, this responsibility included the duty to review the "alignment of asset duration to liabilities."  Though the ARS market froze the prior week, the

Investment Funds Committee did not address the LES Liquidity Crisis at its February 18 meeting.

75.     On February 18, 2008 the Audit Committee met.  There was no discussion of the LES Liquidity Crisis.

76.     On February 19, 2008, the LFG Board of Directors met.  LFG officers, including but not limited to, Ramos and Evans, were aware of the ARS Freeze as of this date.  On information and belief, one or more members of the LFG Board of Directors were also aware of the ARS Freeze as of this date.  At this meeting, the Board of Directors was briefed on corporate risks, and there was discussion of the Risk Committee and the "Risk Dashboard" (as discussed in more detail below).  In connection with this briefing, the Board received a written presentation entitled "Strategic Risk Discussion," which, among other things, included a "Risk Dashboard" and a document entitled "Top 10 Corporate Risks," which listed "Brand Image and Reputation" as a top corporate risk.  There was no discussion of the LES Liquidity Crisis.

77.     The Risk Committee was scheduled to meet on February 25, 2008.  The meeting was canceled because no risks were identified or considered for discussion at that time.  The primary objective of the Risk Committee, as ultimately set forth in writing in the Risk Committee charter, was to identify various risks including "operational, legal, regulatory, market and reputation" that threaten the achievement of LFG's objectives.   Specifically, the Risk Committee members were charged with the duty and responsibility, among other things, to "review and recommend action on significant risk issues, trends and practices that have enterprise-wide implications."  In connection with these duties, the Risk Committee created a so-called "Risk Dashboard" to identify and track potential risks to LFG and responses to said risks. The Risk Committee reported to the Audit Committee, and the Board of Directors had ultimate

oversight responsibility with respect to the management of LFG risks.  The "Risk Dashboard" was to be reviewed by the Audit Committee on a quarterly basis.  The Risk Committee was scheduled to meet monthly throughout 2008.  Notwithstanding the LES Liquidity Crisis that emerged two weeks prior, the LFG Risk Committee adjourned until its next regularly-scheduled meeting in March.

78.     The LFG Board of Directors did not meet in March 2008.

79.     On March 25, 2008, Stephen Connor, a member of LES's Board of Directors and a Senior Vice President of LES and LFG who was responsible for the daily business functions of LES, wrote to his regional managers:

> We are just about to the end of the 1st quarter of 2008 and things are very bleak for LandAmerica Exchange Services [LES] . . . [a]s you can plainly see our business volume is off by almost 50% same period year over year.  This is a trend that is not going to change anytime soon.

80.     On March 26, 2008, the Risk Committee met.  There was no discussion of the LES Liquidity Crisis.

81.     On April 21, 2008, the Risk Committee met.  There was no discussion about the LES Liquidity Crisis.

82.     The Investment Funds Committee met on April 28, 2008.  At that meeting Ramos, Treasurer of LFG and LES, made a presentation regarding LES's ARS investment.  The Investment Funds Committee requested that Ramos provide a "contingency plan that outlines the options available to allow the company to obtain liquidity related to these securities."  No such "contingency plan" was submitted to the Investment Funds Committee until, at the earliest, October 1, 2008 -- more than five months later -- and the Investment Funds Committee did not request that such a plan be delivered to it any sooner.  In the meantime, the LES Liquidity Crisis

22

persisted, LES continued to use new Exchange Funds to meet existing 1031 Exchange obligations, and the net outflow of LES funds continued.

83.     As of the April 28 Investment Funds Committee meeting, the LES commingled balance had experienced a substantial and continuous decline.   On information and belief, members of the Investment Funds Committee were aware of, or had sufficient information to make inquiries about, the foregoing.

84.     On April 28, 2008 the Audit Committee met.  The Audit Committee reviewed the minutes from the April 21, 2008 Risk Committee meeting.  There was no discussion of the LES Liquidity Crisis.  There was no suggestion that the LES Liquidity Crisis should be included as a new strategic risk on the Risk Dashboard.

85.     On April 29, 2008 the LFG Board of Directors met.  The minutes of that meeting record only the following with respect to the LES Liquidity Crisis:

> The [Investment Funds] Committee reviewed the 1031 exchange portfolio.  Out of a portfolio of $612 million, approximately $290 million is in ARS, which are collateralized by student loans.  Although these securities are not liquid, presently they do not pose a concern because the 1031 portfolio always has a base amount of money it is holding.  The Board discussed the ARS issue, including the impact on the 1031 business and options in case the portfolio shrinks to below $300 million.  Mr. McCann stated that the Committee will continue to monitor these securities.

86.     In connection with this meeting, there were no written presentations regarding the LES Liquidity Crisis or the LES commingled balance, such as the recent historical trend of such balances and/or projections.

87.     As of April 29, 2008, at the latest, the LFG Board of Directors:  (i) was aware that LES invested in ARS; (ii) was aware of the ARS Freeze; (iii) was aware that nearly half of LES's portfolio was illiquid and therefore could not be used to meet 1031 Exchange obligations; (iv) was aware of, or had sufficient information to make inquiries about, the fact that LES was

relying on the inflow of funds from new 1031 Exchange transactions to fund the completion of existing 1031 Exchange transactions; (v) was aware, as reported by CFO Evans on April 29, 2008, that the real estate market was in decline, "recession loom[ed]," and that there was "much uncertainty in the market" which made "forecasting difficult;" (vi) was aware of the Okun scandal and/or other 1031-related scandals, which brought increased scrutiny on 1031 companies; and (vii) was aware of, or had sufficient information to make inquiries about, the impact that an alleged scandal at LES could have on the LandAmerica brand and on LFG.

88.    Alternatively, LFG officers, including but not limited to Chandler, Evans, Ramos, Connor and Gluck failed to timely inform the LFG Board of Directors about certain material facts, including one or more of the facts referenced above.

89.    At this April 29th meeting, the LFG Board of Directors exercised no independent judgment and failed to take or consider any timely action with respect to the LES Liquidity Crisis.  Further, the members of the LFG Board of Directors failed to carry out their oversight responsibilities and failed to adequately inform themselves with respect to the LES Liquidity Crisis.  Thus, the members of the LFG Board of Directors failed to:

- take measures to inform themselves about the legal, financial and reputational risks of LES using new Exchange Funds after the ARS Freeze to meet existing 1031 Exchange obligations;

- adequately inform themselves as to whether there likely would be sufficient new Exchange Funds to pay out existing obligations in the weeks and months ahead, including but not limited to seeking a report on same from Connor and/or other persons with first-hand knowledge of LES's business;

- implement any oversight process for keeping themselves informed on a regular or ongoing basis about LES's liquidity, notwithstanding that one or more directors acknowledged the need for ongoing review of the situation;

- inform themselves as to whether LES had made, or should make, any changes to its business in light of the LES Liquidity Crisis such as segregating all new Exchange Funds and/or revising marketing materials or other disclosures to Exchangers;

- request an analysis of the LES Liquidity Crisis and potential solutions to the same, such as potential claims against the financial institutions that sold the ARS to LES;

- inform themselves about the extent of LFG's legal liability, if any, in connection with LES's 1031 Exchange obligations;

- inform themselves as to what alternatives were then available to LFG to avoid or mitigate the effect the LES Liquidity Crisis might have on the rest of LFG and LFG's stakeholders, including but not limited to closing LES and/or filing LES for bankruptcy; and/or

- seek independent advice with respect to any of these matters, notwithstanding that one or more directors understood the need for obtaining expert advice.

90.    Likewise, LFG's and LES's officers failed to adequately inform themselves about the foregoing matters as of April 2008.

91.    In the meantime, the LES Liquidity Crisis persisted, LES continued to use new Exchange Funds to meet existing 1031 Exchange obligations and the net outflow of LES funds continued.

