UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

IN RE:    LANDAMERICA FINANCIAL           Case No. 08-35994
          GROUP, INC., et al,              Chapter 7
                                           Jointly Administered
                Debtors.

## MEMORANDUM OPINION

This comes upon the Motion of Gerald A McHale, Jr., as Liquidation Trustee of the LandAmerica 1031 Exchange Services, Inc., Liquidation Trust (the "LES Trustee"), to Approve a Protocol for Determining Allowance or Disallowance of LES Damages Claims and Granting Related Relief (the "Claims Resolution Protocol Motion")  [Docket No. 5419].  Multiple objections were filed.[1]  Bruce H. Matson, Trustee for the LandAmerica Financial Group, Inc., Liquidation Trust, filed a response [Docket No. 5442].  On July 9, 2013, the Liquidation Trustee filed an Omnibus Reply in Further Support of the Claims Resolution Protocol Motion [Docket No. 5445].  A hearing on the Claims Resolution Protocol Motion was held on July 11, 2013.

---

[1] Objections were filed by Stockard Realty Partnership, Ltd. [Docket No. 5424]; Iron Crown LLLP [Docket No. 5425]; Grunstead Family Limited Partnerships [Docket No. 5428]; DCRE Investment, LLC [Docket No. 5429]; Sharon Billedeau, Charles J. Bocklet Jr., Grace E. Bocklet, Priscilla D Brown, J. Sean Campbell, Alonzo Cantu, Central Rockaway D, LLC, Central Rockaway I, LLC, Central Rockaway Realty LLC, James G. Clarke, Leon A. D'Aquin Jr., Deblu Realty Corporation, Dico Group, LLC, Doerle Properties, LLC, Robert P. Dreyer, Jill Forbes, Frontier Pepper's Ferry, LLC, Gabriella P. Germinaro, Joseph J. Germinaro, Grayling Green, LLC, Guerra Brothers, Michael C. Higgins, Tony Horner, Hoshiko Farms, Inc., Joseph E. Lew and J. J. Lew, Trustees of "The Lew Family Trust, dated October 26, 2007," Barton Kilgore, Julie Kilgore, Korea Plaza, LLC, Leapin Eagle, LLC, Lincolnway Green, LLC, MM & PM, LLC, Millmar Holdings, LLC, Northwood Boat Works Realty, L.L.C., James Phillips, Sandra R. Phillips, Polygon Enterprises, Inc., Scandal Fashion, Inc., E. Michael Spriggs II, Squick, L.L.C., T & J Investments of Roanoke, Inc., Texana Pickle Producers, LLC, Texas AC360 LP, Titan Real Estate Holdings, LLC. [Docket No. 5430]; Kyoungae Kim [Docket No. 5431]; 135th St. Realty Corporation, Alfredo Barraza, C & M Warehouse, Inc. and Car-Mil Realty, LLC, Charles E. Clough, Judith T. Clough, William Childs Detering, Early Lodging, LLC, Greenwich Village Renovation Co., LLC, Maria S. Limon, Pillar Investment Group, L.L.C., Gerald Puff, River Bend Real Estate, Inc., Serena Hospitality Group, Inc., Stoutenburg Enterprises, LLC, The Mazzoncini Family Trust, dated 1/23/1995, The Rose Family Trust, dated 7/10/1991 [Docket No. 5434]; CLA Real Estate Investments, LLC, Kendall Square, LLC, and PC Real Estate Investors, LLC, [Docket No. 5435]; Gregory D. Schultz [Docket No. 5436]; ROHO Investments, Ltd. [Docket No. 5437]; Alfonso Jones [Docket No. 5438]; Patrick K. Burke and Glenda N. Burke [Docket No. 5439]; Wayne R. Kidd and Kimberly R. Kidd [Docket No. 5440]; and NMC Summit, LLC, Tower Summit Colorado, LLC, Westminster Peak, L.P., and Westminster Summit, L.P. [Docket No. 5441] (collectively, the "Objecting Parties").  The Iron Crown LLLP Objection [Docket No. 5425] was resolved prior to the July 11 hearing.