92.    On April 29, 2008, LFG filed with the United States Securities and Exchange Commission (the "SEC") its Form 10-Q for the quarterly period ended March 31, 2008 (the "First Quarter 10-Q"), signed by Vlahcevic, Chandler and Evans.  The First Quarter 10-Q stated, among other things:

> As a result of liquidity issues in the global credit and capital markets, the auctions for our ARS failed beginning February 2008 when sell orders exceeded buy orders. Our portfolio of ARS is comprised entirely of student loan ARS of which 99.1% is guaranteed by government-sponsored enterprises. As of March 31, 2008, these investments were rated "A" or higher. We believe the failures of these auctions do not affect the value of the collateral underlying the ARS and we continue to earn and receive interest on our ARS at contractually set rates. However, we have liquidity exposure to these securities to the extent that we would be required to utilize these securities to satisfy the purchase of properties. Based on the credit quality of the underlying securities and the amount of funds we have historically held, we believe the risk of loss will not have a material adverse effect on our financial position or results of operations.

LFG Quarterly Report (Form 10-Q), at 18 (Apr. 29, 2008).

93.     On May 13, 2008, the Investment Funds Committee met.  The meeting lasted twenty-five minutes.  There was no discussion of the LES Liquidity Crisis.  McCann announced at this meeting that he was stepping down as Chairman of the Investment Funds Committee and that he would be replaced by Caruso.

94.     On May 13, 2008, the LFG Board of Directors met.  Chandler was re-elected as Chairman of the Board.  There was no discussion of the LES Liquidity Crisis.

95.     Again, the LFG Board of Directors exercised no independent judgment and failed to take or consider any timely action with respect to the LES Liquidity Crisis.  Further, the members of the LFG Board of Directors failed to carry out their oversight responsibilities and failed to adequately inform themselves with respect to the LES Liquidity Crisis.  Thus, the members of the LFG Board of Directors failed to:

- take measures to inform themselves about the legal, financial and reputational risks of LES using new Exchange Funds after the ARS Freeze to meet existing 1031 Exchange obligations;

- adequately inform themselves as to whether there likely would be sufficient new Exchange Funds to pay out existing obligations in the weeks and months ahead, including but not limited to seeking a report on same from Connor and/or other persons with first-hand knowledge of LES's business;

- implement any oversight process for keeping themselves informed on a regular or ongoing basis about LES's liquidity, notwithstanding that one or more directors acknowledged the need for ongoing review of the situation;

- inform themselves as to whether LES had made, or should make, any changes to its business in light of the LES Liquidity Crisis such as segregating all new Exchange Funds and/or revising marketing materials or other disclosures to Exchangers;

- request an analysis of the LES Liquidity Crisis and potential solutions to the same, such as potential claims against the financial institutions that sold the ARS to LES;

- inform themselves about the extent of LFG's legal liability, if any, in connection with LES's 1031 Exchange obligations;

- inform themselves as to what alternatives were then available to LFG to avoid or mitigate the effect the LES Liquidity Crisis might have on the rest of LFG and LFG's stakeholders, including but not limited to closing LES and/or filing LES for bankruptcy; and/or

- seek independent advice with respect to any of these matters, notwithstanding that one or more directors understood the need for obtaining expert advice.

96.     In the meantime, the LES Liquidity Crisis persisted, LES continued to use new Exchange Funds to meet existing 1031 Exchange obligations, and the net outflow of LES funds continued.

97.     The Risk Committee was scheduled to meet on May 22, 2008.  The meeting was canceled because no risks were identified or considered for discussion at that time.

98.     The LFG Board of Directors did not meet in June, 2008.

99.     On June 23, 2008, the Risk Committee met.  There was no discussion of the LES Liquidity Crisis.

100.    On July 8, 2008, Stephen Connor sent an e-mail to LES President and Risk Committee member Pamela Saylors regarding another scandal in the 1031 marketplace involving a company called Vesta.  Connor stated:  "We got another high profile defalcation that is going to hit the QI Industry *again*." (Emphasis in original).

101.    On July 21, 2008, the Risk Committee met.  There was no discussion of the LES Liquidity Crisis.

102.    As of July 25, 2008, the total approximate value of the commingled portfolio was just below $500 million, of which approximately $290 million -- or in excess of fifty-eight percent of the total value of the commingled portfolio -- was invested in ARS.  Based upon these figures and if the trend of net outflows had continued at its then-current pace, LES would have been unable to meet exchange obligations within approximately two months.  The Investment

Funds Committee, the Audit Committee and the full LFG Board of Directors had sufficient information to cause them to make inquiries about the foregoing.  Because of their inadequate attention to the matter, the members of the Investment Funds Committee, Audit Committee, and the full LFG Board of Directors failed to inform themselves of the foregoing in July 2008. Likewise, most or all of LFG's officers failed to inform themselves of the foregoing in July 2008.

103.    On July 28, 2008, the Investment Funds Committee met.  The meeting lasted one hour and forty-five minutes.   Among other items, the minutes of the meeting record the following:

> The Committee requested Management present an update of the LandAmerica 1031 Exchange Services Inc.'s portfolio holdings and corresponding ratings, liquidity issues, and funding scenarios at the **October** meeting.

(Emphasis added).

104.    There was no substantive discussion of the LES Liquidity Crisis at the July 28, 2008 Investment Funds Committee meeting.   Instead, the Investment Funds Committee postponed consideration of the issue until its scheduled October 27, 2008 meeting.   As the Investment Funds Committee could have readily determined as of this meeting, the impact of the LES Liquidity Crisis would not wait for the October 27 meeting.  Ultimately, the Investment Funds Committee had to call a special meeting to take place on October 1, 2008.

105.    The Audit Committee met on July 28, 2008.  There was no discussion of the LES Liquidity Crisis, and there was no suggestion that the LES Liquidity Crisis should be included as a new strategic risk on the Risk Dashboard.

106.    The LFG Board of Directors met on July 29, 2008.  Among other items, the minutes of that meeting record the following:

> The [Investment Funds] Committee discussed the ARS in the Company's 1031 exchange services portfolio.  Ms. Caruso noted that the ARS have stayed illiquid longer than anyone expected.  At its **October** 2008 meeting, the Committee will review the 1031 portfolio to **gain an understanding** of the timing of commitments, and management will present the Company's options if greater liquidity is needed.

(Emphasis added).

107.    Thus, more than five months after the LES Liquidity Crisis arose, the members of the Investment Funds Committee and the members of the full LFG Board of Directors had yet to "gain an understanding" of the LES Liquidity Crisis and had still not informed themselves of options to solve or mitigate the LES Liquidity Crisis.  Not only that, the LFG Board of Directors was content to delay the issue for another three months, to October 28, 2008.

108.    Consistent with its prior practice, at the July 29, 2008 meeting, the LFG Board of Directors exercised no independent judgment and failed to take or consider any timely action with respect to the LES Liquidity Crisis.  Further, the members of the LFG Board of Directors failed to carry out their oversight responsibilities and failed to adequately inform themselves with respect to the LES Liquidity Crisis.  Thus, the members of the LFG Board of Directors failed to:

- take measures to inform themselves about the legal, financial and reputational risks of LES using new Exchange Funds to meet existing 1031 Exchange obligations;

- inform themselves as to whether LES had made, or should make, any changes to its business in light of the LES Liquidity Crisis, such as segregating all new Exchange Funds and/or revising marketing materials or other disclosures to Exchangers;

- seek to inform themselves as to whether there would likely be sufficient new Exchange Funds to pay out existing LES obligations through October 28, when the LFG Board of Directors was scheduled to meet again;

- implement any oversight process for keeping themselves informed on a regular or ongoing basis about LES's liquidity;

- inform themselves about the extent of LFG's legal liability, if any, in connection with LES's exchange obligations; and/or

- inform themselves as to what alternatives were then available to LFG to avoid or mitigate the effect of the LES Liquidity Crisis on the rest of LFG and LFG's stakeholders.

They put off an analysis of the LES Liquidity Crisis and potential solutions to same until late October.  And, yet again, the LFG Board of Directors did not seek independent advice as to any of these matters.

109.    Likewise, LFG's and LES's officers failed to adequately inform themselves about the foregoing matters as of July 2008.