This memorandum opinion sets forth the Court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").[2] The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 16, 1984. While the order issued in connection with this memorandum opinion is interlocutory in nature, this is nevertheless a core proceeding, *id.* § 157(b)(2)(A), (B), and (O), in which final orders or judgments may be entered by a bankruptcy court, *id.* § 157(b)(1). Venue is appropriate in this Court. *Id.* § 1409(a).

LandAmerica 1031 Exchange Services, Inc. ("LES") was a qualified intermediary for like-kind exchanges consummated by taxpayers pursuant to § 1031 of the Internal Revenue Code, 26 U.S.C. § 1031, ("1031 Exchange Transaction"). A 1031 Exchange Transaction allows a taxpayer to defer the payment of tax that otherwise would be due upon the realization of a gain on the disposition of business or investment property. *Id.* LES was a wholly owned subsidiary of LandAmerica Financial Group, Inc. ("LFG"). On November 26, 2008 (the "Petition Date"), LFG and LES (collectively, the "Initial Debtors") filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Court").[3]

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

[3] On March 6, 2009, March 27, 2009, March 31, 2009, July 17, 2009, October 12, 2009, and November 4, 2009, various LFG affiliates (LandAmerica Assessment Corporation, LandAmerica Title Company, Southland Title Corporation, Southland Title of Orange County, Southland Title of San Diego, LandAmerica Credit Services, Inc., Capital Title Group, Inc., and LandAmerica OneStop, Inc., (collectively, "LFG Affiliates")) also commenced voluntary Chapter 11 cases in this Court. Pursuant to Orders of this Court dated November 28, 2008, March 11, 2009, April 8, 2009, April 9, 2009, July 22, 2009, October 26, 2009, and November 13, 2009, the Chapter 11 cases of LFG, LES, and the LFG Affiliates (collectively, the "Debtors") are being jointly administered under case number 08-35994.

Subsequent to the Petition Date, over 85 adversary proceedings were filed by Exchange Customers of LES seeking the return of Exchange Funds on the grounds that the Exchange Funds were not property of LES' bankruptcy estate.[4] On January 16, 2009, the Court entered an Order approving a framework for managing these adversary proceedings, which Order stayed the litigation in all but five of the adversary proceedings. Five test cases were allowed to proceed on the basis that they presented legal and factual issues that were common to all of the other adversary proceedings. Three of the select test cases were representative of customers who had commingled account agreements and two of the select test cases were representative of customers who had segregated account agreements. The five test cases were ultimately resolved through mediation; and the mediated settlement agreement ultimately served as the framework for the formulation of a consensual Chapter 11 plan. On November 23, 2009, the Court entered an Order confirming the Joint Chapter 11 Plan of the Initial Debtors, as well as certain LFG Affiliates (the "Plan"). The Plan became effective on December 7, 2009.

Prior to confirmation of the Plan, the Exchange Customers of LES were required to file proofs of claim asserting their claims for damages against LES.[5] Thereafter, the Debtors filed a series of omnibus claims objections to the proofs of claim that the LES Claimants filed with the Court [Docket Nos. 2272, 2289, 2291, 2293, 2295, 2299, 4345]. Subsequent Orders of the Court

---

[4] "Exchange Customer" is defined in the Joint Chapter 11 Plan of the Initial Debtors (the "Plan") to mean "a Person that entered into an Exchange Agreement with LES." Plan § 1.64. The Plan also defines "Exchange Agreement" to mean an "agreement[ ] entered into by and between LES and Persons whereby LES, as a qualified intermediary, acquired the net cash and/or other consideration from the sales of the Persons' relinquished properties." Plan §§ 1.63. "Exchange Funds" is defined in the Plan as "the net consideration from the sale of relinquished property acquired by LES pursuant to an Exchange Agreement." Plan § 1.65

[5] By order entered February 27, 2009 (the "Bar Date Order"), the Court established April 6, 2009, at 4:00 p.m. prevailing Eastern Time as the deadline by which all persons and entities with claims against LFG and LES were required to file proofs of claims against the Initial Debtors (the "General Bar Date"). In accordance with the Bar Date Order, written notice of the General Bar Date was mailed to all known claimants of LES including the Objecting Parties.