110.    In the meantime, the LES Liquidity Crisis persisted, LES continued to use new Exchange Funds to meet existing 1031 Exchange obligations, and the net outflow of LES funds continued.  As the LFG Board could have readily determined as of this meeting, the culmination of this crisis likely would not wait for the October 28 meeting.

111.    On July 30, 2008, LFG filed its Form 10-Q for the quarterly period ended June 30, 2008.  LFG officers Vlahcevic, Chandler and Evans signed this filing.  It stated, among other things:

> Beginning February 2008, the auctions for ARS failed when sell orders exceeded buy orders as a result of liquidity issues in the global credit and capital markets. The portfolio of ARS is comprised entirely of student loan ARS of which 99.1% is guaranteed by government-sponsored enterprises. We believe the failures of these auctions do not affect the value of the collateral underlying the ARS. However, we have liquidity exposure to these securities to the extent that we would be required to utilize these securities to satisfy the purchase of properties. In the unlikely event we may need to provide liquidity to the like-kind exchange funds, we may purchase a portion of the ARS for our investment portfolio. Depending on the fair value of the ARS at the time of purchase, we may incur an impairment charge. As of June 30, 2008, we estimate that the ARS were valued at discounts up to 25% of par value based on discounted cash flow models and other available information.  Based on the amount of funds we have historically held, we believe the risk of loss will not have a material adverse effect on our financial position.

LFG, Quarterly Report (Form 10-Q), at 19-20 (July 30, 2008).

112.    On August 18, 2008, the Risk Committee met.  There was no discussion of the LES Liquidity Crisis.

113.    On information and belief, a meeting of the Risk Committee was scheduled for September 22, 2008 and was cancelled.

**The Crisis Does Not Wait for the Scheduled October LFG Board Meeting**

114.    A special meeting of the LFG Board of Directors was held on September 26, 2008.  After more than seven months of inattention to the issue, the LES Liquidity Crisis had metastasized to the point where LFG's survival was now in question.  The percentage of the commingled LES portfolio made up of illiquid ARS had grown to over 80%.  With LFG's viability as an independent company now very much in doubt, the purpose of the meeting was to discuss the initial steps to pursue a potential sale of LFG to the Markel Corporation.  Among other things, the minutes of that meeting record the following:

> Mr. Chandler reviewed with the Board new developments adversely impacting the Company's financial condition.  First, due to the Company's current below-book-value stock price, the Company is facing a potential write down of up to $170 million in goodwill in the third quarter, 2008. . . . Second, as management has publicly disclosed and discussed with the Board, the Company's 1031 Exchange portfolio contains $300 million in illiquid auction rate securities ("ARS").  Because commercial transactions have virtually ceased, the net cash outflow from the 1031 portfolio in the last two months has averaged $100 million per month.  The Company will soon have to fund from liquid assets outflows from the 1031 portfolio and, due to market-to-market accounting rules, write down the ARS by up to $60 million, or 20% of their value.
>
> * * * *
>
> The Company is quickly approaching a zone where external circumstances may take matters out of the Board's control.

115.    At this meeting the LFG Board created a Special Committee of the Board (the "Special Committee") to explore transaction opportunities, "including a potential acquisition of

31

[LFG]." CEO Chandler recommended that the Special Committee retain J.P. Morgan Securities, Inc. ("J.P. Morgan") and the law firm Wachtell, Lipton, Rosen & Katz to advise it in its efforts.

116.    The LES Liquidity Crisis that supposedly did not "pose a concern" in April 2008 and in July could wait until late October for any meaningful analysis by the LFG Board of Directors was viewed by late September as a primary reason why LFG likely would no longer remain an independent company.  Yet, even though the LES Liquidity Crisis had evolved to this crisis point, the members of the LFG Board of Directors continued to fail to exercise independent judgment and to inform themselves about the legal and reputational risks of LES using new Exchange Funds to meet existing 1031 Exchange obligations.  The LFG directors did not inform themselves as to whether LES had made, or should make, any changes to its business in light of the LES Liquidity Crisis, such as segregating all new Exchange Funds and/or revising marketing materials or other disclosures to Exchangers.  They also did not seek to inform themselves as to whether there likely would be sufficient Exchange Funds to pay out existing 1031 Exchange obligations in the weeks and months ahead.  They also did not inform themselves about the extent of LFG's legal liability, if any, in connection with LES's 1031 Exchange obligations. They did not implement any oversight process for keeping themselves informed on a regular or ongoing basis about LES's liquidity.  And they still did not seek to inform themselves about whether there were viable causes of action against the financial institutions that sold the ARS to LES.

### Corporate Guidelines Are Violated

117.    On October 25, 2006, the LFG Board of Directors met and unanimously approved a resolution titled, "Levels of Authority" (the "Authority Guidelines").   The Authority Guidelines required, among other things, prior review and consent by the LFG Board of

Directors or its Executive Committee for, among other things: (a) any capital or general operating expenditure exceeding $10 million; (b) any loan exceeding $10 million; or (c) any other material contract or obligation which is not in the ordinary course of business and which provides for a monetary commitment exceeding $10 million. Additionally, prior review and consent by the Chairman of the LFG Board, the Chief Executive Officer of LFG and the Chief Financial Officer of LFG was required for, among other things: (a) any capital or general operating expenditure above $5 million but not exceeding $10 million; (b) any loan above $5 million but not exceeding $10 million; and (c) any other material contract or obligation which is not in the ordinary course of business and which provides for a monetary commitment above $5 million but not exceeding $10 million.

118.    From September 25 through October 17, 2008, LFG officers Evans and Ramos caused LFG to transfer a total of $65 million to LES in an ultimately unsuccessful attempt to plug LES's liquidity hole (the "$65 Million Transfer") caused by the ARS Freeze that began in February 2008.

119.    The $65 Million Transfer was composed of the following transactions: (i) a $35 million transfer from LFG to LES, dated September 25, 2008; (ii) a $15 million transfer from LES to LFG, dated September 30, 2008; (iii) a $10 million transfer from LFG to LES, dated October 8, 2008; (iv) a $10 million transfer from LFG to LES, dated October 14, 2008; (v) a $15 million transfer from LFG to LES, dated October 17, 2008; and (vi) a $10 million transfer from LFG to LES, dated October 17, 2008.

120.    None of these transfers were approved as required by the Authority Guidelines. Specifically, not one of the transfers exceeding $10 million received the required LFG Board

approval and not one of the transfers in the amount of $10 million received the required approval

from both Chandler and Evans.

121.    On the day of the last of the transfers,  October 17, 2008, LFG and LES Treasurer

Ramos sent the following e-mail to LFG Chief Legal Officer Gluck, LFG Chief Financial

Officer Evans and LFG CEO and Board of Directors Chairman Chandler:

> As mentioned to Bill and Michelle early this evening, I made the decision to
> move $25 million from LFG holdco to LandAmerica Exchange late this afternoon
> in anticipation of meeting 1031 Exchange disbursement requests we received
> totaling approximately $22 million for early next week (2 of the largest remaining
> deals on the books are closing).  This brings the total amount transferred from
> LFG to the Exchange Company to $55 million.  I decided to transfer the money to
> the Exchange Company this afternoon given the recent dialogue surrounding the
> criticality that we continue to meet our customer's demands for money in a timely
> manner.
>
> ****
>
> At close of business today, following the activity outlined above, LandAmerica
> holdco has about $17 million on hand.  The Exchange Company has about $30
> million in cash on hand, a $10 million par value bond (worth about $9 million)
> and the $290.5 million in ARS. With the decision not to open any more
> commingled accounts and the large disbursements early next week, I suspect we
> have a week, two at most, before the Exchange Company runs out of cash if we
> make all remaining holdco cash available.

122.    Gluck, Evans, Ramos and Chandler failed to consult the Authority Guidelines at

or about the time of the above-referenced e-mail and at or about the time of any of the transfers

set forth above.  LFG Chief Legal Officer Gluck failed to provide legal advice to the LFG Board

of Directors or to any of LFG's officers in connection with the above-referenced transfers and

the Authority Guidelines.