3

allowed the principal portion of the LES claims that were filed, but reclassified the consequential damage portion of these claims as disputed [Docket Nos. 2911, 2912, 2914, 2922, 2921, 2928, 3092, 4389]. The Plan, in turn, classified the disputed consequential damage portion of the LES claims as Class 7 "LES Damages Claims."[6] Not only did the Plan subordinate payment of the LES Damages Claims to the payment of the Principal Claims, but the Plan further provided that no LES Damages Claims would be allowed absent entry of a final Order by this Court. Plan § 11.1. As such, until there is a Court Order providing for the allowance of the LES Damages Claims, these claims remain in dispute and do not have prima facie validity.[7]

Article XI of the Plan governs the treatment of LES Damages Claims. Pursuant to Section 11.1 of the Plan, no LES Damages Claims may be allowed until after the Principal Satisfaction Date[8] and, in such event, only pursuant to the procedures set forth in Article XI of the Plan.[9] In or about November of 2012, the LES Trustee determined that it was probable that all Principal Claims, which collectively compose Classes 3, 4, 5 and 6 under the Plan, had been, or shortly would be, paid in full.

---

[6] The Plan defines the "LES Damages Claims" as "claims held by an Exchange Customer, in its capacity as such, that is not a 'Principal Claim[ ].'" Plan § 1.90. "Principal Claims" are defined as claims for the loss of funds delivered to LES in connection with a failed 1031 Exchange transaction. Plan § 1.175.

[7] Section 11.1 of the Plan provides that: "no LES Damages Claim[ ] shall be Allowed until . . . such time as it is Allowed by Final Order of the Bankruptcy Court . . . ."

[8] The Principal Satisfaction Date is defined in Section 1.176 of the Plan to mean the date when all Allowed Segregated Exchange Principal Claims (LES Class 4), all Allowed Note Exchange Collectible Claims (LES Class 5), and all Allowed LES General Unsecured Claims (LES Class 6) are satisfied in full.

[9] The procedures set forth in Article XI require that

> [a]s soon as practicable after the Principal Satisfaction Date, or at such earlier time as may be mutually agreed upon by the LES Trustee and the LFG Trustee, the LES Trustee shall seek Bankruptcy Court approval of a protocol for determining whether the LES Damages Claims that are the subject of Damages Claim Forms shall be Allowed or Disallowed.

Plan § 11.2(f).

4

On November 1, 2012, the LES Trustee filed a Status Report (the "Status Report") with the Court [Docket No. 5196], which was served on all creditors of LES, including the Objecting Parties. It reported, inter alia, that all Principal Claims of LES Class 3, 4, and 5 Exchange Customers had been paid in full, and that the LES Trustee anticipated that all Principal Claims of LES Class 6 Exchange Customers would be paid in full shortly thereafter and that funds would likely exist to make a distribution on account of the Class 7 LES Damages Claims. The Status Report outlined a proposal for the administration of the LES Damages Claims.

The LES Trustee filed a Motion for Order Approving Form of Questionnaire to Accompany Damages Claim Form and Granting Related Relief (the "Questionnaire Motion") [Docket No. 5195]. The Questionnaire Motion sought approval of (1) an amended Damages Claim Form and (2) a Questionnaire. The LES Trustee wanted to establish clear rules and procedures regarding the submission of LES Damages Claims in order to avoid protracted disputes between the LES Trustee, on the one hand, and Claimants, on the other hand, regarding the quantification and documentation of LES Damages Claims. The LES Trustee also believed that the amended Damages Claim Form and the Questionnaire would allow him to gain an understanding of the different categories, bases, merits, and amounts of LES Damages Claims. The Questionnaire Motion was intended to enable the LES Trustee to formulate an effective and fair protocol for distributing the remaining funds by establishing an efficient procedure for objecting to particular components of the claims.

On November 21, 2012, the Court entered its Order Granting the Questionnaire Motion and Approving the Form of Questionnaire to Accompany Damages Claim Form and Granting Related Relief [Docket No. 5246]. The Questionnaire and Damages Claim Form approved by the Court required each Claimant to

5

    (1)  provide a detailed summary of the asserted LES Damages Claim;
    (2)  assign a dollar amount to each component of the alleged LES Damages Claim;
    (3)  explain clearly and fully the manner in which their alleged LES Damages Claim was calculated;
    (4)  supply documents and records in support of the asserted LES Damages Claim; and
    (5)  file all LES Damages Claims on or before the Damages Claims Form deadline.