123.    LFG records as well as statements of certain of its officers offered multiple and

contradictory characterizations of the nature of the $65 Million Transfer as either a loan to LES

or as a capital contribution.  Ultimately, the directors and officers did not cause LFG to take any official position as to the nature of this disposition of virtually all of its cash.

124.    On information and belief, the $65 Million Transfer was funded in part by a net $40 million dividend paid to LFG by CLTIC on September 5, 2008 (the "CLTIC Dividend").

125.    The LFG Board of Directors and its relevant officers were on notice of the transfers that made up the $65 Million Transfer but nevertheless failed to deliberate about and vote on the transfers as required by the Authority Guidelines.

126.    Thus, by way of example, a written presentation to the Investment Funds Committee at a specially called meeting on October 1, 2008, referenced that LFG might "lend money to LES from current assets" and "use the company's cash that could otherwise be used for operations."

127.    Members of the LFG Board of Directors and LFG officers also became aware of a large portion of the $65 Million Transfer at an October Special Committee meeting.  According to minutes of a meeting held by the Special Committee on October 15, 2008, "Mr. Chandler advised that the Company had advanced $20.0 million to date to the 1031 Exchange Company."  In fact, by October 15, 2008, a net $40 million had been advanced by LFG to LES.  Dinkins, Snead, Wishnack, Chandler, Evans, Gluck and Smith were present at the October 15, 2008 Special Committee meeting.  Similarly, a November 2, 2008 J.P Morgan presentation to the LFG Board of Directors stated that LFG had transferred $65 million to LES.

128.    Despite being aware of the transfers making up the $65 Million Transfer, the LFG Board of Directors exercised no independent judgment.  The directors did nothing to:  (i) inform themselves as to whether such transfers were in the best interest of LFG, its stockholders and its creditors; that is, whether the transfers would rectify LES's liquidity problem or at best merely

serve to buy a short delay before LES's then inevitable collapse, while costing the LFG stakeholders $65 million; or (ii) enforce the Authority Guidelines.

129.    The creditors of LFG were not the same as the creditors of LES.

**A Mid-October Wake-up Call**

130.    On October 16, 2008, LFG officers, Chandler, Evans, Gluck and Ramos met in Atlanta with SunTrust, one of LFG's primary lenders, to discuss LFG's third quarter results and the impact of these results on certain loan covenants in LFG's Credit Agreement with SunTrust. During the meeting, Brian Edwards, an attorney with SunTrust, stated that his institution was wary of entering into any further transactions with LFG because LES's practice of using Exchange Funds to pay existing 1031 Exchange obligations, at a time when much of its assets were illiquid, might be viewed as fraudulent.  Remarkably, this was the first time that it occurred to these LFG officers that this practice raised significant legal issues.

131.    The very next day, Friday, October 17, a decision was made by one or more of LFG officers Chandler, Gluck and/or Evans that LES should not take in any more Exchange Funds unless such funds were segregated, that is, not used to meet 1031 Exchange obligations of other Exchangers.  Accordingly, that same day, Gluck communicated this directive to Ramos (the "Segregated Funds Directive").  As set forth in paragraph 121 above, and in response to the Segregated Funds Directive, Ramos transferred a total of $25 million from LFG to LES to meet near-term LES Exchange obligations.

132.    On this same day, October 17, 2008, a memorandum was sent to the Risk Committee (the "October 17 Memorandum") that identified for the very first time the LES Liquidity Crisis as a "new strategic risk" on its proposed "Risk Dashboard" as of September 30, 2008.  The Risk Dashboard indicated that a response to this risk was yet to be determined and

that the responses remained "under development." According to the October 17 Memorandum, this "new strategic risk" was added to the proposed "Risk Dashboard" based on discussions with Chief Legal Officer Gluck and was to be presented at the scheduled October 20th Risk Committee meeting. That meeting was cancelled on October 19th. On information and belief, the Risk Committee held no meetings after August 18, 2008.

133. On Saturday, October 18, Evans, Gluck and Ramos telephoned Connor, Senior Vice President of LFG and LES and a member of LES's Board of Directors. Chandler later joined the call. On the call, Connor was questioned about a decrease of funds in LES's commingled bank account. One or more of the officers on the phone were unaware that, at Connor's initiative, in anticipation of a change in an IRS regulation, 468(B), LES had recently begun to segregate all new Exchange Funds in excess of two million dollars (the "468(B) Policy Change").

134. On the October 18 call, or within a day or two thereafter, Connor was instructed by one or more of Chandler, Gluck and/or Ramos to reverse the 468(B) Policy Change.

135. Connor became aware of the extent of the LES Liquidity Crisis for the first time on the above-described October 18 call, fully eight months after the ARS Freeze occurred. Further, despite having primary responsibility for LES's operations and serving as an LES director, Connor had failed to inform himself about the LES Liquidity Crisis for at least eight months. He had been unaware until April 2008 that LES even invested in ARS. That same October 18th weekend, Connor telephoned LES President and director Pamela Saylors to advise her of the LES Liquidity Crisis, of which she also was previously unaware. Saylors had been unaware until the summer of 2008 that LES even invested in ARS. Connor and Saylors had

wholly abdicated their duties as LES officers and directors to inform themselves about the LES Liquidity Crisis.

136.    On Monday, October 18, 2008, Chandler and/or Gluck reversed the Segregated Funds Directive issued only one business day prior.  The Segregated Funds Directive and the 468(B) Policy Change both were reversed because Chandler, Evans, Ramos and/or Gluck concluded that LES could not continue to operate unless it continued the practice of using new Exchange Funds to meet 1031 Exchange obligations to existing Exchangers.

137.    Notwithstanding that all three LES directors, Saylors, Connor and Evans, were or became aware of the foregoing, the LES Board of Directors still did not hold a meeting.

138.    On or about October 20, 2008, Connor, among other LES officials, was asked by Gluck to sign a non-disclosure agreement concerning LES's investments in ARS.  Connor called this request "a test, like a McCarthy test."  LFG was circling the wagons.

**The LES Liquidity Crisis Had Become an LFG Disaster**

139.    On October 20, 2008, LFG's Chairman and CEO, Chandler, wrote to the United States Treasury Secretary, the Honorable Henry M. Paulson, Jr., requesting financial assistance for LFG under the Emergency Economic Stabilization Act of 2008.  In this letter, Chandler in dramatic terms articulated that the long-festering LES Liquidity Crisis was catastrophic for LFG as a whole:

> If LandAmerica cannot immediately translate its auction rate securities into the cash necessary to fund such 1031 real estate transactions, hundreds of innocent businesses and individuals will be needlessly harmed, hundreds of scheduled real estate closings will not occur, and there will be a further erosion of public confidence in local real estate deals that are critical to re-building the American economy. **Moreover, the ultimate result of LandAmerica's present inability to sell auction rate securities in its portfolio could be a disastrous chain reaction that would cause customers to cease doing business with it and its state regulated insurers.**

38

(Emphasis added).

**The ARS Swaps**

140.    In late October 2008, LFG facilitated the transfer of $40.1 million in liquid and marketable securities from LTIC and CLTIC to LES in exchange for illiquid ARS having a par value equal to $55.6 million (the "October ARS Swap").

141.    In November 2008 an additional approximately $29.9 million in liquid and marketable securities were transferred from CLTIC and LTIC to LES in exchange for illiquid ARS having a par value equal to $33.2 million (the "November ARS Swap," together with the October ARS Swap, the "ARS Swaps").

142.    The effect of the ARS Swaps was to diminish the value of the Underwriting Companies by tens of millions of dollars.  In that regard, on October 18, 2008, shortly before the October ARS Swap, Peter Kolbe, LFG Senior Vice President and Government Affairs Counsel, transmitted to Gluck a draft letter resigning as an LFG officer.  His draft resignation stated, among other things:

> For some time now I have expressed grave concerns about pulling assets out of the LFG insurers.  I am now forced to opine that not one penny of surplus should come out of those insurers for any reason - their surplus is too low and it must be preserved to protect policyholders.  I believe this with every ounce of my being. After the financial information I learned today (actually 10/19/08), I am no longer able to argue to any regulator that one penny should come out of the LFG insurers, including the swap of ARS into those insurers.  The risk to policyholders is too great.  My position exists even if the regulator approves such a swap.