The Questionnaire and Damages Claim Form clearly stated that failure to comply with any of the foregoing would result in disallowance of the claim. The Questionnaire identified various categories of damages for the holder of an LES Damages Claim to assert. These categories included (1) Professional Fees; (2) Lost or Forfeited Deposits; (3) Deprivation of Tax Benefits; (4) Punitive Damages; (5) Interest; (6) Lost Opportunities and Other Speculative Damages; (7) Exchange Fees Paid to LES; and (8) Other Miscellaneous Damages.

      Pursuant to Section 11.2(b) of the Plan, the LES Trustee established January 31, 2013, at 5:00 p.m., prevailing Eastern Time, (the "Damages Claim Form Deadline") as the deadline to submit Damages Claim Forms and Questionnaires. Notice of the Damages Claim Form Deadline was filed with the Court and mailed to all holders of asserted LES Damages Claims, including the Objecting Parties, [Docket Nos. 5252, 5253, 5256, 5257]. Publication notice was also provided [Docket Nos. 5254, 5261]. Each holder of an alleged LES Damages Claim, including each of the Objecting Parties, received a Damages Claim Form and Questionnaire.

      On January 23, 2013, the LES Trustee filed a Notice of Principal Satisfaction Date, which was mailed to all Claimants who had filed LES Damages Claims [Docket No. 5284]. All claims for lost principal (i.e., Classes 3, 4, 5, and 6 under the Plan) have now been paid in full.

6

Approximately $15 million remains in the liquidation trust available for distribution to holders of the LES Damages Claims in Class 7 under the Plan.

Approximately 165 LES Damages Claimants submitted timely Damages Claim Forms and Questionnaires.  Pursuant to Section 11.2(c) of the Plan, any other Disputed LES Damages Claims have been disallowed and expunged in their entirely for failure to submit timely Damages Claim Forms and Questionnaires.

As the LES Trustee reviewed the 165 Damages Claim Forms he had received, he began to realize that an analysis of each individual claim would be time-consuming and costly, due to the large number of claims submitted, the variety of damages asserted, the voluminous documentation attached, and the complex nature of the elements raised.  Section 11.2 (f) of the Plan requires the LES Trustee to seek Bankruptcy Court approval of a protocol for determining whether the damages asserted in Damages Claim Forms should be allowed or disallowed.  Accordingly, the LES Trustee, with the endorsement of the Liquidation Trust Oversight Committee, has proposed such a Protocol in his Claims Resolution Protocol Motion.

This Court has core jurisdiction to interpret the Confirmation Order and enforce the terms of the confirmed plan.  *In re Lyondell Chem. Co.*, 445 B.R. 277, 287 (Bankr. S.D.N.Y. 2011) ("[A] bankruptcy court retains core jurisdiction to interpret and enforce its own prior orders, including and especially confirmation orders."); *see also Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) ("[T]he Bankruptcy Court plainly ha[s] jurisdiction to interpret and enforce its own prior orders."); *In re Jones*, No. 09-14499-BFK, 2011 Bankr. LEXIS 4083, at *1 (Bankr. E.D. Va. Oct. 21, 2011) ("Bankruptcy Courts plainly have jurisdiction to interpret and enforce their own prior orders.").  The Plan clearly authorizes the use of a Protocol such as that proposed

7

by the LES Trustee for resolving the allowance or disallowance of the LES Damages Claims, all subject to the final approval of the Court.