143.    On November 10, 2008, LFG filed its Form 10-Q for the quarterly period ended September 30, 2008 (the "Third Quarter 10-Q") with the SEC.  It was signed by Vlahcevic, Chandler and Evans.  The Third Quarter 10-Q reflects the belated realization that the LES Liquidity Crisis indeed posed disaster for LFG:

> . . . . Because 1031 unconditionally obligated for the return and availability of like-kind exchange proceeds and related interest in commingled accounts to the

taxpayer, our current inability to sell ARS at par value to satisfy these obligations required us for the first time in the third quarter of 2008 to perform under contingent obligation by providing liquidity to the commingled like-kind exchange fund accounts.

During the quarter ended September 30, 2008, we advanced $20.0 million of cash to the like-kind exchange funds. Subsequent to September 30, 2008, we advanced an additional $45 million of cash to the like-kind exchange funds. In order to provide liquidity to the 1031 exchange company going forward, we have or will contribute approximately $88.8 million par value of auction rate securities to our title insurance subsidiaries (with the approval of the Nebraska Department of Insurance) in exchange for liquid assets with an approximate value of $70.0 million. The Nebraska Department of Insurance approved the contribution of an approximately $34.2 million par value of auction rate securities to our title insurance subsidiaries in exchange for liquid assets with an approximate value of $30.0 million upon the expiration of Fidelity's due diligence contingency. In connection with the execution of the merger agreement, a subsidiary of Fidelity also agreed to provide us with a $30.0 million stand-by credit facility for our 1031 exchange company secured by auction rate securities held for the benefit of customers of that subsidiary. The stand-by credit facility cannot be drawn upon until the expiration of Fidelity's due diligence contingency on November 21, 2008.

While we cannot predict the timing or amounts of additional ARS we may need to acquire from the like-kind exchange funds, we believe that it is probable we will need to make such acquisitions or provide other forms of liquidity to the like-kind exchange funds to satisfy our contingent obligation. As a result, we have recorded at September 30, 2008 a contingent obligation and corresponding estimated loss of $60.5 million, which represents our estimate at September 30, 2008 of the probable loss we will incur to satisfy our contingent obligation to return or make available exchange funds and related interest to taxpayers. We estimated the probable loss based on the shortfall between the estimated fair value and the par value of the ARS held in the like-kind exchange funds at September 30, 2008.

****

While significant attention is currently being given to redemptions or other means of restoring liquidity to auction rate securities by the issuers of the securities, the financial markets and federal and state government officials, no assurance can be given as to the timing or amount of redemptions or the return of liquidity for these securities. **Accordingly, our estimate of the liability resulting from our contingent obligation may increase in the near term, and the resulting losses could be significant.**

LFG, Quarterly Report (Form 10-Q), at 29-30 (Nov. 10, 2008) (emphasis added).

### LFG's Failed Merger

144.    The officers and directors of LFG and LES had allowed the LES Liquidity Crisis to fester for at least seven months and had failed to timely or adequately inform themselves about a wide array of issues and alternatives that were relevant to nothing short of the continued viability of both LFG and LES.  By the fall, the day of reckoning was fast upon them -- they knew that it would only be a matter of weeks or days before LES would run out of funds with which to meet its obligations, and when that day came, they also knew there would be nothing left of LFG's reputation.  And as of October 16, Chandler, Evans, Gluck and Ramos finally realized that the reputational and legal fallout could be considerable.  In short, they had a ticking time bomb on their hands and they needed to hand it off before it was too late.  Their inaction led to desperation, which only served to exacerbate the damages that LFG and its stakeholders would ultimately incur.  LFG's efforts to find a buyer took place under extremely distressed circumstances, rather than in an orderly fashion.

145.    On November 7, 2008, LFG executed a merger agreement (the "Prior Merger Agreement") with Fidelity National Title Insurance Company, Chicago Title Insurance Company and Fidelity National Financial, Inc. (collectively, "Fidelity").   Under the Prior Merger Agreement, Fidelity was to acquire LFG as a whole, including all of its assets and associated liabilities.  The Prior Merger Agreement provided for a two-week diligence and exclusivity period, from November 7, 2008 until November 21, 2008, during which time LFG was restrained from undertaking any negotiations with other potential suitors.  The Prior Merger Agreement provided that Fidelity could terminate the merger transaction if it was not satisfied with what it uncovered during the diligence period (the "Diligence Out").

146.    LFG's officers and directors consented to Fidelity's request for the Diligence Out as a part of the Prior Merger Agreement because of their self-created desperation.

**The End Comes to LES and LFG**

147.    At the close of the diligence and exclusivity period on November 21, 2008, Fidelity notified LFG that it was exercising its right, by virtue of the Diligence Out provision, to terminate the Prior Merger Agreement.

148.    The Prior Merger Agreement was the last alternative to provide a liquidity solution for LES.  When it fell through, there were no more.

149.    On November 24, 2008, LES closed its business.  In a letter to its customers, LES wrote:

Dear Valued Customer,

We regret to inform you that, effective November 24, 2008, LandAmerica 1031 Exchange Services Company, Inc. ("LES") is accepting no new customers and is terminating its operations.  Although the total par value of our 1031 Exchange funds exceeds the value of all funds received from our customers, portions of the 1031 funds are invested in illiquid auction rate securities.  Our inability to sell or borrow against these securities has precipitated our decision to terminate operations.

LES has long invested 1031 deposits only in Investment Grade Securities Rated A or stronger, including auction rate securities backed by federally guaranteed student loans.  Our goal for the exchange funds has been to maintain the full liquidity necessary to meet customer withdrawal demands.  The auction rate securities in our exchange funds, which were sold to us by certain financial institutions, were highly liquid for many years.  As has been widely publicized, the auction rate securities market froze earlier this year, and that extenuating circumstance prevents us from liquidating the auction rate securities held in the exchange funds.

We understand that this situation is detrimental to you, and we can only assure you that we have taken every reasonable step possible to avoid the problem, including pursuing numerous liquidity options to no avail.  You will be provided soon with details regarding the establishment of a process for submitting claims relating to exchange funds.

This situation involves only LES and not any other LandAmerica companies. Specifically, LandAmerica's title insurers are highly regulated companies, with legal identities and assets completely separate from LES. These insurers have more than sufficient assets to meet their obligations to policyholder and escrow customers.

150. In sum, LES declared that it shut its doors on account of the ARS Freeze, which began more than nine months earlier, before all of its then-existing Exchangers had become LES customers.

151. The LandAmerica brand had suffered a mortal wound. As reported in The Wall Street Journal:

> Customers are furious that LandAmerica continued to solicit business and put customers' money in the commingled funds even after the company had admitted its problems with auction-rate securities months earlier. "That dog shouldn't have hunted anymore. And all we got was a dear customer letter," said Larry Campbell, a Madison Heights, Mich., retail-store developer who placed several million dollars with LandAmerica.

Alex Frangos, *LandAmerica's Collapse Leaves Investors Looking for Cash*, Wall St. J., Dec. 3, 2008, at C10.

**NEDOI Rehabilitation**

152. Also on Monday, November 24, 2008, the Nebraska Department of Insurance ("NEDOI"), the insurance regulatory agency governing LTIC and CLTIC, filed a petition with the Court of Lancaster County, Nebraska, to place LTIC and CLTIC in rehabilitation. The petition was sustained. The basis for the petition was NEDOI's finding that LTIC and CLTIC were in "hazardous financial condition." On information and belief, the foregoing condition was caused in substantial part by the $65 Million Transfer, the ARS Swaps, and/or the CLTIC Dividend.

**LFG and LES File for Bankruptcy**

153.     On November 26, 2008, LFG and LES filed voluntary petitions in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court") for relief under the Bankruptcy Code.