The Court rejects the objections filed by a number of the Objecting Parties that the Plan cannot provide for a protocol for resolving the LES Damages Claims because such a protocol would violate Section 502 of the Bankruptcy Code and Bankruptcy Rule 3007. The time to object to the use of a protocol was at confirmation. "[I]f a creditor fails to timely object to a plan or appeal a confirmation order, 'it cannot later complain about a certain provision contained in a confirmed plan . . . .'" *Enewally v. Wash. Mut. Bank* (*In re Enewally*), 368 F.3d 1165, 1172 (9th Cir. 2004) (quoting *Great Lakes Higher Educ. Corp. v. Pardee* (*In re Pardee*), 193 F.3d 1083, 1086 (9th Cir. 1999)). The Plan has been confirmed and the Confirmation Order has become a final, non-appealable order. As such, the Plan is now a binding agreement between the Debtors and all creditors, including the LES Damages Claimants. The LES Damages Claimants are bound by the terms of the Plan. 11 U.S.C. § 1141(a) ("[T]he provisions of a confirmed plan bind . . . any creditor . . . ."). The LES Damages Claimants cannot now re-litigate issues that should have been raised at the time of confirmation. *First Union Commercial Corp. v. Nelson, Mullins, Riley & Scarborough* (*In re Varat Enters.*), 81 F.3d 1310, 1315 (4th Cir. 1996) ("A bankruptcy court's order of confirmation is treated as a final judgment with *res judicata* effect. . . . Consequently, parties may be precluded from raising claims or issues that they could have or should have raised before confirmation of a bankruptcy plan, but failed to do so."). The use of a protocol for resolving the allowance or disallowance of the LES Damages Claims is in accordance with the Plan.

The protocol presents a very practical solution to the complex problem now confronting the LES Trustee. The Protocol will treat the LES Damages Claims as equitably as possible.

There is a limited fund of approximately $15 million to be allocated among the LES Damages Claims, far less than the total asserted amount of the LES Damages Claims. Any outsized or unwarranted distribution on account of any single claim component will adversely affect the balance of the LES Damages Claimants.

The Protocol does not adjudicate the actual amount of any of the LES Damages Claims. Rather, it establishes guidelines that the LES Trustee will employ in the claim objection process. After the Protocol is approved, the LES Trustee will file an omnibus claims objection, which will address specifically each of the 165 LES Damages Claims that have been submitted. The omnibus claims objection will be duly served on each of the LES Damages Claimants, including each of the Objecting Parties. The LES Damages Claimants will have an opportunity to respond to the LES Trustee's proposed treatment of their claims. A hearing on the LES Trustee's omnibus claims objection will be conducted on August 29, 2013, at which the specific allowed amount of each LES Damages Claim shall be fixed and determined in accordance with the Protocol and the Court's ruling.

The Protocol proposed by the LES Trustee is appropriate under the facts and circumstances of this case. It will effectuate a speedy resolution of the LES Damages Claims by employing a uniform procedure for determining the disallowance or allowance of the various components that comprise the LES Damages Claims. The Protocol will permit a prompt distribution of the finite pool of remaining funds without depletion caused by any continuing, needless administrative burdens. The Protocol accomplishes this by providing for the blanket allowance and disallowance of certain components of the submitted LES Damages Claims.

According to the Protocol, properly asserted LES Damages Claims for lost deposits, lost exchange fees, and certain miscellaneous damages will automatically be allowed in the amounts

claimed. Lost exchange fees include fees paid to LES in connection with (proposed) transactions wherein LES defaulted in its obligations. The Protocol also allows for the recovery of miscellaneous damages related to failed 1031 Exchange Transactions, such as out-of-pocket expenses incurred in arranging necessary financing.

The Protocol provides for the allowance of the claimed amounts of other damage components as well, but with certain qualifications. Notwithstanding the American Rule under which each party is expected to bear its own cost of litigation,[10] professional fees (i.e., payments made to attorneys, accountants, and other professional persons) will be allowed, except to the extent that they exceed 100 percent of the claimant's Principal Claim, or are for or relate to professional services incurred in pursuing a Test Case or pursuing litigation against non-debtor third-parties. The limitations imposed on this component of recovery are intended to prevent the payment of unreasonable fees and to prevent duplicative reimbursements.

The Court agrees with the LES Trustee that the allowance of attorneys' fees in excess of 100 percent of the claimant's Principal Claim is unreasonable and, therefore, is properly subject to disallowance.[11] The Court finds that allowance of professional fees incurred pursuing claims relating to the Test Cases would also be unreasonable as fees associated with the Test Cases have already been paid. Allowing this component of these claims could result in a double recovery. The Court finds that allowance of professional fees for litigation against non-debtor third-parties, including, without limitation, class-action litigation would also be unreasonable. Ignoring the American Rule, these fees would only be properly recoverable from the third-party defendants.