154.     The Affidavit of G. William Evans, Chief Financial Officer Of LandAmerica Financial Group, Inc. And Vice President of LandAmerica 1031 Exchange Services, Inc. In Support Of Chapter 11 Petition And First Day Pleadings stated, among other things, that "LFG's liquidity has been significantly constrained as a result of difficulties faced by LES."

155.     As of the Petition Date, LES had approximately $46 million of commingled funds (excluding the illiquid ARS) with which to satisfy approximately $191 million of commingled 1031 Exchange obligations.

**The Sale of the Underwriting Companies**

156.     After Fidelity terminated the Prior Merger Agreement, the LFG Board of Directors scrambled to arrange for an alternative transaction to secure some value for a deteriorated LFG.   Accordingly, LFG re-opened negotiations with Fidelity about a potential transaction involving the sale of LFG's stock in the Underwriting Companies.

157.     On November 25, 2008, Fidelity executed the Stock Purchase Agreement (the "SPA") with LFG whereby Fidelity agreed to acquire, among other things, the stock of the Underwriting Companies from LFG in exchange for cash consideration of approximately $298 million.

158.     On December 12, 2008, LFG and Fidelity executed an amended and restated version of the SPA (the "Revised SPA").   The Revised SPA set the total purchase price for the

Underwriting Companies' stock at approximately $298 million ($16 million of which was subject to a delayed closing).

159.    On December 17, 2008, the Bankruptcy Court granted Debtor's Motion for Order Approving Related Stock Purchase Agreement.

160.    On December 17, 2008, Fidelity attempted to withdraw from the sale by claiming, among other things, that a material adverse change had occurred with respect to the Underwriting Companies' businesses.   Thereafter, on December 18, 2008, LFG filed an adversary complaint against Fidelity alleging anticipatory repudiation of the Revised SPA and requesting that Fidelity be ordered to specifically perform under the terms of the Revised SPA.

161.    After a hearing on December 21, 2008, the Bankruptcy Court approved a further amended version of the Revised SPA (the "Final SPA"), which was the result of a settlement between LFG and Fidelity.   The sale of the Underwriting Companies to Fidelity closed on December 22, 2008.

162.    Pursuant to the terms of the Final SPA, LFG received:   (i) approximately $147 million in cash (which included $59 million transferred to LandAmerica's Cash Balance Plan in accordance with the terms of the Final SPA); (ii) 3,176,620 shares of common stock in Fidelity National Financial, Inc. ("FNF"); and (iii) a subordinated promissory note issued by FNF in an initial principal amount equal to $50 million due in 2013.   The proceeds received were far less than the fair (non-distressed) value of the title subsidiaries in December 2008.   Further, the value of the Underwriting Companies had by December decreased considerably, due in no small part to the ARS Swaps and the CLTIC Dividend.

**LFG and LES Sued and Investigated In Connection with their Handling of the LES Liquidity Crisis**

163.    Multiple adversary proceedings were filed against LFG and/or LES on account of LES using new Exchange Funds to pay out on existing 1031 Exchange obligations after the ARS Freeze.   The LFG and LES bankruptcy estates have been depleted by millions of dollars to defend against or otherwise address these complaints.

164.    Further, the LFG and LES bankruptcy estates have been depleted by millions of dollars to respond to and address multiple government investigations arising out of the LES Liquidity Crisis.

**The Officers and Directors of LES and LFG Breached Their Fiduciary Duties**

165.    The LES Board of Directors completely abdicated its fiduciary duties, as it held not one meeting in 2008, despite a crisis that led to the ruin of both LES and LFG.   The LES Board of Directors exercised no independent judgment and failed to take or consider any timely action with respect to the LES Liquidity Crisis.   The LES Board of Directors failed to timely or adequately inform itself about issues pertaining to the LES Liquidity Crisis.   This, despite the fact that Connor, Selby and Saylors were aware of the increased scrutiny of the reliability and solvency of 1031 companies.   Indeed, the members of the LES Board of Directors failed to inform themselves about LES's investments and its treasury functions.   The LES Board of Directors included Evans, Senior Vice President Connor (who ran LES's day-to-day operations), Selby and later Saylors (both of whom served as LES Presidents).   Nevertheless, the LES Board of Directors had little or no knowledge about its own company's funds and investments upon which its viability depended.

166.    The LES Board of Directors also failed to exercise adequate oversight and control over LES and its officers with respect to the LES Liquidity Crisis.   For example, the LES Board

46

of Directors did not request that LES Treasurer Ramos inform it about the details of LES's commingled balance.  In turn, LES Treasurer Ramos failed to inform the LES Board of Directors about such details.  LES officers Connor, Saylors, Selby, Ramos and Allen failed to exercise adequate oversight and control over LES employees regarding the LES Liquidity Crisis, including, but not limited to, employee communications with 1031 Exchange customers.

167.   Brent Allen, who was responsible for providing legal advice to LES, failed to advise the LES Board of Directors to meet and to undertake other actions to fulfill their fiduciary duties.  Though he was aware of the ARS Freeze as of April 2008, he failed to provide or seek advice with respect to the legal risks of LES using new Exchange Funds to fulfill existing 1031 Exchange obligations.

168.   The LFG Board of Directors exercised no independent judgment and failed to take or consider any timely action with respect to the LES Liquidity Crisis.

169.   LFG directors and officers failed to act in good faith and grossly mismanaged LFG when such directors and officers breached their responsibility to carry out their oversight responsibilities and to adequately inform themselves about the effects of the LES Liquidity Crisis.  Among other things, the LFG directors and officers:

(i)  failed, from February 2008 through mid-October 2008, to inform themselves about the legal, financial and reputational risks of LES's practice of taking in new Exchange funds and using such funds to pay out on 1031 obligations to other customers at a time when a substantial portion of LES's portfolio was inaccessible;

(ii)  failed, from February until, at the earliest, late September 2008, to adequately inform themselves about LES's liquidity, including but not limited to LES's ability, or lack thereof, to meet future 1031 Exchange obligations;

(iii)  failed, from February 2008 until, at the earliest, October 2008, when it was too late, to inform themselves about the liquidity alternatives for LES;

(iv)  failed, from February 2008 until, at the earliest, mid-October 2008 to inform themselves about the legal and other alternatives to monetize the ARS owned by LES;

(v)  failed, from February 2008 until, at the earliest, October 2008, when it was too late, to inform themselves about and to consider or take any action to contain or mitigate the effect of the LES Liquidity Crisis on LFG, such as, by way of example, placing LES in bankruptcy, selling or merging LES, causing LES to cease taking in or commingling new customer funds, making revisions to LES marketing materials in order to fully apprise its customers of the LES Liquidity Crisis and/or other means to "ringfence" the LES liquidity crisis from LFG;

(vi)  failed to seek independent legal and financial advice regarding any of the above on a timely basis, if at all; and

(vii)  failed to consult and to enforce the Authority Guidelines mandating that transfers above certain amounts require Board or officer approval.

170.    LFG Chief Legal Officer Gluck failed until October 16, 2008 -- when the lawyer for another company, SunTrust, prompted her to do so -- to provide or seek advice with respect to the legal implications of LES using new Exchange Funds to fulfill existing 1031 Exchange obligations, given the ARS Freeze.  Gluck failed until late October to determine legal alternatives for LFG and LES to monetize the ARS.  Gluck also failed to investigate and provide advice with respect to the Authority Guidelines and the $65 Million Transfer.

171.    Members of the Risk Committee breached their fiduciary duties by failing to inform themselves about the LES Liquidity Crisis and potential alternatives to address same.

48

This failure to timely and adequately inform themselves of issues pertaining to the LES Liquidity Crisis occurred despite the fact that the Risk Committee's own charter imposed a duty, among other things, to "review and recommend action on significant risk issues, trends and practices that have enterprise-wide implications."