---

[10] Generally, the prevailing litigant is not entitled to collect reasonable attorney's fees from the loser. *See Cherry v. Arendall (In re Cherry),* 247 B.R. 176, 186 (Bankr. E.D. Va. 2000).

[11] *See In re Evans*, 289 B.R. 813, 827 (Bankr. E.D. Va. 2002) (awarding a reduced amount of attorneys' fees based on reasonableness).

For these reasons, the Court approves the proposed treatment of professional fees included in the Protocol.[12]

Another damage component that will be allowed subject to qualification is that for deprivation of tax benefits. These are damages related to the unexpected imposition of income taxes due to the failed 1031 Exchange Transactions. The LES Trustee acknowledges the unliquidated and contingent nature of this damage component. As such, the Protocol provides that these claims will be estimated pursuant to Section 502(c) of the Bankruptcy Code.[13]

Under Section 1031 of the Tax Code, a taxpayer can generally defer the recognition of gain on the disposition of the relinquished property by exchanging it for replacement property which is of like kind. The value of this deferral is generally the difference between the amount of tax that would be due on the gain realized on the date of disposition of the relinquished property and the present value of the tax on that amount of gain when realized in a taxable disposition of the replacement property at some time in the future. The value of the tax deferral may vary widely depending upon the facts and circumstances of each individual instance.[14] It would be impossible to determine, on an ex ante basis, the amount of damages these Exchange Customers incurred due to deprivation of tax benefits.

---

[12] Some objectors have requested inclusion of attorneys' fees for responding to this Motion. By allowing the inclusion of attorneys' fees incurred in litigating the Claims Resolution Protocol Motion, particular litigious LES Damages Claimants may receive a disproportionately high recovery, thereby reducing the recovery of more placid LES Damages Claimants. The Court will defer to the LES Trustee's determination of which attorneys' fees to include.

[13] Section 10.4 of the Plan provides that "[t]he Trustees may request that the Bankruptcy Court estimate any Claim pursuant to Section 502(c) of the Bankruptcy Code for purposes of determining the Allowed amount of such Claim . . . ." *See also In re Nova Real Estate Inv. Trust*, 23 B.R. 62, 65 (Bankr. E.D. Va. 1982) (stating that the court should estimate claims pursuant to § 502(c) where actual liquidation of which would unduly delay the closing of the estate).

[14] Such factors might include the death of a taxpayer, a decrease in the value of the replacement property, the timing of the final distribution, and any future changes to the Tax Code.

11

The Protocol provides that these claims will be estimated in a uniform manner, using a set formula. The formula provides for these claims to be allowed in the amount realized (if any) on the sale of the relinquished property less the adjusted tax basis with respect to a failed Section 1031 Exchange Transaction, multiplied by 20 percent. No objections have been raised to the use of this formula to estimate these claims. Accordingly, the Court will approve the treatment of damage claims based on deprivation of tax benefits.

The Protocol also provides for the disallowance of certain claim components. These include punitive damages, interest, and lost opportunities and speculative damages.

Punitive damages are inappropriate under the circumstances of this case. Punitive damages are intended to punish wrongdoers and to deter future wrongdoing. Punitive damages would not punish LES for its wrongdoing, but instead would punish other trust beneficiaries as the money to pay the punitive damages would come out of other claimants' potential recoveries from the finite reserve the LES Trustee has remaining. *See, e.g.*, *In re Manchester Lakes Assocs.*, 117 B.R. 221, 225 (Bankr. E.D. Va. 1990) ("[T]he general unsecured creditors should not be penalized for such losses in view of the fact that tax penalties [among other punitive damage claims] are to punish late-paying debtors, not the creditors."). LES is no longer an operating company and, as such, there is no possibility of future wrongdoing by this entity that punitive damages could potentially deter. The Court notes that only a handful of the 165 Exchange Customers with Class 7 Claims have asserted punitive damages claims. Those few LES Damages Claimants that did assert punitive damages claims did so in very large amounts. Allowance of punitive damages would upset the distribution scheme and dilute recoveries for the vast majority of claimants who did not assert such claims. This would be inequitable given that all of the Exchange Customers suffered harm from the same conduct of LES.