172.    Members of the Audit Committee breached their fiduciary duties by failing to inform themselves about the LES Liquidity Crisis and potential alternatives to address same. This failure to timely and adequately inform themselves of issues pertaining to the ARS Freeze occurred despite the fact that the Audit Committee was charged with, among other things, oversight responsibility with respect to the Risk Committee and regular review of the Risk Dashboard.

173.    Members of the Investment Funds Committee breached their fiduciary duties by failing to inform themselves about the LES Liquidity Crisis and potential alternatives to address same.  This failure to timely and adequately inform themselves of issues pertaining to the ARS Freeze occurred despite the fact that the Investment Funds Committee was charged with, among other things, monitoring LES's investments and portfolio.

**The Defendants' Proofs of Claim**

174.    Each of the Defendants has filed one or more proofs of claim against the LFG estate (collectively, the "Defendants' Claims").

175.    The Defendants' Claims include certain proofs of claim filed by Defendants Gluck, Saylors, Ramos, Chandler, Evans, and Vlahcevic (collectively, the "Change of Control Defendants") in connection with the execution of certain Change of Control Employment Agreements dated October 27, 2008 (collectively, the "Change of Control Agreements"),

49

between each of these Defendants and LFG (these proofs of claim collectively, the "Change of Control Claims").

176.    Defendants have filed proofs of claim for indemnification.  Those claims are deemed disputed pursuant to Section 7.9(b) of the Plan.

### COUNT I
### (LES Directors' Breach of Fiduciary Duty/Duty of Care)

177.    The LFG Trustee incorporates by reference and realleges each and every allegation contained above in paragraphs 1 through 176, as though fully set forth herein.

178.    The LES Board of Directors owed fiduciary obligations to LES and to LFG, the sole shareholder of LES.  By reason of their fiduciary relationships, the LES Board of Directors owed LES and LFG the highest obligations of care, oversight, reasonable inquiry, supervision and informed decision making.

179.    After the ARS Freeze, as the LES Liquidity Crisis worsened, the LES Board of Directors failed to hold even one meeting in 2008 to address the LES Liquidity Crisis.  The members of the LES Board of Directors failed to timely inform themselves about the LES Liquidity Crisis and failed to consider any timely action to address same.  Further, the LES Board of Directors failed to take any action to prevent and/or mitigate the effect of the LES Liquidity Crisis on LFG and LES by, for example, causing to be implemented on a timely basis one or more of the measures set forth in paragraph 65.

180.    Additionally, the LES Board of Directors failed to exercise adequate oversight and control over LES's officers with respect to the LES Liquidity Crisis, as evidenced by LES officers and/or LES employees having taken no action with respect to the LES Liquidity Crisis.

181.    The members of the LES Board of Directors breached their fiduciary duties by failing to exercise their duties in good faith, in the best interests of the corporation, and with the

care that an ordinarily prudent person in a like position would have used under similar circumstances.

182.    As a direct and proximate result of the LES directors' breach of their fiduciary obligations to LES and LFG, LFG, as LES's sole shareholder, sustained significant damages including, *inter alia*, the destruction of hundreds of millions of dollars of LFG enterprise value; the $65 Million Transfer; the decrease in value of LFG's Underwriting Companies due to the ARS Swaps; the cost of defending litigation brought by Exchangers; the cost of responding to multiple government investigations arising out of the LES Liquidity Crisis; and the substantial diminution of the value of other LFG subsidiaries.

### COUNT II
### (LES Officers' Breach of Fiduciary Duty/Duty of Care)

183.    The LFG Trustee incorporates by reference and realleges each and every allegation contained above in paragraphs 1 through 176, as though fully set forth herein.

184.    LES officers owed fiduciary obligations to LES and to LFG, the sole shareholder of LES.  By reason of their fiduciary relationships, LES officers owed LES and LFG the highest obligations of care, oversight, reasonable inquiry, supervision and informed decision making.

185.    After the ARS Freeze, as the LES Liquidity Crisis worsened, LES officers Connor, Saylors, Selby, Ramos and Allen (the "LES Officer Defendants") failed to timely inform themselves about the LES Liquidity Crisis and failed to consider any timely action to address same.  Further, the LES Officer Defendants failed to take any action to prevent and/or mitigate the effect of the LES Liquidity Crisis on LFG and LES by, for example, causing to be implemented on a timely basis one or more of the measures set forth in paragraph 65.

186.    Alternatively, LES Treasurer Ramos failed to inform the LES Board of Directors of crucial facts regarding the LES Liquidity Crisis.

187.    The LES Officer Defendants breached their fiduciary duties by failing to exercise their duties in good faith, in the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would have used under similar circumstances.

188.    The LES Officer Defendants also breached their fiduciary duty to exercise adequate oversight and control over LES's employees, including with respect to disclosures to customers regarding the LES Liquidity Crisis.

189.    As a direct and proximate result of the LES Officer Defendants' breach of their fiduciary obligations to LES and LFG, LFG, as LES's sole shareholder, sustained significant damages including, *inter alia*, the destruction of hundreds of millions of dollars of LFG enterprise value; the $65 Million Transfer; the decrease in value of LFG's Underwriting Companies due to the ARS Swaps; the cost of defending litigation brought by Exchangers; the cost of responding to multiple government investigations arising out of the LES Liquidity Crisis; and the substantial diminution of the value of other LFG subsidiaries.

## COUNT III
### (LFG Directors' Breach of Fiduciary Duty/Duty of Care)

190.    The LFG Trustee incorporates by reference and realleges each and every allegation contained above in paragraphs 1 through 176, as though fully set forth herein.

191.    The LFG Board of Directors owed LFG fiduciary obligations.  By reason of their fiduciary relationships, the LFG Board of Directors owed LFG the highest obligations of care, good faith, oversight, reasonable inquiry, supervision and informed decision making.

192.    After the ARS Freeze, as the LES Liquidity Crisis worsened, the members of the LFG Board of Directors failed to timely inform themselves about the LES Liquidity Crisis and failed to consider any timely action to address same.  Further, the LFG Board of Directors failed to take any action to prevent and/or mitigate the effect of the LES Liquidity Crisis on LFG by,

for example, causing to be implemented on a timely basis one or more of the measures set forth in paragraph 65.  As such, they breached their duties as members of the LFG Board of Directors.

193.    Additionally, the LFG Board of Directors failed to exercise adequate oversight and control over LFG's officers with respect to the LES Liquidity Crisis, as evidenced by LFG officers and/or LFG employees having taken little, if any, action with respect to the LES Liquidity Crisis.

194.    Further, notwithstanding its knowledge of the transfers making up the $65 Million Transfer, the LFG Board of Directors failed to follow or enforce its own Authority Guidelines and breached its fiduciary duties.  Nor did the LFG Board of Directors instruct that Chandler and Evans deliberate and/or authorize the two transfers to LES of $10 million.

195.    The members of the Investment Funds Committee -- Defendants McCann, Alpert, Caruso, Dinkins, Foster, and Smith -- failed to timely or adequately inform themselves about the LES Liquidity Crisis, despite that Committee's duty to oversee the LES investment portfolio.

196.    The members of the Audit Committee -- defendants Snead, Caruso, McCann, Neal, Skunda and Norfleet -- failed to timely or adequately inform themselves about the LES Liquidity Crisis, despite that Committee's duty to oversee the Risk Committee and to review and assess the "Risk Dashboard."

197.    The members of the LFG Board of Directors failed to carry out in good faith their responsibilities with respect to the LES Liquidity Crisis and the $65 Million Transfer.

198.    The foregoing was not, and could not have been, an exercise of good faith business judgment.  The foregoing constituted a lack of good faith by the LFG Board of Directors and as a result the members of the LFG Board of Directors are liable to LFG and LFG's creditors.

53

199.    Alternatively, the LFG Board of Directors consciously and willfully disregarded their responsibilities to consider appropriately the risks posed by the LES Liquidity Crisis.

200.    As a direct and proximate result of the LFG directors' breach of their fiduciary obligations, LFG and LFG's creditors sustained significant damages including, *inter alia*, the destruction of hundreds of millions of dollars of LFG enterprise value; the $65 Million Transfer; the decrease in value of LFG's Underwriting Companies due to the ARS Swaps; the cost of defending litigation brought by Exchangers; and the cost of responding to multiple government investigations arising out of the LES Liquidity Crisis.