Claims for post-petition interest will also be disallowed. Pre-petition interest has already been paid as a component of the distributions made to claimants in Classes 3 through 6. The Plan, by its terms, disallows the payment of post-petition interest. Section 9.2 of the Plan provides that

> [u]nless otherwise specifically provided for in the Confirmation Order or other order of the Bankruptcy Court, or required by applicable bankruptcy or non-bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the petition date.

No prior order of the Bankruptcy Court, including the Confirmation Order, entitles the LES Damages Claimants to post-petition interest. Further, there is no bankruptcy or non-bankruptcy law that requires the payment of post-petition interest to the LES Damages Claimants.[15]

Claims for lost opportunities and other speculative damages arising from failed 1031 Exchange Transactions will also be categorically disallowed. This component of the asserted LES Damages Claims seeks recovery for the loss of ability to realize future appreciation in value of a replacement property had the claimant been able to purchase the replacement property. Only twenty-three LES Damages Claims asserted damages for lost opportunities. While only twenty-three such claims were asserted, the total amount of these asserted claims exceeds $15 million. Not only would the allowance of these lost opportunities damages materially increase the recovery for a select few of the LES Damages Claimants at the expense of others, but also these claims are highly speculative and would be extremely expensive to adjudicate. The common justification for lost opportunities is the argument that the replacement property would

---

[15] Section 726(a)(5) of the Bankruptcy Code does provide for the payment of post-petition interest in Chapter 7 cases. However, Section 726(5) is inapplicable in Chapter 11 cases, such as this one. Section 507(b) also provides for the payment of post-petition interest. While Section 507(b) does apply in Chapter 11 cases, it only applies to oversecured lenders. As the LES Damages Claimants are unsecured creditors, Section 507(b) does not apply to potentially require the payment of post-petition interest.

13

have either increased in value or would have generated income. A determination of either would be a fact-intensive and subjective inquiry that would be time-consuming and expensive to resolve. Under the circumstances presented here, this damage component should be disallowed.

Two critical timing considerations lend support for the approval of the LES Trustee's Claims Resolution Protocol Motion. If approved as proposed, the Protocol will allow for the estimation of the LES Damages Claims by September 15, 2013. The extended deadline for filing 2012 federal income tax returns is September 15, 2013, for non-individuals and October 15, 2013, for individuals. Under the Protocol, the LES Trustee would be able to issue final grantor letters (the equivalent of K-1 forms when issued by a grantor trust) by September 15. With the issuance of the final revised grantor letters, any LES Damages Claimants who have extended the deadline to file their 2012 federal income tax returns will be able to include the correct allocation of Class 6 and Class 7 claims on their 2012 federal income tax returns. If the LES Trustee is unable to issue final revised grantor letters by September 15, 2013, these LES Damages Claimants would have to file an amended 2012 federal income tax return at a later date. Therefore, the deadline associated with the Protocol potentially could reduce administrative burden and expense to the LES Damages Claimants.

Further, at the July 11 hearing, the LES Trustee stated that his tax professionals were concerned about adverse tax consequences if the LES Damages Claims were not expeditiously resolved. If the LES Trustee is unable to distribute the remaining $15 million in the liquidation trust, the Internal Revenue Service may determine that the LES Trustee should be required to pay taxes on those funds. Applying the 35 percent tax rate, that would result in roughly $6 million of the remaining $15 million being unavailable to satisfy remaining LES Damages Claims. While

14

the Internal Revenue Service may very well not pursue this tack, if it were to do so, distributions on account of the allowed LES Damages Claims would be severely and negatively impacted.

For all these reasons, the Court finds that a protocol is well within the LES Trustee's sound business judgment and entirely consistent with the framework mandated by the Plan.

A separate Order shall issue.


Date:   July 15, 2013                                              /s/ Kevin R. Huennekens
                                                                                United States Bankruptcy Judge