## COUNT IV
### (LFG Officers' Breach of Fiduciary Duty/Duty of Care)

201.    The LFG Trustee incorporates by reference and realleges each and every allegation contained above in paragraphs 1 through 176, as though fully set forth herein.

202.    LFG officers owed LFG fiduciary obligations.  By reason of their fiduciary relationships, LFG officers owed LFG the highest obligations of care, good faith, oversight, reasonable inquiry, supervision and informed decision making.

203.    After the ARS Freeze, as the LES Liquidity Crisis worsened, LFG officers Chandler, Evans, Gluck, Saylors, Vlahcevic, Connor, and Ramos (the "LFG Officer Defendants") failed to timely inform themselves about the LES Liquidity Crisis and failed to consider any timely action to address same.  Further, the LFG Officer Defendants failed to take any action to prevent and/or mitigate the effect of the LES Liquidity Crisis on LFG by, for example, causing to be implemented on a timely basis one or more of the measures set forth in paragraph 65.  As such, they breached their duties as officers of LFG.

204.    Alternatively, the LFG Officer Defendants failed to inform the LFG Board of Directors of crucial facts regarding the LES Liquidity Crisis.

54

205.    Additionally, certain LFG officers failed to follow the Authority Guidelines and breached their fiduciary duties.  The LFG officers who did not cause the $65 Million transfer to occur were aware, or should have been, that the transfers making up the $65 Million Transfer violated the Authority Guidelines and did not attempt to stop such transfers.

206.    At all times relevant, defendant officers Chandler, Evans, Gluck, Vlahcevic, and Saylors served on the Risk Committee.  The foregoing failed to timely or adequately inform themselves about the LES Liquidity Crisis, despite that Committee's duty to monitor risks with enterprise-wide implications, and the responses thereto.

207.    The LFG Officer Defendants failed to carry out in good faith their responsibilities with respect to the LES Liquidity Crisis and the $65 Million Transfer.

208.    The foregoing was not, and could not have been, an exercise of good faith business judgment.  The foregoing constituted a lack of good faith by LFG officers and as a result LFG officers are liable to LFG and LFG's creditors.

209.    Alternatively, the LFG Officer Defendants consciously and willfully disregarded their responsibilities to consider appropriately the risks posed by the LES Liquidity Crisis.

210.    As a direct and proximate result of the LFG Officer Defendants' breach of their fiduciary obligations, LFG and LFG's creditors sustained significant damages including, *inter alia*, the destruction of hundreds of millions of dollars of LFG enterprise value; the $65 Million Transfer; the decrease in value of LFG's Underwriting Companies due to the ARS Swaps; the cost of defending litigation brought by Exchangers; and the cost of responding to multiple government investigations arising out of the LES Liquidity Crisis.

## COUNT V
### (<u>LFG Officers' Waste by G. William Evans and Ronald B. Ramos</u>)

211.   The LFG Trustee incorporates by reference and realleges each and every allegation contained above in paragraphs 1 through 176, as though fully set forth herein.

212.   As a result of failing to comply with the Authority Guidelines, LFG officers G. William Evans and Ronald B. Ramos wasted valuable corporate assets by using LFG's capital to fund the $65 Million Transfer to LES.

213.   In light of LES's dire capital position at the time, the $65 Million Transfer could have had no other purpose but delaying the inevitable downfall of LES as a result of the ARS Freeze and LES's failure to address the LES Liquidity Crisis.

214.   LFG officers Evans and Ramos caused the $65 Million Transfer to occur in violation of the Authority Guidelines.

215.   Additionally, LFG officers Evans and Ramos were aware, or should have been, that the transfers making up the $65 Million Transfer violated the Authority Guidelines.

216.   As a result of the waste of corporate assets, LFG officers Evans and Ramos are liable to LFG for significant damages including, *inter alia*, the $65 Million Transfer.

## COUNT VI
### (<u>Equitable Subordination of the Defendants' Claims</u>)

217.   The LFG Trustee incorporates by reference and realleges each and every allegation contained above in paragraphs 1 through 176 as though fully set forth herein.

218.   As set forth above, the Defendants engaged in a pattern of misconduct at the expense of LFG and its estate and stakeholders, including creditors.

219.   The misconduct of the Defendants described herein was inequitable and resulted in injury to LFG's stakeholders, including creditors.

220.     Under the principles of equitable subordination, each of the Defendants' Claims is subject to subordination pursuant to section 510(c) of the Bankruptcy Code.

221.     Equitable subordination of the Defendants' Claims is consistent with the provisions and purposes of the Bankruptcy Code.

222.     Accordingly, all of the Defendants' Claims are subject to equitable subordination.

### COUNT VII
### (<u>Avoidance of Fraudulent Obligations Against Change of Control Defendants</u>)

223.     The LFG Trustee incorporates by reference and realleges each and every allegation contained above in paragraphs 1 through 176 as though fully set forth herein.

224.     By execution of the Change of Control Agreements, LFG incurred an obligation of one or more of the Debtors to or for the benefit of the Change of Control Defendants (the "Obligations").

225.     LFG incurred the Obligations within two years of the Petition Date.

226.     LFG received less than a reasonably equivalent value in exchange for the Obligations.

227.     The Obligations were incurred at a time when LFG was insolvent and/or LFG was rendered insolvent thereby.

228.     The Obligations are avoidable pursuant to 11 U.S.C. § 548(a)(1)(B).

### RESERVATION OF RIGHTS

229.     The LFG Trustee hereby specifically reserves the right to bring any and all other causes of action and/or objections that he may maintain against Defendants including, without limitation, causes of action arising out of the same transaction(s) set forth herein, to the extent discovery in this action or further investigation by the LFG Trustee reveals such further causes of action.

WHEREFORE, the LFG Trustee respectfully prays for:

(a)    On COUNT I, for a judgment that the members of the LES Board of Directors are jointly and severally liable in an amount to be determined at trial but believed to be not less than $300 million;

(b)    On COUNT II, for a judgment that the LES Officer Defendants are jointly and severally liable in an amount to be determined at trial but believed to be not less than $300 million;

(c)    On COUNT III, for a judgment that the members of the LFG Board of Directors are jointly and severally liable in an amount to be determined at trial but believed to be not less than $300 million;

(d)    On COUNT IV, for a judgment that the LFG Officer Defendants are jointly and severally liable in an amount to be determined at trial but believed to be not less than $300 million;

(e)    On COUNT V, for a judgment against LFG officers Evans and Ramos in an amount to be determined at trial but believed to be not less than $65 million;

(f)    On COUNT VI, for equitable subordination of the Defendants' Claims;

(g)    On COUNT VII, for avoidance of the Transfers;

(h)    Interest on the judgment, and the costs, attorneys' fees, and disbursements of this action;

(i)    Relief under Section 502(b)(7) of the Bankruptcy Code consistent with that sought in the Debtors' Twentieth Omnibus Objection to the Allowance of Certain Claims; and

(j)    Such other relief as the Court may deem just and proper.

Dated:  June 24, 2011
      Richmond, Virginia

/s/Christopher L. Perkins_____
Everette G. (Buddy) Allen, Jr. (VSB No. 05179)
Robert Wm. Best (VSB No. 72077)
Christopher L. Perkins (VSB No. 73419)
LeClairRyan, A Professional Corporation
Federal Reserve Bank Building, 16th Floor
701 East Byrd Street
Richmond, VA 23219
Telephone:  (804) 545-1508
Facsimile:  (804) 545-1501

-and-

Jeffrey S. Sabin (*admitted pro hac vice*)
Mark M. Elliott (*admitted pro hac vice*)
Jared R. Clark (*admitted pro hac vice*)
BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, New York 10022-4689
Telephone:  (212) 705-7000
Facsimile:  (212) 752-5378

*Attorneys for Plaintiff Bruce H. Matson, as Trustee of the LFG Liquidation Trust*